**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| SPIRIT LAKE TRIBE, on its own behalf and on behalf of its members, DION JACKSON, KARA LONGIE, KIM TWINN, TERRY YELLOW FAT, LESLIE PELTIER, CLARK PELTIER,<br><br>                Plaintiffs,<br><br>        v.<br><br>ALVIN JAEGER, in his official capacity as Secretary of State,<br><br>          Defendant. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Civil No. _____ |

Plaintiffs, by and through their undersigned attorneys, allege on information and belief as follows:

**INTRODUCTION**

1. Plaintiffs bring this action to vindicate their right to vote under the First and Fourteenth Amendments to the United States Constitution. Plaintiffs seek injunctive and declaratory relief narrowly tailored to ensure that eligible Native American voters residing on reservations in North Dakota will be able to cast a ballot in the 2018 election on November 6 and future elections.

2. Native American voters have the same fundamental right to vote as every other North Dakotan. The Constitution guarantees that right. But the State's law requiring voters to present identification proving their current residential address imposes on them—and uniquely on them—a severe impediment to that right.

3.     The current implementation of North Dakota's proof of residential address requirement is unplanned, untested, and broken. The Defendant has assured this Court, the Eighth Circuit, and the Supreme Court that it could fairly administer this law. The facts on the ground, which are rapidly developing and worsening by the day, show otherwise. Voters whose state-issued or tribal IDs list what they know to be their current residential address have had their absentee ballots rejected as having "invalid" addresses. This problem threatens hundreds if not thousands more on Election Day. And Native Americans uniquely lack access to supplemental documentation to satisfy the State's requirement.

4.     Moreover, many Native Americans simply have no residential address because the government has not assigned them one. Others have been assigned an address, but it was never communicated to them. Rarely will one encounter a road sign in rural areas of reservations. Many such roads in North Dakota have been assigned multiple, conflicting names, and many homes have been assigned multiple, conflicting numbers. Some homes have been identified as occupying two cities, with different zip codes, depending upon the occupant to whom the government spoke in assigning an address.

5.     The State had six years to fix this—a problem of its own making.

6.     This law, as applied to Native Americans living on reservations in this State, is plainly unconstitutional and emergency relief is needed to prevent the potential for unchecked disenfranchisement on November 6.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

8.     This court also has jurisdiction pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

9.     This Court has personal jurisdiction over Defendant, who resides in this District, in his official capacity.

10.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b).

11.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## LEGAL BACKGROUND

12.     In February 2018, six individual Plaintiffs asked this Court to enjoin the requirement that a voter produce identification or a supplemental documentation with a current residential street address on the grounds that it is facially unconstitutional and unconstitutional as applied to those Plaintiffs. *See Brakebill v. Jaeger*, No. 1:16-cv-008-DLH, 2018 WL 1612190 at *1 (Apr. 3, 2018). On April 3, 2018, this Court granted the injunction and ordered that the Secretary of State accept otherwise valid forms of identification that listed either a current residential street address or a current mailing address. *Id*. at 7.

13.     On September 24, 2018 the Eighth Circuit stayed this Court's order requiring the state to accept otherwise valid forms of identification that list a P.O. Box or other current mailing address. *Brakebill*, No 18-1725, Slip. Op. at 11. The Eighth Circuit found that "even assuming that some communities lack residential street addresses, that fact does not justify a statewide injunction that prevents the Secretary from requiring a form of identification with a residential street address from the vast majority of residents who have residential street addresses." *Id*. at 7.

14. The Eighth Circuit explicitly acknowledged that "a court might have authority to enter a narrower injunction to relieve certain voters of an unjustified burden," and indicated that "if any resident of North Dakota lacks a current residential street address and is denied an opportunity to vote on that basis, the courthouse doors remain open." *Id.* at 11.

15. This lawsuit is precisely the type of challenge the Eighth Circuit suggested could provide relief.

## PARTIES

### *Spirit Lake Tribe*

16. Plaintiff SPIRIT LAKE TRIBE is a federally recognized Sioux Tribe with an enrollment population of 8,001 members. Of those members, approximately 3,776 live on the Spirit Lake Reservation, which covers approximately 405 square miles, primarily in Benson County and Eddy County. Parts of the Reservation extend into Nelson County, Wells County, and Ramsey County. Approximately 2,569 of the Reservation's residents are eighteen years old or older. Spirit Lake asserts claims on its own behalf and on behalf of its members as *parens patriae*.

17. The Spirit Lake Tribe has a strong and demonstrated interest in ensuring its members are able to exercise their right to vote on Election Day. If Spirit Lake Tribe members are unable to vote, the collective political power of the Spirit Lake Tribe is reduced. Spirit Lake Tribe advocates on behalf of all its members to local, state, and federal representatives. If some of its members are unable to vote, the Spirit Lake Tribe's overall ability to advocate effectively for crucial resources for the Spirit Lake Tribe and the Reservation will be diminished.

18. Many streets on the Spirit Lake Reservation do not have marked signs on them and many houses are not labeled with numbers. On parts of the Reservation, the residences do not have street addresses assigned. Many members who do have street addresses assigned by 911 do not

4

know their address and have not been notified of their address. On parts of the Reservation, mail service does not exist and members often rely upon P.O. boxes to receive mail.

19.     Spirit Lake Tribe has many members who live in poverty and do not consistently live in one house, although they remain within one district moving from home to home. The Spirit Lake Reservation has a family poverty rate of 41.3%.

20.     The Spirit Lake Tribe is expending substantial resources to ensure that as many of its enrolled members as possible have acceptable forms of identification for voting. Prior to the Eighth Circuit's stay in *Brakebill v. Jaeger*, Spirit Lake Tribe issued tribal IDs with residential addresses, P.O. Box mailing addresses, or no addresses at all. Since Monday October 22, it has extended its enrollment office hours from Monday through Friday 8am to 4:30pm to Monday through Friday 8am to 6:30pm in order to issue new tribal IDs to its members. Ordinarily, the enrollment office charges $11 for a tribal ID to cover its costs. It has waived these costs for its members for IDs issued before or on Election Day, November 6, 2018. The enrollment director not only issues tribal IDs but also assists members in determining their proper 911 street addresses.

