**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| SPIRIT LAKE TRIBE, on its own behalf and on behalf of its members, DION JACKSON, KARA LONGIE, KIM TWINN, TERRY YELLOW FAT, LESLIE PELTIER, CLARK PELTIER, | Civil No. 1:18-cv-00222-DLH-CSM |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF *EMERGENCY* MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| ALVIN JAEGER, in his official capacity as Secretary of State, | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF *EMERGENCY* MOTION
FOR TEMPORARY RESTRAINING ORDER**

*"If any resident of North Dakota lacks a current residential street address and is denied an opportunity to vote on that basis, the courthouse doors remain open."*[1]

In allowing Defendant Jaeger to implement North Dakota's proof of residential address requirement, the Eighth Circuit was clear: its order was dependent on Defendant's ability to implement the law in a manner that would not actually disenfranchise eligible voters. Now that absentee voting has begun and Election Day approaches, the flaws in this system are self-evident. The plaintiffs in this case represent precisely those individuals for whom the Eighth Circuit left the courthouse doors open. These plaintiffs have been denied the opportunity to vote or are at risk of imminently being denied the opportunity to vote because of the proof of residential address

---

[1] *Brakebill v. Jaeger,* 905 F.3d 553, 561 (8th Cir. 2018).

requirement. Emergency relief must be ordered to ensure that they and many other eligible Native Americans are not irreparably deprived of the right to vote in this election.

But the problems are more myriad than the issues this Court considered in the *Brakebill* case. Defendant Jaeger has not been forthright with North Dakotans about the dangers lying in wait even for voters with qualifying ID including a residential address. The Spirit Lake Tribe ("Spirit Lake") and the impacted voters in this case represent several categories of Native American voters at imminent risk of disenfranchisement: (1) voters with IDs with residential addresses that the State considers "invalid"; (2) voters with no access to an accurate residential address to place on a qualifying ID; (3) voters with no access to documentation of their residential address; (4) voters whose addresses are unassigned; and (5) voters unable to determine their address and obtain a qualifying ID before Election Day.

Native American voters living on or near reservations have been denied the right to vote despite having North Dakota and tribal IDs with residential addresses; voters have been assigned 911 addresses that do not actually correspond with their residence; voters living in the same house have been issued different addresses in different cities and zip codes; and the list goes on. Moreover, Defendant Jaeger has plainly not considered the position of North Dakotans like Plaintiff Twinn who live on a reservation but are enrolled in a different tribe and therefore do not have easy access to tribal IDs. Despite issuing more tribal IDs in the past week than it ordinarily does in six months, Spirit Lake has identified over a hundred members that still have tribal IDs without residential addresses. This is the as-applied challenge the Eighth Circuit anticipated.

"We deal here with matters close to the core of our constitutional system. 'The right . . . . to choose,' that this Court has been so zealous to protect, means, at the least, that States may not casually deprive a class of individuals of the vote because of some remote administrative benefit

to the State." *Carrington v. Rash*, 380 U.S. 89, 96 (1965) (internal citations omitted). This Court should order immediate but targeted relief to ensure that eligible Native Americans are not deprived of "having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). In accordance with the Eighth Circuit's opinion, the relief that Plaintiffs seek for themselves and others like them maintains the proof of residency requirement where it does not unduly burden the constitutional right to vote but provides a fail-safe for those who would otherwise be turned away. As this Court recognized two years ago, "a safety net is needed" to avoid electoral chaos and unchecked disenfranchisement. *Brakebill v. Jaeger*, No. 1:16-CV-008, 2016 WL 7118548, at *1 (D.N.D. Aug. 1, 2016).

## FACTUAL BACKGROUND

North Dakota law requires a voter to provide proof of a residential street address in order to vote a regular ballot. N.D. Cent. Code § 16.1-01-04.1. The statute does not define "residential street address" other than to state that the address must be for the fixed permanent dwelling, establishment, or abode at which the voter resides. N.D. Cent. Code § 16.1-01-04.2. The 911 Coordinator in each county is responsible for assigning new residential street addresses to homes and dwellings that do not already have them, and for informing residents, upon request, of the address that has been assigned to their home. *See* Danahy Decl. Ex. 12 (Sec'y Jaeger Letter of Sept. 28, 2018). The residential addressing system in counties that include the exterior boundaries of Indian reservations is completely dysfunctional. *See, e.g.*, Laverdure Decl. ¶ 4-9.