21.     The Spirit Lake Tribe does not have the resources to issue tribal IDs for free indefinitely.

22.     The Spirit Lake Tribe has spent resources on public service announcements online, on social media, and on the radio to inform its members of the new residential street address requirement for voting.

23.     The State of North Dakota has not provided the Spirit Lake Tribe with any resources, financial or otherwise, to assist members in obtaining IDs with residential street addresses, which the State is now requiring for the Spirit Lake Tribe's members to vote.

24.     From October 22 to October 29, the enrollment office issued 328 new IDs to its tribal members. This is approximately 25 times the ordinary rate of tribal ID issuance. Long lines, particularly during lunch breaks, have formed nearly every day to obtain tribal IDs. In the past week, Spirit Lake Tribe has distributed tribal IDs to members who previously had tribal IDs with only P.O. Box addresses, members who had no IDs whatsoever, and members who did not have their *current* address on their tribal ID.

25.     Many of the members who have received tribal IDs in this past week did not know their residential street address and had always relied upon their P.O. Box. These members needed assistance to determine their residential street address.

26.     Last week, Spirit Lake Tribe identified 262 members whose tribal IDs did not have residential street addresses. Well over one hundred of those members have not yet been issued an updated tribal ID with a residential street address.

27.     Recently, Spirit Lake Tribe identified an error in the street address for approximately 15 of its members. The members thought their address was on Crow Hill Road in Fort Totten. After further investigation, the enrollment director has determined that the "correct" 911 address is Crow Hill Road in Oberon.

### *Dion Jackson and Kara Longie*

28.     Plaintiff Dion Jackson is a 34-year-old enrolled member of the Spirit Lake Tribe. He resides on the Spirit Lake Reservation and is a citizen of the United States. He lives with his girlfriend Plaintiff Kara Longie and their two children in Tokio, North Dakota. Mr. Jackson is the primary caregiver for his two children.

29.     Mr. Jackson has lived in in his current residence for the past two years. Since moving to this residence, Mr. Jackson has always understood his address to be 8225 34th St. NE,

Tokio, N.D. 58379. Ms. Longie, his girlfriend, whose mother previously lived in the home before she passed away, informed him of this address when he moved in.

30.     Mr. Jackson has a North Dakota non-driver's ID that was issued to him on March 28, 2017. The address listed on his North Dakota identification card is 8225 34th St. NE, Tokio, N.D. 58379. He is able to receive packages through UPS and FedEx by using this address. He relies on his P.O. Box for all other mail.

31.     Mr. Jackson has not previously voted but wishes to vote for the first time this year. He submitted an application for an absentee ballot on October 14, 2018. The absentee ballot application included his North Dakota non-driver's ID number and the 8225 34th St. NE address that is on his state ID.

32.     On October 22, 2018, he received a letter at his P.O. Box from the Benson County Auditor/Treasurer. The letter states that the Auditor received his absentee ballot application and that it was rejected because the address on the application "does not match the address in the ND DOT database or is an invalid address." The letter was accompanied by his original absentee ballot application.

33.     While 8225 34th St. NE, Tokio, N.D. 58379 appears on Mr. Jackson's state issued ID, it nevertheless is not an address that appears using the Secretary of State's "My Voting Information" online tool.[1]

34.     Upon entering Mr. Jackson's ID number and birthdate into the "My Voting Information" online tool, the tool indicates: "Record Not Found."

35.     There is no street sign on Mr. Jackson's street nor is there a number on his house.

---

[1] *My Voting Information*, N.D. SEC'Y OF STATE,
https://vip.sos.nd.gov/WhereToVote.aspx?tab=AddressandVotingTimes (last visited Oct. 30, 2018).

36.     On the North Dakota GIS Hub Explorer, an official tool previously cited by Defendant Jaeger as an authoritative source for 911 addresses, Mr. Jackson's street is marked as "Unknown2."



37.     Google Maps shows 8225 34th St. NE as an address nearby Mr. Jackson's home. In the figure below, the blue dot represents Mr. Jackson's home. The red flag indicates where Google Maps places his known address. The street with the red flag is labeled 82nd Ave. Mr. Jackson's street has no road sign.

 

38.     Mr. Jackson's right to vote an absentee ballot has been denied on the basis of a supposedly "invalid" address despite his use of an address that is on his North Dakota state-issued ID, is the only address the residents of that home have ever known, and is used by FedEx and UPS to deliver packages.

39.     Plaintiff Kara Longie is a 35-year-old enrolled member of the Spirit Lake Tribe. She is a resident of the Spirit Lake Reservation and a citizen of the United States. She lives with her boyfriend Plaintiff Dion Jackson and their two children. She works as a slot tech at the Spirit Lake Casino.

40.     Ms. Longie's mother lived at the residence before she passed away. Ms. Longie has used this residence as her permanent residential address dating back to at least 2012 and has lived there permanently and continuously since 2013 after her mother passed away.

41.     The only address Ms. Longie has ever known for her home is 8225 34th St. NE, Tokio, N.D. 58379. She believes that she located that address in the telephone book in or around 2012.

42.     Ms. Longie has a North Dakota non-driver's identification that lists 8225 34th St. NE, Tokio, N.D. 58379 as her address. It was issued on May 3, 2012.

43.     Ms. Longie's First Community Credit Union uses this address as well.

44.     Ms. Longie recently had Dish Network satellite service set up her at residence at this address. UPS delivered the satellite to her home using this address.

45.     However, as discussed above, this address does not appear when using the "My Voting Information" online tool.

46.     Upon entering Ms. Longie's ID number and birthdate into the "My Voting Information" online tool, the tool indicates that her address is 8225 34th St NE, Warwick, ND 58381:



47.     When the Warwick address is searched for on the North Dakota GIS Hub Explorer, it identifies an address not particularly close to Ms. Longie's actual residence (the red dot in the figure below):



48.    The Warwick address does not appear in Google Maps:



49.    Ms. Longie wishes to vote on November 6, 2018.

50.    Ms. Longie is aware that Plaintiff Jackson's absentee ballot application was rejected because their shared address was considered "invalid."