On April 3, 2018, this Court held that requiring voters to produce identification or supplemental documentation with a current residential street address was "a clear legal obstacle" and thus unconstitutional. *Brakebill v. Jaeger*, No. 1:16-CV-008, 2018 WL 1612190, at *4 (D.N.D.

Apr. 3, 2018). Accordingly, the Court granted an injunction against that requirement and ordered the Secretary of State to accept otherwise valid forms of identification that listed either a current residential street address or a current mailing address. *Id.* at *7.

On September 24, 2018 the Eighth Circuit stayed this Court's order. *Brakebill*, 905 F.3d 553. While not disagreeing with the ultimate conclusion, the Eighth Circuit found that "even assuming that some communities lack residential street addresses, that fact does not justify a statewide injunction that prevents the Secretary from requiring a form of identification with a residential street address from the vast majority of residents who have residential street addresses." *Id.* at 558. The Eighth Circuit explicitly acknowledged that "a court might have authority to enter a narrower injunction to relieve certain voters of an unjustified burden," and indicated that "if any resident of North Dakota lacks a current residential street address and is denied an opportunity to vote on that basis, the courthouse doors remain open." *Id.* at 559.

In *Brakebill*, Defendant assured this Court and the Eighth Circuit that the State could fairly administer this law. *Id.* at 560. Yet since the Eighth Circuit's ruling, the State has rejected voters' absentee ballots despite the voters' having residential street addresses on their qualifying IDs. *See* Jackson Decl. ¶ 7; Street Decl. ¶ 3. Rather than updating the poll books with the voters' information and providing a ballot, *see* N.D. Cent. Code Ann. § 16.1-05-07 (election officials to request, correct, and update any information), the State has been "verifying" a voter's precinct, likely by checking the house number and street name provided against a state mapping database containing street names and house numbers assigned by county 911 coordinators. *See, e.g.*, *id.*; Danahy Decl. Ex 1 (2018 Election Officials Manual) at 7-8.

Spirit Lake is a federally recognized Tribe with an enrollment population of 8,001 members, approximately 2,569 of whom are of voting age and live on the Spirit Lake Reservation.

Yankton Decl. ¶ 5. Many streets on the Spirit Lake Reservation do not have marked signs on them, and many houses are not labeled with numbers. *Id.* ¶ 8. Many tribal members living on the reservation rely on P.O. boxes to receive mail, and do not know and have never been notified of their residential street address, even if one has been assigned by the 911 Coordinator. *Id.* ¶ 8, 10.

Without any resources provided by the state, financial or otherwise, Spirit Lake has spent significant resources to inform its members of the new residential street address requirement and to assist those members in complying with the requirement. Smith Decl. ¶ 3-5; Yankton Decl. ¶ 15-24. From October 22 to October 29 alone, the enrollment office issued 328 new IDs to its tribal members—approximately 25 times the ordinary rate of tribal ID issuance—and waived all customary fees for such IDs. Smith Decl. ¶ 3. These members previously had tribal IDs with only P.O. box addresses, did not have their current address on their tribal ID, or had no ID whatsoever. Smith Decl. ¶ 6-8. Many of the members did not know their residential street address (having always relied upon their P.O. boxes) and needed assistance to determine that address. Smith Decl. ¶ 9.

Spirit Lake has identified well over one hundred members who have not yet been issued an updated tribal ID with a residential street address. Smith Decl. ¶ 16. Moreover, it is likely that additional members' existing IDs have addresses that do not match the State's database, but these members will have no idea that they will be turned away until they appear to vote.

Plaintiffs Dion Jackson and Kara Longie reside together on the Spirit Lake Reservation and are citizens of the United States. Jackson Decl. ¶ 1; Longie Decl. ¶ 10. The State rejected Mr. Jackson's absentee ballot application for the 2018 election because, according to the State, the only address he has ever known for his home, and therefore the address listed on his state-issued ID,

does not match the address in the ND DOT database or is an "invalid" address. *Id.* ¶ 3, 7. Danahy Decl. Ex. 3 (Dion Jackson Rejection Letter).