51.     Ms. Longie fears that she will not be permitted to vote on Election Day because the state considers "invalid" the address that is on her North Dakota state-issued ID, is the only address the residents of that home have ever known, and is used by FedEx and UPS to deliver packages.

### *Leslie and Clark Peltier*

52.     Plaintiffs Leslie Peltier and Clark Peltier ("Peltiers") are married and reside together. They are both enrolled members of the Turtle Mountain Band of Chippewa Indians and citizens of the United States. They live on reservation Trust Land north of the Reservation boundary.

53.     Plaintiff Leslie Peltier is a member of the faculty at Turtle Mountain Community College.

54.     Plaintiff Clark Peltier is the foreman of the maintenance department at the Turtle Mountain Housing Authority.

55.     The Peltiers have lived in their current residence for the past twelve years. Their home is rural and is located about 11 miles northwest of Belcourt, North Dakota. The roads around their home are primarily gravel roads. There is not a street sign on the road where they live, nor are there are street signs nearby.

56.     On or about the 2012 election, the Peltiers went to vote at their polling place in Belcourt, North Dakota. A representative from Rolette County was present at the polling location and asked them to describe where they lived. Based upon the information the Peltiers described, the representative wrote down their assigned address: 10296 40th Ave. NE. The representative did not write down a city or zip code.

57.     The Peltiers have always understood themselves to live in the city of Belcourt with a zip code of 58316. The representative at the polling place did not inform them otherwise.

58.     In 2013, after receiving their 911 address, the Peltiers obtained new North Dakota driver licenses. Those driver licenses list the following address: 10296 40th Ave NE, Belcourt, ND 58316.

59.     At a subsequent election, the Peltiers again presented themselves at their polling place in Belcourt. However, this time, the poll worker informed them that, based on their address, they should vote in St. John. St. John is not located on the Reservation. As a result of this change, on Election Day, they now have to travel to St. John to vote in state and local races and to Belcourt to vote in tribal elections.

60.     When the information from the Peltiers' driver license address is entered into the Secretary of State's "My Voting Information" online tool, it does not identify 10296 40th Ave. NE, Belcourt, ND 58316. The only address it can find with the house number 10296 in the zip code 58316 is on BIA Road 7. The Peltiers do not live on BIA Road 7.

61.     When the Peltiers' driver license numbers and birth dates are entered into the online tool, their address is listed as follows: 10296 40th Ave. NE, St. John, ND 58369.

62.     The Peltiers do not have any identification or supplemental documentation that lists their address as in St. John or a zip code of 58369. Their tribal IDs do not include a residential street address.

63.     The Peltiers plan to vote on Election Day. They fear that they will not be permitted to do so because the residential address on their IDs does not match the assigned 911 address for their home in the State's files.

***Kim Twinn***

64.     Plaintiff Kim Twinn is a 46-year-old resident of Fort Yates on the Standing Rock Reservation and a citizen of the United States.

65.     Ms. Twinn was born in Fort Yates Hospital and has lived in Fort Yates, North Dakota her entire life. Although Ms. Twinn was born on the Standing Rock Reservation, she is not an enrolled member of the Standing Rock Sioux Tribe. She is an enrolled member of the Northern Cheyenne Tribe.

66.     Ms. Twinn lives at 8746 Highway 24, Fort Yates, North Dakota 58538, with her aunt Phyllis Young. She has lived there for about one year. She serves as the caretaker for her uncle Eugene Young.

67.     Ms. Twinn has only two forms of identification: her Fort Yates birth certificate and her enrollment certificate from the Northern Cheyenne Tribe. Both indicate her birth date and name but not her residential street address.

68.     Ms. Twinn does not own a home nor is her name listed on any bank statements or utility bills that are delivered to her residence. She is not employed and therefore does not receive a paycheck.

69.     Because she is not a member of the Standing Rock Sioux Tribe she cannot receive a tribal ID from the Tribe's enrollment office.

70.     Ms. Twinn wishes to vote on Election Day.

71.     Ms. Twinn has not identified any way to obtain an identification or supplemental documentation of her residential address that would allow her to vote on Election Day.

### *Terry Yellow Fat*

72.     Plaintiff Terry Yellow Fat is a 69-year-old enrolled member of the Standing Rock Sioux Tribe. He lives in Fort Yates, North Dakota.

73.     A few years ago, a sign was put up near his house that said "Buffalo Avenue." He does not know who put that sign up or what it signifies but he assumed he must live on Buffalo Avenue.

74.     Sometime after that sign went up, Mr. Yellow Fat went to the courthouse to speak to the sheriff, who is also the 911 coordinator, to receive his 911 address. He was given the following address: 1343 92nd Street.

75.     There is no sign on his street that says 92nd Street. He had never heard of this address before.

76.     Even so, he and his family attempted to use that address for packages. But the packages did not arrive.

77.     Eventually, the UPS delivery person found Mr. Yellow Fat and his family. He told Mr. Yellow Fat that he had struggled to find him because 1343 92nd Street is an address that belongs to a liquor store further down the street.

78.     When the "1343 92nd Street" address is searched for on the North Dakota GIS Hub Explorer, the search result appears on a street labeled 93rd Street. Mr. Yellow Fat actually lives further to the west of that result at the corner of what is labeled 93rd Street and Buffalo Avenue. Further to the west, the same street is labeled 92nd Street. Mr. Yellow Fat's actual residence is represented by the red circle in the figure below.



79.     Mr. Yellow Fat uses his P.O. Box to receive mail. His utility bills for his home are delivered to his P.O. box and do not include a residential address.