Plaintiffs Leslie Peltier and Clark Peltier ("Peltiers") are enrolled members of the Turtle Mountain Band of Chippewa Indians and citizens of the United States. The Peltiers reside together on reservation trust land north of the reservation boundary, in a rural area approximately 11 miles northwest of Belcourt, North Dakota. Peltier Decl. ¶ 2. There is not a street sign on the road where they live, nor are there are street signs nearby. Their tribal IDs do not include a residential street address, but their state IDs list their address as *Belcourt*, North Dakota. *Id.* ¶ 3. The Secretary of State's online GIS mapping system produces no valid results for the location of the Peltiers' home, yet lists them as residents of *St. John*, which does not match any identification or supplemental documentation in their possession. *See* North Dakota GIS Hub Explorer, https://www.nd.gov/itd/new-gis-hub-explorer (last visited Oct. 29, 2018).[2]

Plaintiff Kim Twinn is a resident of Fort Yates on the Standing Rock Reservation and a citizen of the United States. Twinn Decl. ¶ 5. She has lived in Fort Yates her entire life. *Id.* ¶ 3. Although Ms. Twinn was born on the Standing Rock Reservation, she is not an enrolled member of the Standing Rock Sioux Tribe; she is an enrolled member of the Northern Cheyenne Tribe. *Id.* ¶ 1-2, 13. Danahy Decl. Ex. 7 (Twinn Birth Certificate); Ex. 8 (Twinn Enrollment Certificate). Ms. Twinn resides with and is the caretaker for her uncle. Young Decl. ¶ 4. Neither of the two forms of identification that Ms. Twinn possesses—her birth certificate and her enrollment certificate from the Northern Cheyenne Tribe—list a residential street address. Danahy Decl. Ex. 7 (Twinn Birth Certificate); Ex. 8 (Twinn Enrollment Certificate). Ms. Twinn does not own a home, is not

---

[2] Defendant Jaeger has referred to this database as authoritative in his prior briefing before this Court. Brakebill v. Jaeger, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 104 at 5.

listed on any bank statements or utility bills that are delivered to her residence, and does not receive a paycheck. *Id.* ¶ 10, 12. Because she is not a member of the Standing Rock Sioux Tribe, she cannot receive a tribal ID from the Tribe's enrollment office, and she has not identified any way to obtain an identification or supplemental documentation of her residential address that would allow her to vote on Election Day. *Id.* ¶ 13-16.

Plaintiff Terry Yellow Fat is an enrolled member of the Standing Rock Sioux Tribe. Yellow Fat Decl. ¶ 1. He lives in Fort Yates, North Dakota. *Id.* ¶ 3. Mr. Yellow Fat obtained his 911 address from the Sheriff. *Id.* ¶ 4. The address he was assigned is actually the address for the liquor store down the street. *Id.* ¶ 8. Because the assigned address is not his home, Mr. Yellow Fat has difficulty using that address for deliveries and relies on his P.O. box to receive mail. *Id.* ¶ 6, 9. The P.O. box is the address listed on Mr. Yellow Fat's current tribal ID. Although he may be able to obtain a Tribal ID listing his 911 address before the election, it is not clear whether he can rely on such identification because that is not in fact where he lives. *Id.* 10-11.

There are often substantial burdens imposed on Native voters attempting to obtain the necessary information and documentation required to vote. For example, in Rolette County the Driver's License Site ("DLS") nearest the reservation is only open once a month for about three hours. Charette Decl. ¶ 6. The last time the DMV offered services in Rolette County was October 1, 2018. Laducer Decl. ¶ 7. The next time the DMV will offer services in Rolette County is November 7, 2018. The election is on November 6, 2018. *Id.* 911 Coordinators may also be difficult to reach, or require multiple trips. Riggs Decl. ¶ 4-6.

## LEGAL STANDARD

In ruling on a motion for a temporary restraining order, "[t]he court is required to consider the factors set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th Cir. 1981). Whether a preliminary temporary restraining order should be granted involves

consideration of "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Brakebill v. Jaeger*, No. 1:16-CV-008, 2016 WL 7118548, at *3 (D.N.D. Aug. 1, 2016).

## ARGUMENT

## I. Plaintiffs Have Standing.

A plaintiff satisfies Article III's standing requirement when it can show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Spokeo v. Robins*, 136 S. Ct. 1540 (2016)). All plaintiffs here easily satisfy this jurisdictional prerequisite.

The prospective denial of the fundamental right to vote—as to each individual plaintiff and as to Spirit Lake Tribe's enrolled members—is unquestionably sufficient to establish a justiciable injury-in-fact. *Reynolds v. Sims*, 377 U.S. 533, 561 (1964) (recognizing the right to vote is "individual and personal in nature"). Each individual Plaintiff has attested to his or her imminent risk of disenfranchisement. *See* Jackson Decl.; Longie Decl.; Twinn Decl.; Yellow Fat Decl.; Peltier Decl. They have also attested that their injury is directly traceable to the Defendant's residential address requirement. *Id.* These harms can be redressed by a restraining order from this Court.