80.     Mr. Yellow Fat's current tribal ID includes only his P.O. Box.

81.     Mr. Yellow Fat does not have any identification or supplemental declaration with the 1343 92nd Street address.

82.     Even if Mr. Yellow Fat asked to have the enrollment office issue him a new tribal ID with the "911 address" he was given, it would not represent the "fixed permanent dwelling" where he actually lives.

83.     Mr. Yellow Fat is a qualified elector who wishes to vote in the 2018 election but cannot meet the new residential address documentation requirement because the 911 coordinator has not issued him an accurate address.

*Defendant*

84.     Defendant Alvin Jaeger is the North Dakota Secretary of State and is sued in his official capacity. The North Dakota Secretary of State is the State's supervisor of elections. The Office of the North Dakota Secretary of State is responsible for coordinating the implementation of N.D. Cent. Code § 16.1-01-04.1.

# FACTS

***Eligible Native American voters have been and will continue be denied the right to vote due to the state's deeply flawed system of assigning and verifying voters' residential addresses.***

85.　North Dakota law requires voters to provide a residential street address in order to vote a regular ballot. N.D. Cent. Code § 16.1-01-04.1. The statute does not define "residential street address" other than to state that the address must be for the fixed permanent dwelling, establishment, or abode at which the voter resides. N.D. Cent. Code § 16.1-01-04.2.

86.　The state's justification for requiring voters to provide a residential street address is twofold: to prevent voter fraud and to verify the voter's qualifications to vote, including that he or she is voting in the correct precinct. *Brakebill v. Jaeger*, No. 18-1725, Slip. Op. at 8-9 (8th Cir. Sept. 24, 2018); 2018 Election Officials Manual at 8. The state represents that it is unable to ensure that a voter will receive the correct ballot without first determining the voter's residential street address. *Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 104 at 6.

87.　Upon information and belief, Defendant Jaeger's implementation of the residential address requirement of N.D. Cent. Code § 16.1-01-04.1 has not only required a residential address on a qualifying ID but also required that the residential address match a "valid" address according to the State.

88.　When a voter arrives at a polling place or requests an absentee ballot, the 2018 Election Manual directs officials to verify the precinct in which the voter is qualified to vote, according to their residential address, to ensure that the voter receives the correct ballot. 2018 Election Officials Manual at 8. If election officials determine that the address the voter has provided on their ID is in a different precinct, the voter should be directed to the correct polling place. *Id.*

89.     On information and belief, the state verifies a voter's precinct by checking the house number and street name provided against a state GIS mapping system. Street names and house numbers in the state GIS mapping system are assigned to fixed permanent dwellings by county 911 coordinators. If the residential street address provided by the voter matches a house number and street name that is within the precinct, election officials will provide the voter with a regular ballot. If the residential street address provided by the voter matches a house number and street name that is within a different precinct, then the voter will be directed to the polling place for that precinct. 2018 Election Officials Manual at 8.

90.     On information and belief, a voter who provides a residential street address that does not correspond with a street name and house number in the GIS mapping system is determined to have an "invalid" or "incorrect" address.

91.     On information and belief, a voter who presents a form of identification or supplemental documentation that lists a residential street address that is "invalid" will not be considered qualified to vote in any precinct, and will neither be directed to a different precinct or be issued a regular ballot. *See* Election Officials Manual at 9; Sec'y Jaeger Letter, Sept. 28, 2018 (stating that if a voter presents a form of identification with "incorrect" information, their information may be updated only if they can provide one of the acceptable forms of supplemental documentation that contains the "correct" information).

92.     Although voters with "invalid" addresses on their identification and supplemental documentation may be able to vote a "set-aside" ballot, their ballot will be counted only if they obtain a new form of identification or supplemental documentation with a valid address, and return to the polling place or to the County Auditor's office before the County Canvassing Board meets on November 13th, 2018. N.D. Cent. Code § 16.1-01-04.1(5); Sec'y Jaeger Letter, Sept. 28, 2018.

93.     On information and belief, voters whose identification lists an invalid address will only have three days after the election to obtain and submit their new form of identification or supplemental documentation to the County Auditor, since auditors' offices will be closed from Saturday, November 10 through Monday, November 12th for the weekend and for the observance of Veterans Day. *See* Sec'y Jaeger Letter, Sept. 28, 2018. The Deputy Secretary of State Jim Silrum stated that "[a]s for the set-aside ballots . . . many individuals who cast them will not likely come into [county auditors' offices] later to verify their qualifications." *Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 90-7.

94.     Many Native American voters have forms of identification that list a residential street address that may be "invalid," and thus may be denied the right to vote. Plaintiff Jackson used the residential street address listed on his DOT-issued IDs on his absentee ballot application form. His application was denied for having an "invalid" address.

95.     Plaintiff Longie has the same address on her North Dakota non-driver's ID as Mr. Jackson. She plans to vote, but faces a substantial risk that she will be denied either an absentee or a regular ballot because her address is "invalid."

96.     Spirit Lake is aware of another enrolled member of the Tribe who was rejected in the same manner as Mr. Jackson. On October 14, the member turned in an absentee ballot application with the 911 address issued to her by the County and listed on her DOT-issued driver's license. Upon information and belief, the 911 coordinator issued her this address. In a letter dated October 22, she received a letter rejecting her absentee ballot application because "[t]he address written on your application does not match the address in the ND DOT database *or is an invalid address*." (emphasis added).

97.    Voters like Mr. Jackson and Ms. Longie—who have an otherwise valid form of identification that lists a residential address they have always understood to correspond to the physical location of their permanent dwelling—have no notice that they may be disenfranchised. On information and belief, an address assigned to a fixed permanent dwelling through the 911 system is not communicated to the resident of that dwelling unless the resident affirmatively requests the address. *See* Sec'y Jaeger Letter, Sept. 28, 2018 ("After the [911] address is assigned, the office assigning it will provide a letter *upon request*.") (emphasis added). Because many Native American voters rely on P.O. boxes, they have not requested or do not know their 911 addresses.