Plaintiff Spirit Lake Tribe has standing to challenge Defendant Jaeger's implementation of this requirement both in its own right because it has been harmed by Defendant Jaeger's actions and to protect its members. *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013) (citations omitted) (tribes, like states, are afforded "special solicitude in our standing analysis."). The Tribe is expending considerable resources—in the form of direct member services

and public education—to ensure that its enrolled members have acceptable forms of identification for voting, including by extending its enrollment office hours to issue compliant tribal IDs and by waiving the fees it ordinarily charges to recoup its costs. Yankton Decl. ¶¶ 15-27; Smith Decl. ¶¶ 3-5. For standing purposes, therefore, the Tribe's diversion of resources is directly traceable to the Defendant's implementation of the restrictive residential address requirement, which "overwhelmed" tribal officials with the need to "address this serious and emergent issue" caused by the "sudden change" to state voting qualifications. *See* Yankton Decl. ¶¶ 22-26. And it is not just "*likely . . .* that the injury will be redressed by a favorable decision from this Court," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)—it is *only* an injunction from this Court that can redress the imminent and irreparable harm to the fundamental rights of Spirit Lake and its members.

Spirit Lake Tribe also has *parens patrie* standing to assert these claims on behalf of its enrolled members. The doctrine of *parens patriae* standing refers to a sovereign's right to sue "to prevent or repair harm to its 'quasi-sovereign' interests." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 258 (1972). To establish *parens patriae* standing, a sovereign must "articulate an interest apart from the interests of particular private parties." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). A sovereign has a quasi-sovereign interest in the "health and well-being" of its residents and in "not being discriminatorily denied its rightful status within the federal system." *Id.* Both of those interests—protecting tribal members' "health and well-being" and preserving the Tribe's quasi-sovereign status within the federal system—are implicated here.

The Eighth Circuit has recognized a tribe's *parens patriae* standing to bring claims on behalf of its members so long as the injury affects a "sufficiently substantial segment of its

population." *Id.*; *see United States v. Santee Sioux Tribe of Neb.*, 254 F.3d 728, 734 (8th Cir. 2001). The collective political power of the tribal members is central to the Tribe's ability to advocate effectively for its community, and thus it has standing. Yankton Decl. ¶¶ 12-14, 28-31; Smith Decl. ¶¶ 15-16; Street Decl. ¶¶ 3-5; Longie Decl.; Jackson Decl.

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

"There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure" and the right to an effective vote is protected by the Equal Protection Clause of the Fourteenth Amendment. *See Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

Plaintiffs have demonstrated a likelihood of success on the merits. Indeed, the facts that Plaintiffs have set forth with concrete evidence include eligible voters who have already been denied the right to vote, eligible voters who cannot obtain the necessary identification with a physical address by Election Day and thus will not be able to vote without court intervention, and eligible voters facing an imminent risk of disenfranchisement through no fault of their own. The facts demonstrate the likelihood that there are hundreds, if not thousands, more similarly situated

Native Americans across the State. Defendant Jaeger cannot possibly justify these deprivations, particularly since his alleged interests are undercut by the inherent unreliability of the addressing system he holds up as the paramount determination for the eligibility to vote.

**A. Plaintiffs are likely to succeed on the merits of their claims on behalf of individuals who have qualifying IDs with addresses not recognized by Defendant or assigned addresses that do not reflect their actual residence.**

This lawsuit has identified two problems with Defendant Jaeger's implementation of the proof of residential address requirement that were not clear from the face of the statute. These problems are two sides of the same coin: (1) voters are at risk of being turned away if they have qualifying IDs (sometimes issued by the State itself) that have addresses the State cannot locate in its database and (2) voters are being assigned addresses that do not correspond to their actual residence yet being asked to jump through the hoops of obtaining an ID with that faulty address. Both of these problems result from the State's failure to create and implement a coherent, singular, and consistent residential addressing system combined with its insistence that the right to vote hinge on compliance with its broken system.

These severe burdens—which are likely to be sprung on many voters on Election Day when they present their current and valid State-issued or tribal ID—require the application of "strict scrutiny even under the more flexible, sliding-scale standard of review articulated in *Burdick*." *Republican Party of Arkansas v. Faulkner Cty., Ark.*, 49 F.3d 1289, 1297 (8th Cir. 1995).