98.    Voters like Mr. Jackson and Ms. Longie who believe their IDs list the correct residential address for their home have no reason to suspect that their ID may be insufficient for voting because the county has, unbeknownst to them, assigned them a different address in the 911 system. Indeed, if Mr. Jackson had not applied to vote absentee, Ms. Longie would have no reason to suspect that the residential address on her North Dakota non-driver's ID may be invalid for voting purposes.

99.    Some 911 addresses assigned to individuals do not correspond with the actual physical location of their fixed permanent dwelling. For example, Mr. Yellow Fat was issued a 911 address by the Sheriff in Sioux County that corresponds with the physical location of a liquor street down the street from his home. Thus, even if Mr. Yellow Fat's 911 address is "valid," it appears not to comply with the residential address requirement, because the liquor store is not a dwelling, establishment, or abode to which Mr. Yellow Fat returns when not called elsewhere. N.D. Cent. Code § 16.1-01-04.2(1).

100.    On information and belief, the implementation of procedures for verifying the residential address requirement has resulted in substantial confusion for election officials and

voters, which is likely to lead to the disenfranchisement of additional qualified Native American voters.

101.    Because the systems for assigning and verifying residential addresses are deeply flawed and produce conflicting and inaccurate results, and have generated significant confusion, qualified Native American voters face a substantial risk of being denied the right to vote. Indeed, Native voters, like Mr. Jackson, have already been denied access to the ballot.

***Defendant's Failure to Provide a Coherent, Singular, and Consistent Residential Addressing System to Native Americans Will Disenfranchise Many Eligible Voters.***

102.    The North Dakota counties that are home to the State's Native American reservations have a 911 addressing system characterized by disarray, errors, confusion, and missing or conflicting addresses.

103.    Take Rolette County, home to the most populous of North Dakota's Native American Tribes, the Turtle Mountain Band of the Chippewa Indians. Here is how the 911 coordinator for Rolette County has recently characterized his county's preparedness for the newly effective law in the media: "County emergency coordinator Mike Stewart said Monday [October 1, 2018] that residential street addresses have been assigned in '99 percent' of the county—including on the reservation—in the past several years."[2] Moreover, Mr. Stewart explained that "[h]e agreed with state elections officials that obtaining a residential street address is a no-cost and quick process that may take no more than a few hours."[3]

104.    The facts bear a different story. One recent example is of Ace Charette and his fiancée Adriana Riggs, who moved to Belcourt, in Rolette County, in the fall of 2017 from Arizona

---

[2]    James MacPherson, *ND Officials Tell Tribes of Election Requirements*, Rapid City Journal, https://rapidcityjournal.com/news/state-and-regional/nd-of_cials-tell-tribes-of-electionrequirements/article_d62a5623-cf66-5211-b5f3-4dc2210ac550.html.
[3] *Id.*

when Mr. Charette started a new job as Director of Research, Assessment, and Accreditation at Turtle Mountain Community College. They needed North Dakota driver licenses, but hit a roadblock because their rental home had no street address.

105.    So they called the Rolette County government to obtain their address, but were told they could get a 911 address only by appearing in person in Rolla, a city about ten miles away.

106.    On a weekday, Ms. Riggs drove to Rolla Courts, where the office was located, but when she arrived she was told the necessary employee was gone and no one could assist her.

107.    About a week later, in October 2017, she and Mr. Charette tried again, but once again were told the necessary employee was gone and no one could assist them.

108.    Finally, Ms. Riggs called ahead on November 14, 2017 and was told "Kurt" was in the office. When she arrived (for the third time in approximately one month), she found Kurt with two computer screens, each displaying a different mapping program. Kurt toggled between the two mapping programs looking for her address, based upon her neighbors' house numbers.

109.    Kurt explained to Ms. Riggs that the County's two mapping programs were often in conflict with one another, and most homes in Rolette County had two different addresses depending upon which computer program was selected. He told Ms. Riggs he hoped to start using just one of the programs.

110.    Kurt settled on an address—321 Sunset Street NE. Ms. Riggs saw that the other computer program showed a different address for her home, with the numbers transposed.

111.    Kurt handwrote the address on a slip of paper with his first name, phone number, and longitudinal coordinates, as shown below:



112.    Ms. Riggs and Mr. Charette received no official government determination from their trip to the government office, nor did the County later send them any such documentation by mail or otherwise. It took over a month for Ms. Riggs and Mr. Charette to obtain their residential street address, which they now display on a piece of paper taped to their window because the County has not provided a house number or a road sign.

113.    Vast areas of Rolette County have no road signs and no house numbers. Although the County may have maps with road names and house numbers in its office, no one outside those offices would have reason to be aware of such maps.

114.    Kurt's admission of the conflicting and confused Rolette County 911 addressing system matches the experience of the former Belcourt Fire Chief Marcus Laverdure, Sr. Mr. Laverdure has lived on the Turtle Mountain Reservation for most of his life. From 2012 to 2015, he served as Belcourt Fire Chief, and for three prior years as a volunteer at the department.

115.    As Fire Chief, Mr. Laverdure experienced issues with the inaccuracy of Rolette County's 911 system. For example, in one emergency call, 911 dispatch in Rolla directed him to the wrong address following an automatic emergency call from a home's smoke alarm system.

The 911 system led the fire department about one mile from the actual alarm; Mr. Laverdure's team had to work in concentric circles knocking on doors until they found the correct home.

116.    Based on Mr. Laverdure's experiences as Fire Chief encountering homes with incorrect addresses, he decided to contact the 911 coordinator in Rolla to determine whether the address he had always known to be his own was correct. He called the coordinator (with whom he was personally familiar) and proceeded to describe the location of his home: "a mile north of the dump ground on BIA road number 23." That was the most specific he could be, given his rural location.

117.    The address the coordinator assigned him was different from the one he had always understood to be his.

118.    Mr. Laverdure never received (then, previously, or since) any proactive notice from the County of his 911 address. And the County did nothing to verify that Mr. Laverdure lived at the address he reported. Had his experience as Fire Chief not alerted him to Rolette County's inaccurate address system, he would have had no reason to inquire as to whether his existing address matched what the County assigned him.