Plaintiffs Dion Jackson, Kara Longie, Leslie Peltier, and Carl Peltier all have qualifying IDs with residential street addresses. *See* Longie Decl. ¶ 6; Peltier Decl. ¶ 6. These addresses are associated with their current residences. *Id.* Thus, they meet the letter of the statute at issue. *See* N.D. Cent. Code § 16.1-01-04.1(2)(b). Yet, Plaintiff Jackson's absentee ballot was already rejected because the State considered the address he understands to correspond to his home to be "invalid."

Jackson Decl. ¶ 7. Plaintiffs Longie and the Peltiers face the same risk. Defendant Jaeger has chosen to enforce this requirement strictly, not merely requiring that an address is "current" but whether it is "correct" according to the State's current address data. *See* Danahy Decl. Ex 1 (Election Officials Manual) at 9; Danahy Decl. Ex. 12 (Sec'y Jaeger Letter of Sept. 28, 2018) (stating that their information may be updated only if one can provide the "correct" information). This is contrary to state law, which requires the state to update any incorrect information it has. *See* N.D. Cent. Code Ann. § 16.1-05-07 (election officials to request, correct, and update any information).

Defendant's failure to take any affirmative steps to ensure that voters with addresses on their IDs that are supposedly "incorrect" are informed of this fact only increases this unreasonable burden. *See, e.g., Veasey v. Abbott*, 830 F.3d 216, 256 (5th Cir. En banc 2016) (affirming that "State's lackluster educational efforts resulted in additional burdens on Texas voters."). Defendant has not any steps even though the State issued many of the IDs in question and therefore has reason to know that many citizens have IDs with addresses it no longer recognizes. This disenfranchisement by trap is unduly burdensome and unreasonable. *Miller v. Moore*, 169 F.3d 1119, 1125 (8th Cir. 1999) ("Thus while states enjoy a wide latitude in regulating elections . . . they must exercise this power in a reasonable, nondiscriminatory, politically neutral fashion.").

Defendant has failed to demonstrate that this system is reliable. Indeed, there is now good reason to believe that voters' affirmations of the location of their residences on precinct maps would be more reliable than the State's 911 system in many locations on reservations. Both Plaintiff Yellow Fat and Plaintiff Longie appear to have been assigned to addresses that correspond to map locations that are not where they actually live. Yellow Fat Decl. ¶ 8; Compl. ¶ 46. It would be nonsensical to require these Plaintiffs and others similarly situated to go retrieve useless

identification with these addresses—which do not correspond to where they live—in order to vote. *Republican Party of Arkansas v. Faulkner Cty., Ark.*, 49 F.3d at 1301 (finding an undue burden where "the state's reasoning [for its procedure was] simply impenetrable"). And if they did, those identifications would not actually comply with the statute and they would be at risk of being prosecuted for fraud because they do not reside at those locations. N.D. Cent. Code § 16.1-01-04.2(1) (defining residence as "an actual fixed permanent dwelling, establishment, or any other abode to which the individual returns when not called elsewhere").

The careless implementation of this law—seeking to confirm the physical addresses of every voter when the State *knows* there are many unmapped areas, conflicting address systems, and conflicting addresses even within its own system—imposes undue burdens on those with qualifying IDs with addresses the State won't recognize and on those who have been assigned 911 addresses that are themselves incorrect. *Id.* at 1300.

**B.   Plaintiffs are likely to succeed in proving that the "residential address" requirement is an undue burden on voters who lack any feasible means of obtaining documentary proof of their address.**

Plaintiffs are likely to succeed in proving that the "residential address" requirement is an undue burden on voters who lack any feasible means of obtaining the statutorily required proof of address. "[A] law severely burdens voting rights if the burdened voters have few alternate means of access to the ballot," and such a "law impermissibly restricts 'the availability of political opportunity.'" *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Indeed, "[t]he hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (2016).

Plaintiff Kim Twinn possesses two forms of identification: (1) a birth certificate and (2) her enrollment certificate from the Northern Cheyenne Tribe, which is based in Montana. Twinn Dec. ¶¶ 8-9. Neither would be sufficient to obtain a driver's license or a nondriver's license; for that, she would need proof of her residential address. *See* N.D. Cent. Code § 16.1-01-04.1. She cannot obtain a tribal or BIA ID from where she lives in Sioux County because she is not a member of that tribe. Twinn Dec. ¶ 13. She has no utility bill, bank statement, government-issued checks, or any other tribal document setting forth her residential address, nor any paycheck that would do so. Twinn Dec. ¶¶ 10-12.