119.    As Rolette County's 911 coordinator Mr. Stewart has acknowledged to the media, "[i]t's very possible some homes have been overlooked."[4] And even those who have been assigned addresses may have multiple addresses assigned, or may possess IDs with addresses that no longer correspond to the 911 address system.

120.     In short, Rolette County residents have little reason to believe their addresses are correct, reflect where they live, where they should vote, or will not lead them to being

---

[4] *Id.*

disenfranchised under Secretary Jaegar's publicly stated standard for ballot rejection: "information on the ID is incorrect, not current, [or] missing."[5]

121.    Rolette County is not unique; similar issues plague the Spirit Lake Nation, which is primarily located within Benson and Eddy counties, but is also included within parts of Ramsey, Wells, and Nelson counties.

122.    On parts of the Spirit Lake Reservation, homes do not have addresses assigned, or if they do, the residents are unaware of the addresses. The counties have not provided signage for roads or house numbers in many parts of the Reservation. Mail service does not exist on parts of the Reservation, and throughout the Reservation residents rely upon P.O. boxes to conduct affairs.

123.    In some instances, the State has identified a single home as having two different physical addresses. Vice Chairman of the Spirit Lake Tribe Douglas Yankton was issued a state ID with an address of 7041 37th St. NE, Oberon, ND 58357. He has lived at that home for eighteen years, always with that address. Yet when his girlfriend Sara Hesse called the 911 coordinator to obtain her address (at the same home) in 2015, she was provided the following: 7041 37th St. NE, Fort Totten, ND 58335.

124.    Furthermore, the Secretary of State's online search tool for identifying the correct polling place using house number and zip code recognizes neither address.

125.    The problems with 911 addresses on Spirit Lake are not isolated. The North Dakota GIS Hub Explorer, an official tool previously cited by Secretary Jaeger as an authoritative source for 911 addresses, reveals that many homes in Spirit Lake are on roads labeled "Unknown" or on roads the County has assigned more than one road name. Below are just a few examples, of many:

---

[5] Memo from N.D. Sec'y of State to Tribal Leaders, Sept. 28, 2018.





126.    Moreover, many Spirit Lake tribal members are unaware of their residential street address, even if they have one. Robin Smith, the enrollment director for Spirit Lake, has given out 382 tribal IDs in the past week, which is 6 months' worth of IDs at the normal rate.

127.    Ms. Smith reports that approximately 30 percent of those were changing IDs from a P.O. Box to a physical address, 40 percent had no previous form of valid ID, and 30 percent did not previously know their physical address.

128.    Ms. Smith has encountered significant confusion because of the complicated 911 addressing system as it applies to the Reservation. For example, a member living in the Tokio area

could have one of four different cities for their residential street address: Sheyenne, Warwick, Tokio, or St. Michael. All would have different zip code.

129.    One member had to come to Ms. Smith's office three different times before the office could accurately identify the member's residential address. He was initially told his 911 address was on Crow Hill Road in Fort Totten. But Ms. Smith determined that was wrong because many residents in the same area have Oberon addresses, not Fort Totten addresses. They ultimately determined his address was in Oberon.

130.    The discovery of that issue raised an alarm for 15 other members who had newly issued tribal IDs that list Crow Hill Road as being in Fort Totten, which now must be changed to Oberon before the election.

131.    As of two weeks prior to the election, Spirit Lake had identified 262 people who had only P.O. boxes on their IDs and no residential street address. Ms. Smith estimates that 40 percent of those have come in for an updated tribal ID, leaving well over 100 people who still have tribal IDs with no residential street address.

132.    The 911 addressing is similarly confused and contradictory in the Fort Berthold Reservation. Fort Berthold extends into Mountrail, McLean, Mercer, Dunn, and McKenzie counties.

133.    The GIS Hub Explorer shows that a significant number of roads in Fort Berthold, on which sit a significant number of homes, are either labeled "Unknown," have no label, or have multiple names for a single road. Below are a few illustrative examples, of many:











134.    Confusion in the government's addressing system abounds in Standing Rock in Sioux County as well. The 911 coordinator has assigned homes addresses at a liquor store, preexisting road signs contradict 911 addresses, there are few house number or road signs, and people are unaware of their addresses, as most people have always used a P.O. Box. Indeed, the 2016 Emergency Services Communication Report in North Dakota to the legislature identifies signs as a priority for Sioux County.[6] The same report shows that as of 2016, 4 counties in North Dakota lacked a plan to address residential street addresses.[7]

135.    Here this confusion and disarray jeopardizes the most fundamental right in our country—the right to vote.

136.    If the address situation were not confusing and chaotic enough, Defendant Jaeger has taken steps to worsen the situation, refusing to provide public comment on whether poll workers will accept addresses printed on newly issued IDs, while simultaneously issuing statements that residential street addresses on IDs must not be "incorrect"—a warning that creates a particular chill for Native American voters, in light of the chaos and uncertainty caused by the rapid response to the newly effective law.

137.    Even more alarmingly, a Spirit Lake tribal member was issued an ID through her tribal government with an address issued by the County 911 Coordinator. Yet, she was denied an absentee ballot because the State's system considered the address invalid. There is therefore no guarantee that even following the system proposed by Mr. Jaeger that Native Americans will not be denied from the ballot box.

---

[6] Emergency Servs. Commcn's Coordinating Cmte., Emergency Services Communication in North Dakota at 16; https://www.legis.nd.gov/files/committees/64-2014%20appendices/17_5152_03000appendixc.pdf.
[7] *Id.* at 26.

138.     Fair elections demand clear and uniform rules. The circumstances surrounding 911 addresses for North Dakota's Native Americans make that impossible for the counties containing reservations.

### *The Application of the "Current Residential Address" Requirement Imposes a Uniquely Severe Burden for Native Americans in North Dakota.*

139.     The Court has received substantial and compelling evidence about the severe burdens imposed upon Native Americans by the residential address requirement in the *Brakebill* litigation. That evidence is unchanged and those effects continue.