She is far from alone in facing this near impossibility of obtaining ID. Rather, as Ms. Twinn's aunt Phyllis Young has explain, "[t]here are others like Kim that live in our community but are not enrolled in the Standing Rock Sioux Tribe but are members of other tribes. These individuals often have difficulty receiving necessary documentation of their residential address to vote." Young Dec. ¶ 6. For Ms. Twinn and those similarly situated, the burden imposed by the "residential address" requirement is particularly severe. Nothing they possess, and nothing they can feasibly obtain, will satisfy the law's requirement. They cannot open a bank account, because the Patriot Act requires proof of a physical address to do so. *See* Laducer Dec. ¶ 4. In order to vote, they would be required either to induce the government to send them a check or purchase utility services. Electrical consumption bears no relation to one's qualification to vote, and the "residential address" requirement unconstitutionally burdens the right to vote for those who lack any feasible means of obtaining the necessary documentary proof.

**C.    Plaintiffs are likely to prevail in proving that the "residential address" requirement is an undue burden for those whom the government has failed to**

**assign an address or who are unable to obtain a "residential address" ID by election day.**

Plaintiffs are likely to prevail in proving that the "residential address" requirement is an undue burden for those Native Americans whom the government has failed to assign an address or who are unable to obtain a residential address ID by Election Day. It is unduly burdensome to disproportionately require only some voters to compel the government to perform one of its most basic functions—providing residential addresses—as a precondition to voter eligibility. This is especially so considering the difficulties Native Americans on reservations face in obtaining those addresses. For some, it has taken multiple trips, and over a month to obtain an address. *See* Charette Dec. ¶¶ 2-5; Riggs Dec. ¶¶ 4-8; Smith Dec. ¶ 14. In Sioux County, the 911 coordinator often has been unavailable.[3] People face bureaucratic red tape, such as long and confusing telephone answering services that do not mention address assignment or the 911 coordinator. Pasternak Dec. (2d) ¶ 6. Others face confusing and circular paperwork, such as in Rolette County, where those who complete the paper application must obtain the longitudinal coordinates of the home; the Township, Range, and Section; Block Number and Lot Number; and the road name (one of the pieces of information the form is intended to uncover).

Moreover, in several locations, a voter seeking to obtain an address must interact with law enforcement to do so. In Sioux and Mountrail counties, the only 911 coordinator is the sheriff.[4] But courts recognize that requiring a voter to interact with the sheriff in order to vote is deeply problematic, and severely burdensome. *See Veasey v. Perry*, 71 F.Supp.3d 627, 693 (S.D. Tex.

---

[3] Maggie Astor, *In North Dakota, Native Americans Try to Turn an ID Law to Their Advantage*, Oct. 30, 2018, https://www.nytimes.com/2018/10/30/us/politics/north-dakota-voter-id.html

[4] N.D. Dep't of Emergency Servs., Sioux County/Standing Rock,
 https://www.nd.gov/DES/emergency/sioux/;
Mountrail, https://www.nd.gov/DES/emergency/mountrail/.

2014); *vacated on grounds*, *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (*en banc*). Indeed, many states prohibit the presence of law enforcement at polling stations. *See, e.g.*, FLA. STAT. § 102.101 (1895); IND. CODE § 3-6-6-36 (1999); LA. STAT. ANN. § 18:428A (2013); 25 PA. CONS. STAT. § 3047 (2009). The Supreme Court has observed that "law enforcement officers generally are barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process." *Burson v. Freeman*, 504 U.S. 191, 207 (1992).

And even if a voter chose to seek to obtain an address, given the mass chaos of the 911 addressing system on North Dakota's reservations, the voter would have no guarantee of succeeding in obtaining a valid address that the State would accept for voting purposes. *See* Hesse Dec. ¶¶ 9-10; Riggs Dec. ¶ 6; Laverdure Dec. ¶ 4-6; Yellow Fat Dec. ¶¶ 4-8; Smith Dec. ¶¶ 11-16. Indeed, a thorough examination of road names in Spirit Lake and Fort Berthold using the North Dakota GIS Hub Explorer, an official tool previously cited by Defendant Jaeger as an authoritative source for 911 addresses, reveals a 911 addressing system plagued by errors and chaos—roads labeled "Unknown," roads with more than one name, and roads with no names. *See* Pasternak Dec. & Exhibits) (compilation of screenshots of "unknown," contradictory, double-named, and no-named roads, plus screenshots of corresponding aerial views of homes on those roads); Christ Dec. & Exhibits (same).