140.     The burden has only become more severe, however, in the past month, and more acutely in the past few weeks.

141.     The Supreme Court declined to reinstate the statewide stay on the residential address requirement on October 9, 2018. The DMV offers services in Rolette County one day a month for a total of three (3) hours. The last time the site was available at the county seat of Rolla was October 3, 2018—six days before the Supreme Court's decision. The next time the site will be available is November 7, 2018—one day after the November election.

142.     So for voters in Rolette County, after it became clear that a substantial number of Native Americans would need to obtain new identification—foreign to their understanding of how and where they live—the primary source of state IDs is unavailable without taking a 200 mile roundtrip drive to Minot, or a 160 mile roundtrip drive to Devil's Lake.

143.     The sole bank on the Turtle Mountain Reservation, Turtle Mountain State Bank, has over 2,500 accounts, the vast majority of which show only the mailing address—P.O. boxes—on the bank statements, because otherwise there would be no way for the customers to receive the statements in the mail, given the lack of residential mail delivery.

144.    Utility statements in Turtle Mountain generally list P.O. boxes as well, for the same reason.

145.    These categories of "supplemental" documentation of residential street addresses are systematically unavailable to many Native Americans—and not just in Turtle Mountain, but in all of North Dakota's reservations.

146.    The acceptable "supplemental" documentation are categories of documents that must generally be mailed to be of any use. But to be delivered in the mail to Plaintiffs, they must show the precise address—a P.O. Box—the State has deemed inadequate to prove residency.

147.    The burden is particularly severe for those Native Americans who are either not enrolled in a Tribe, or who are enrolled in Tribes from outside the State. There are many such people, like Ms. Twinn, but because their circumstances preclude their access to documentation to prove their residential address, they cannot obtain state-issued IDs (if such services are even accessible), and they also cannot obtain tribal identification from a North Dakota tribe.

148.    Moreover, for those unaware of or lacking a residential address, the requirement that they obtain those addresses from their county's 911 coordinator often means that in order to vote, they must first interact with law enforcement. In Sioux County, the only 911 coordinator is the Sheriff. The same is true in Mountrail. And for Spirit Lake, the 911 coordinator is located at the Law Enforcement Center, which is surrounded by Corrections buildings, the Sheriff, and other law enforcement.

149.    For many people, particularly minorities and those suffering disparities in socioeconomic status, encounters with law enforcement are intimidating and to be avoided. Many states prohibit the presence of law enforcement at the polls. Requiring Native American voters to

first come into contact with law enforcement, like in Sioux County, as a precondition to exercising their right to vote causes a severe burden, with a serious chilling effect on the franchise.

150.    And for those who do attempt to nonetheless interact with law enforcement to learn of their 911 address, the bureaucratic tape can be difficult to navigate, with multiple pre-recorded telephone messages and options, none of which reference 911 coordinators or obtaining an address.

151.    Rolette County's paper application for a 911 address is an illustrative example.  It asks residents to provide their home's longitude and latitude; Township, Range, and Section; Block Number and Lot Number; and, paradoxically, "[r]oad name providing property address." How one could know the latter, with no postage road name signage, is unclear.

152.    Standing on its own, the residential address requirement poses a particular and acutely severe burden for Native American voters. The severity of that burden has been magnified by the failure of the State and counties to fulfill their roles in providing a basic governmental services—correctly and uniformly assigning residential addresses for Native American voters. Nevertheless, the State has chosen to make residential addresses the paramount determination for the eligibility to vote.

153.    The State may not condition the right to vote upon a Native American voter's access to a category of information only the government can provide and which the government has made difficult or functionally impossible to obtain. Even if the elector can successfully navigate this system, there is no guarantee the address that is issued will be correct or will be accepted.

***North Dakota's interest in enforcing the residential address verification procedure against Native American voters living on or near reservations is low.***

154.    The state asserts that the residential address requirement advances the important interests of ensuring that qualified electors vote in the correct precinct or receive the correct ballot,

and preventing non-resident voters from voting in North Dakota simply by setting up a P.O. box in the state. *See Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 104 at 9.

155.    Enforcing the residential address requirement against Native American voters who reside on or near reservations does not advance the interest of preventing non-resident voters from voting in North Dakota.

156.    The state has rejected alternative methods of determining which ballot to provide a voter, or which precinct the voter is entitled to vote in because those methods are self-authenticating. *See, e.g.*, *Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 81 at 6-10.

157.    On information and belief, obtaining a 911 address is a self-authenticating process. When Mr. Lavendure obtained his 911 address, the 911 coordinator asked him to describe where he lived based upon the BIA road numbers and landmarks. The 911 coordinator did not do anything to verify that the address was actually where Mr. Lavendure lived. Similarly, when Ms. Riggs obtained her 911 address, the 911 coordinator simply asked her what her neighbor's street numbers were.

158.    North Dakota law provides that the DOT director *may* require "proof of residence" to obtain a state ID card or driver's license. N.D. Cent. Code § 39-06-03.1(3). The DOT website currently provides a list of acceptable documents for proof of residence and states that "proof of residence will be requested every time an address is changed."[8] As of December 2017, however, it was possible to obtain a North Dakota driver license without providing any documentary proof of residence. Ms. Riggs' contemporaneous text message to her fiancé confirms this:

---

[8] https://www.dot.nd.gov/divisions/driverslicense/docs/proof-of-address-documents.pdf

159.    Requiring a voter to provide a form of identification listing a residential street address that corresponds with a street name and house number in the 911 address system or the GIS mapping system does not advance the interest in ensuring that voters vote in the correct precinct or receive the correct ballot substantially more than any other self-authenticating method of determining a voter's precinct.

## CAUSES OF ACTION

**Count I:     Violations of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)**

160.    Plaintiffs repeat and reallege paragraphs 1-159 above.

161.    "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure" and the right to an effective vote is protected by the Equal Protection Clause of the Fourteenth Amendment. *See Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

162.    When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put

forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

163.    The Eighth Circuit gave Defendant Jaeger the opportunity to implement N.D. Cent. Code § 16.1-01-(2)(b), (3)(b) in a manner that would not disenfranchise eligible North Dakotan voters. He has failed to do so for many citizens living on North Dakota reservations.