Moreover, Native Americans living on North Dakota's reservations who have not yet been able to obtain an ID with their residential address face an undue burden if they are precluded from voting next Tuesday for lack of residential address. First, the chaos and confusion caused by the flawed address system on the reservations has caused a surge in the number of new tribal IDs being requested; there may not be sufficient time for the tribes to meet the need. Smith ¶ 16. Second, Native Americans often lack access to DMV services to obtain an acceptable ID. In Turtle

Mountain, the DMV in Rolla is only open once a month for three hours; the last time DMV was open was October 3, prior to the Supreme Court's decision in *Brakebill*. The next time the DMV will be present in Rolla is November 7—the day *after* the Election. *See* Laducer Dec. ¶ 7. So during the busiest time in *years* for obtaining IDs, several categories of IDs have been unobtainable for members of Turtle Mountain unless they could afford to travel 200 miles roundtrip to Minot or 160 miles roundtrip to Devil's Lake. Bank statements are also largely useless for proving a residential address for Native Americans because the statements generally list their P.O. boxes. *See* Laducer Dec. ¶ 3. And even if people in Turtle Mountain wanted to change their address, the new statement would not be mailed until November 15—a week after the Election. *See* Laducer Dec. ¶ 8. Just as in 2016, "a safety net is needed for those voters who cannot obtain a qualifying ID with reasonable effort." *Brakebill v. Jaeger*, No. 1:16-CV-008, 2016 WL 7118548, at *1 (D.N.D. Aug. 1, 2016).

**D.  The State's interests—as applied to the categories of voters—are weak.**

In the abstract, the Eighth Circuit held that the State has an interest in using an addressing system to prevent voter fraud and ensure that voters cast ballots in the correct precincts. *Brakebill v. Jaeger*, 905 F.3d 553, 559 (8th Cir. 2018). But the question presented here is quite different: does the State have a significant interest in enforcing the law in this manner against these categories of voters in particular? The answer to that more narrowly defined question is no.

The State's addressing system may have value and promote voter confidence in areas of North Dakota where the 911 addresses are well-established, do not overlap and conflict, and are not inaccurate. But it has little to no value given the facts established by Plaintiffs' experiences navigating the oft-inaccurate system on many areas of reservations in North Dakota. Indeed, the State's precinct finder places Plaintiff Longie over a mile away from her home. It would be far

more accurate for her to identify her actual residence on a precinct map. *See* N.D. Cent. Code Ann. § 16.1-05-08 (election boards have precinct maps).

And though the state has disdained "self-authentication" of a voter's residential address, their system for providing residential addresses to Native voters provides no better protection than simply allowing a voter to affirm where they live via affidavit or by pointing out their home on a map. The 911 addressing system is nothing more than self-authentication. The process involves more bureaucratic steps but the actual manner of receiving a 911 address is still self-authentication. Laverdure Decl. ¶¶ 6-8; Riggs Decl. ¶ 6. This system does nothing more to prevent fraud; instead it functions only to create more steps that will deter and suppress weary voters frustrated by a broken system. The state has therefore failed to advance its interests in any meaningful fashion, while imposing a severe burden on Native American voters.

## III.   In the Absence of a Restraining Order, Plaintiffs Will Suffer Irreparable Harm by Being Forever Denied the Right to Vote in the 2018 Election

"The right to vote and to have one's vote counted 'is of the most fundamental significance under our constitutional structure.'" *Spirit Lake Tribe v. Benson Cty*, No. 2:10-cv-095, 2010 WL 4226614, at *4 (D.N.D. October 21, 2010) (quoting *Ill. Bd. of Election v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). The denial of the right to vote is a constitutional injury that cannot be redressed. *See Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016).

There is a very real risk that the deeply flawed system implemented by North Dakota for issuing and verifying residential addresses to Native Americans living on or near the reservation will result in the widespread denial of the right to vote for qualified Native voters. Indeed, Native voters are already being denied access to the ballot. This clear and imminent risk of irreparable harm weighs in favor of granting the temporary restraining order. *Planned Parenthood of Minn., Inc. v. Citizens for Cmty Action*, 558 F.3 861, 867 (8th Cir. 1977) (holding that a showing by

plaintiffs that the challenged regulation "interfere[s] with the exercise of [their] constitutional rights . . . supports a finding of irreparable injury.").