164.    Plaintiff Dion Jackson has already been denied access to an absentee ballot.

165.    Despite having already obtained qualifying IDs with residential street addresses, Plaintiffs Kara Longie, Leslie Peltier, and Clark Peltier face an imminent threat of being denied the right to vote because the state considers their addresses "incorrect [or] not current."

166.    Plaintiff Kim Twinn is a lifelong resident of Fort Yates and a qualified voter. However, Defendant has provided her no mechanism to obtain the necessary ID with residential address to vote because she does not have any documentary proof of address or a means of obtaining it.

167.    Plaintiff Terry Yellow Fat has been assigned a 911 address by the coordinator that does not represent "an actual fixed permanent dwelling, establishment, or any other abode to which the individual returns when not called elsewhere for labor or other special or temporary purposes." N.D. Cent. Code § 16.1-01-04.2.

168.    Plaintiff Spirit Tribe has identified over 100 members who still do not have a tribal ID with a residential address that would enable them to vote despite expanding their hours, issuing free IDs, and processing the same number of IDs in the last week that ordinarily are issued in six months. Many of these members do not know their residential street addresses. Many may not have 911 addresses assigned at all.

169.    Additional members may have addresses on their IDs that do not match the state's database. These members will likely have no idea that they will be turned away until they appear at the polls. They will have three business days to "cure" this problem created by Defendant.

170.    Defendant Jaeger's implementation of N.D. Cent. Code § 16.1-01-04.1(2)(b), (3)(b) threatens to deny hundreds if not thousands of North Dakota voters the opportunity to cast a ballot.

171.    Upon information and belief, these failures in implementation have disproportionately impacted Native American eligible voters.

172.    This mismanaged system imposes a severe burden on the right to vote; indeed, a denial of the right to vote in many occasions.

173.    The State has no legitimate interest in enforcing a law requiring accurate residential street addresses on IDs where the addressing system itself has failed.

174.    Nor can the State's interest in determining the precinct of a voter by documentary proof override an eligible voter's right to cast a ballot when the State has not provided the voter any way to obtain the necessary identification.

175.    This is particularly so because Defendant's stated interest in enforcing this law to ensure voters cast a ballot in the correct precinct is weak in the affected areas given the lack of clear, consistently applied, and accurate 911 addresses on reservations. Indeed, that interest would be equally or better served in many cases by having a voter identify his or her residence on the precinct map.

176.    Defendant's stated interest in using a system other than self-authentication to ensure voters cast a ballot in the correct precinct cannot explain or justify Defendant's implementation of the 911 address assignment system for these voters. The 911 address assignment system itself

depends on a voter's self-authentication of where they currently reside. And yet it is more likely to result in an inaccurate result than a voter's self-identification of their residence on a precinct map.

177.     Defendant Jaeger's implementation of this residential address requirement has failed in practice for many voters on reservations and cannot survive Fourteenth Amendment scrutiny as applied to them.

**Count II:     Violations of the First Amendment to the United States Constitution (42 U.S.C. § 1983)**

178.     Plaintiffs repeat and reallege paragraphs 1-177.

179.     Voting and participating in the election process is a form of speech and expression. It is the ultimate form of political speech and association and is entitled to First Amendment protection.

180.     Defendant Jaeger's implementation of the residential address requirement has imposed severe—sometimes insurmountable—burdens on the right to vote for many voters on reservations. These burdens violate the First Amendment.

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1.     Enter a declaratory judgment that N.D. Cent. Code § 16.1-01-04.1(2)(b), (3)(b) violates the First and Fourteenth Amendments to the United States Constitution as applied to voters residing in the counties in North Dakota that include territory within the exterior boundaries of an Indian reservation, including but not limited to, Benson, Dunn, Eddy, McLean, Mercer, Mountrail, Nelson, Ramsey, Richland, Rolette, Sargent, and Sioux counties who fall into the following categories: (1) voters with IDs with residential addresses that the State considers "invalid"; (2) voters with no access to an accurate residential address to place on a qualifying ID; (3) voters with

no access to documentation of their residential address; (4) voters whose addresses are unassigned; and (5) voters unable to determine their address and obtain a qualifying ID before Election Day.

2.      Enter preliminary and permanent injunctions barring Defendant from enforcing N.D. Cent. Code § 16.1-01-04.1 (2)(b), (3)(b) as to the voters described above;

3.      In the alternative, enter preliminary and permanent injunctions barring Defendant from enforcing N.D. Cent. Code § 16.1-01-04.1(2)(b), (3)(b) as to the voters described above and, in lieu of that statute, allow voters to identify their residences on the precinct map to verify their eligibility in the precinct;

4.      Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

5.      Grant such other relief the Court may deem just and proper.

Respectfully submitted,

/s/ Timothy Q. Purdon
Timothy Q. Purdon (ND#05392)
ROBINS KAPLAN LLP
1207 West Divide Avenue
Suite 200
Bismarck, ND 58503
T: (701) 255-3000
F: (612) 339-4181
TPurdon@RobinsKaplan.com

Matthew Campbell,
NM Bar No. 138207, CO Bar No. 40808
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
Phone: (303) 447-8760
mcampbell@narf.org

Jacqueline De León, CA Bar No. 288192, DC Bar No. 40808
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
jdeleon@narf.org

Mark P. Gaber *
Danielle M. Lang *
Molly Danahy *
&#10070;   Licensed to practice in N.Y. only; supervision by Mark P. Gaber, a member of
    the D.C. Bar.
CAMPAIGN LEGAL CENTER
1411 K Street NW, Suite 1400
Washington, DC 20005
(202) 736-2200

Joseph M. Sellers, Bar No. 318410 *
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
JSellers@cohenmilstein.com

*Counsel for Plaintiffs*

\* — *Motions for admission* pro hac vice *forthcoming*

Dated: <u>October 30, 2018</u>