## IV.    The Balance of Harms and Public Interest Weigh Heavily in Favor of Plaintiffs

The potential harms alleged by the State, and recognized by the Eighth Circuit in *Brakebill,* simply do not have the same force in light of the evidence put forth by Plaintiffs in this as-applied challenge. *See supra* Section II.D. In contrast, the burdens imposed on Native voters through the careless implementation of State's addressing system shift the balance in favor of granting the temporary restraining order.

The Eighth Circuit found that requiring the State to accept identification listing a mailing address left it vulnerable to the potential that sufficient numbers of voters could vote in the wrong precinct to tip the scales in an otherwise close election. *See Brakebill*, 905 F.3d at 560. But the State cannot seriously purport to rely on the accuracy of the 911 system for verifying which precinct a voter is entitled to vote in, when the system itself is riddled with errors. And given that substantial numbers of qualified voters may be disenfranchised on the basis that their addresses are "invalid," there is a real possibility that the State's enforcement of the residential address requirement against Native voters could result in the disenfranchisement of enough qualified electors to "affect the outcome of a local election." *Id*.

The State also argued that requiring it to accept identification listing a mailing address would allow non-resident voters to vote fraudulently in North Dakota simply by setting up a P.O. Box address in the State. *See Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 104 at 9. But this harm is attenuated in light of the relief requested by Plaintiffs, which is narrowly tailored to ensure access to the ballot for voters who might otherwise be denied the right to vote, while still "requiring a form of identification with a residential street address from the vast majority of residents who have residential street addresses." *Brakebill*, 905 F.3d at 558. For example, allowing

Native American voters who have acceptable forms of identification that list a residential street address to vote without verifying their addresses simply does not give rise to the threat that non-resident voters could vote in North Dakota using a P.O. Box address. Likewise, the risk of Native American voters committing fraud at a reservation polling place by lying about the physical location of their address on a precinct map is extraordinarily low (because the risk of being caught would be so high).

Finally, denying qualified Native electors the right to vote creates a substantial risk of undermining confidence in the legitimacy of elections. *See Spirit Lake*, No. 2:10-cv-095, 2010 WL 4226614, at *5

## V.   The Requested Relief Is Appropriately Tailored.

Plaintiffs are only seeking relief for counties that include an Indian reservation. Plaintiffs are also only seeking relief for the following categories of voters who are at imminent risk of disenfranchisement: (1) voters with IDs with residential addresses that the State considers "invalid"; (2) voters with no access to an accurate residential address to place on a qualifying ID; (3) voters with no access to documentation of their residential address; (4) voters whose addresses are unassigned; and (5) voters unable to determine their address and obtain a qualifying ID before Election Day. For these voters, Plaintiffs ask the Court to enjoin the proof of residential address requirement and in its place require voters to identify their residence on the precinct map. *See* N.D. Cent. Code Ann. § 16.1-05-08. This remedy is appropriately tailored to the affected individuals that Plaintiffs represent. *See Veasey*, 830 F.3d at 271.

## CONCLUSION

For the foregoing reasons, the Court should enter an order providing the relief described above and as outlined in Plaintiffs' proposed order.

Respectfully submitted,


/s/ Timothy Q. Purdon_____
Timothy Q. Purdon (ND#05392)
ROBINS KAPLAN LLP
1207 West Divide Avenue
Suite 200
Bismarck, ND 58503
T: (701) 255-3000
F: (612) 339-4181
TPurdon@RobinsKaplan.com

Matthew Campbell
NM Bar No. 138207, CO Bar No. 40808
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
Phone: (303) 447-8760
mcampbell@narf.org

Jacqueline De León
CA Bar No. 288192, DC Bar No. 1023035
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
jdeleon@narf.org


Mark P. Gaber *
Danielle M. Lang *
Molly Danahy *
   ❖Licensed to practice in N.Y. only; supervision by Mark P. Gaber, a member of
   the D.C. Bar.
CAMPAIGN LEGAL CENTER
1411 K Street NW, Suite 1400
Washington, DC 20005
(202) 736-2200

Joseph M. Sellers, Bar No. 318410 *
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Counsel for Plaintiffs*

\* — *Motions for admission* pro hac vice *forthcoming*

Dated: October 31, 2018_____