**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| SPIRIT LAKE TRIBE, on its own behalf and on behalf of its members, STANDING ROCK SIOUX TRIBE, on its own behalf and on behalf of its members, DION JACKSON, KARA LONGIE, KIM TWINN, TERRY YELLOW FAT, LESLIE PELTIER, CLARK PELTIER, <br><br> Plaintiffs, <br><br> v. <br><br> ALVIN JAEGER, in his official capacity as Secretary of State, <br><br> Defendant. | **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Civil No. 1:18-cv-00222 |

Plaintiffs, by and through their undersigned attorneys, allege on information and belief as follows:

## INTRODUCTION

1.       Plaintiffs bring this action to vindicate their right and the right of their members to vote under the First, Fourteenth, and Fifteenth Amendments to the United States Constitution and the Voting Rights Act. Plaintiffs seek injunctive and declaratory relief narrowly tailored to ensure that eligible Native American voters residing on or near reservations in North Dakota will be able to cast their ballots in future elections free from unnecessary and discriminatory restrictions.

2.       Native American voters have the same fundamental right to vote as every other North Dakotan. The Constitution guarantees that right. But the State's law requiring voters to

1

present identification proving their current residential address imposes on them—and uniquely on them—a severe impediment to that right.

3.     The current implementation of North Dakota's proof of residential address requirement is broken. The Defendant assured this Court, the Eighth Circuit, and the Supreme Court that it could fairly administer this law. The facts on the ground show otherwise. In the 2018 election, voters whose state-issued or tribal IDs list what they knew to be their current residential address had their absentee ballot applications rejected as having "invalid" addresses. North Dakota has indicated in this litigation that it expects voters not only to have a current residential address but one that matches the "possible ranges in [his or her] county" according to the Central Voter File. Doc. 39. Given the lack of uniformity in addressing across North Dakota reservations, this problem likely threatens thousands of potential Native American voters.

4.     Moreover, many Native Americans simply have no residential address because the government has not assigned them one. Others have been assigned an address, but it was never communicated to them. Rarely will one encounter a road sign in rural areas of reservations. Many such roads in North Dakota have been assigned multiple, conflicting names, and many homes have been assigned multiple, conflicting numbers. Some homes have been identified as occupying two cities, with different zip codes, depending upon the occupant to whom the government spoke in assigning an address.

5.     The State had six years to fix this—a problem of its own making.

6.     This law, as applied to Native Americans living on or near reservations in this State, is plainly unconstitutional and violates the fundamental protections of the Voting Rights Act.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

8.      This court also has jurisdiction pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

9.      This Court has personal jurisdiction over Defendant, who resides in this district, in his official capacity.

10.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b).

11.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## LEGAL BACKGROUND

12.     In February 2018, six individual Plaintiffs asked this Court to enjoin the requirement that a voter produce identification (or identification plus supplemental documentation) with a current residential street address on the grounds that it is facially unconstitutional and unconstitutional as applied to those Plaintiffs. *See Brakebill v. Jaeger*, No. 1:16-cv-008-DLH, 2018 WL 1612190 at *1 (Apr. 3, 2018). On April 3, 2018, this Court granted the injunction and ordered that the Secretary of State expand the types of acceptable identification and accept otherwise valid forms of identification that listed either a current residential street address or a current mailing address including a P.O. box. *Id*. at 7.

13.     On September 24, 2018 the Eighth Circuit stayed this Court's order requiring the state to accept otherwise valid forms of identification that list a P.O. Box or other current mailing

address. *Brakebill*, No 18-1725, Slip. Op. at 11. The Eighth Circuit found that "even assuming that some communities lack residential street addresses, that fact does not justify a statewide injunction that prevents the Secretary from requiring a form of identification with a residential street address from the vast majority of residents who have residential street addresses." *Id.* at 7.

14.     The Eighth Circuit explicitly acknowledged that "a court might have authority to enter a narrower injunction to relieve certain voters of an unjustified burden," and indicated that "if any resident of North Dakota lacks a current residential street address and is denied an opportunity to vote on that basis, the courthouse doors remain open." *Id.* at 11.

15.     This is the lawsuit the Eighth Circuit contemplated.

## PARTIES

### *Spirit Lake Tribe*

16.     Plaintiff SPIRIT LAKE TRIBE is a federally recognized Tribe with an enrollment population of 7,547 members. Approximately 3,659 members live on the Spirit Lake Reservation, which covers approximately 405 square miles, primarily in Benson County and Eddy County. Approximately 108 additional members live within twenty miles of the Reservation. Parts of the Reservation extend into Nelson County, Wells County, and Ramsey County. Approximately 2,146 of the Reservation's residents are eighteen years old or older, along with 66 of the members who live near the reservation. Spirit Lake asserts claims based on its own injuries and on behalf of its members as *parens patriae*.

17.     Many streets on the Spirit Lake Reservation do not have marked signs on them and many houses are not labeled with numbers. On parts of the Reservation, the residences do not have street addresses assigned. Many members who do have street addresses assigned by a county 911

coordinator do not know their address and have not been notified of their address. On parts of the Reservation, mail service does not exist and members rely upon P.O. boxes to receive mail.

18.     The Spirit Lake Tribe has many members who live in poverty and do not consistently live in one house, although they remain within one district moving from home to home. The Spirit Lake Reservation has a family poverty rate of 41.3%.

19.     The Spirit Lake Tribe has expended and, absent this Court's action enjoining Defendant's unlawful practices, will continue to expend substantial resources to ensure that as many of its enrolled members as possible have acceptable forms of identification for voting. Prior to the Eighth Circuit's stay in *Brakebill v. Jaeger*, Spirit Lake issued tribal IDs with residential addresses or P.O. box mailing addresses. From Monday October 22 through Election Day, Spirit Lake extended its enrollment office hours from Monday through Friday 8am to 4:30 p.m. to Monday through Friday 8am to as late as 7:00 p.m. in order to issue new tribal IDs to its members. To accommodate these hours, the tribe had to pay building security overtime to stay though the extended hours. During this time the enrollment director regularly worked through her lunchbreak to accommodate the need. In total, the enrollment director worked 21.25 hours of overtime to ensure members could obtain ID.

20.     Ordinarily, the enrollment office charges $11 for a tribal ID to cover its costs. It waived these costs for its members for IDs issued before or on Election Day, November 6, 2018. As a result, the tribe lost over $7,000 in income and paid almost $4,000 in expenses to print IDs. The enrollment director not only issues tribal IDs but also assists members in determining their proper 911 street addresses, which take additional time to obtain.

21.     The enrollment director's duties extend beyond issuing IDs. The enrollment office also collects enrollment applications, procures enrollment documents, creates family trees, issues

income verification, and works with services such as schools, social services, tribal court, and ICWA to name a few.

22.    The Spirit Lake Tribe does not have the resources to issue tribal IDs for free indefinitely.

23.    The Spirit Lake Tribe has spent and will continue to spend resources on public outreach to inform its members of the residential street address requirement for voting.

24.    Members and staff of the Spirit Lake tribal government expended substantial time and resources each day during the weeks leading up to the November 2018 election to ensure members had access to valid identification for voting. The Spirit Lake tribal government expects to continue to expend time and resources on ensuring access to valid identification for its members leading up to subsequent elections.

25.    The State of North Dakota has not provided the Spirit Lake Tribe with any resources, financial or otherwise, to assist members in obtaining IDs with residential street addresses, which the State is now requiring for the Spirit Lake Tribe's members to vote.

26.    From October 22 to November 6, 2018, the enrollment office issued 665 new IDs to its tribal members. This is almost 30 times the ordinary rate of tribal ID issuance. Prior to Election Day 2018, long lines, particularly during lunch breaks, formed nearly every day to obtain tribal IDs. Prior to Election Day 2018, Spirit Lake Tribe distributed tribal IDs to members who previously had tribal IDs with only P.O. box addresses, members who had no IDs whatsoever, and members who did not have their *current* address on their tribal ID.

27.    Many of the members who receive tribal IDs do not know their residential street address and have always relied upon their P.O. box. These members needed assistance to determine their residential street address.

6

28.     Many members rely on a P.O. Box because they are homeless and move around between friends' and relatives' homes.

29.     Additionally, many people living on the reservation are not eligible for a tribal ID because they are not members of the tribe. This includes descendants of Spirit Lake members, members of other tribes, and spouses of members.

30.     Some members do not know their physical address when they arrive to obtain an ID. Staff at the enrollment office must therefore assist the member in determining their physical address. If the staff cannot determine the address based on the member's description, then they call the Benson County 911 coordinator to determine the address or have one assigned. It can take multiple attempts to reach the 911 coordinator.

31.     Addresses obtained by members from the 911 coordinator are not always correct. Addresses may be given out with the incorrect city or zip code. As such, many members have to try more than once to obtain the correct address. And, many members have to come back in to have their IDs reissued with the correct address.

32.     Prior to Election Day 2018, Spirit Lake Tribe identified at least 262 members whose tribal IDs did not list a residential street addresses.

33.     Prior to Election Day 2018, Spirit Lake Tribe identified an error in the street address for at least 15 of its members who thought their address was on Crow Hill Road in Fort Totten. After further investigation, the enrollment director determined that the "correct" 911 address is Crow Hill Road in Oberon.

34.     There is a severe housing shortage on the reservation, and many members live in poverty, and may not consistently live in one house. Members may rotate households depending on where their relatives and friends are. As a result, many of the members of the Spirit Lake Tribe

are transient or change residences on a frequent basis. Because of the residential address requirement, the Spirit Lake Tribe will need to update their tribal IDs each time a member relocates.

35.     The tribe expects that many of the individuals who obtained a new ID listing their physical address will not still be living at the same address before the next election.

36.     As a result, Spirit Lake expects to continue to expend substantial resources to ensure its members have the necessary identification to vote in future elections.

### *Standing Rock Sioux Tribe*

37.     Plaintiff STANDING ROCK SIOUX TRIBE (Standing Rock) is a federally recognized Tribe with an enrollment population of approximately 15,975 members, 8,367 of whom live on the Standing Rock Sioux Reservation. The Standing Rock Sioux Reservation has a land base of approximately 2.3 million acres extending across both North and South Dakota. On the North Dakota side of the border, the Standing Rock Sioux Reservation is coterminous with Sioux County, and contains approximately one million acres of land.  Approximately 5,868 of residents living on the reservation are eighteen years old or older. Standing Rock asserts claims based on its own injuries and on behalf of its members as *parens patriae*.

38.     The Sioux County Sheriff, who is also the 911 Coordinator, has assigned tribal members 911 addresses that do not correspond with the physical location of their residence.

39.     Standing Rock has many members who live in poverty and do not consistently live in one house, although they remain within one district moving from home to home. Sioux County has a family poverty rate of 35.9%.

40.     Standing Rock has expended and, absent this Court's action enjoining Defendant's unlawful practices, will continue to expend substantial resources to ensure that as many of its

enrolled members as possible have acceptable forms of identification for voting. Prior to the Eighth Circuit's stay in *Brakebill v. Jaeger*, Standing Rock issued tribal IDs with residential addresses or P.O. box mailing addresses. From October 15 through November 6, 2018, Standing Rock waived the $5 fee for issuing updated or duplicate IDs to members under 60 years of age to ensure that they could obtain an ID with a residential address before the 2018 election. During that period Standing Rock issued 807 total IDs, 486 of which were IDs which they would have charged for if they had not waived the fee. As a result, Standing Rock lost nearly $2,500 in income and incurred almost $500 in costs just to print IDs for members.

41. Standing Rock does not have the resources to issue tribal IDs for free indefinitely.

42. Standing Rock has spent and will continue to spend resources on public outreach to inform its members of the residential street address requirement for voting.

43. Members and staff of the Standing Rock tribal government also expended substantial time each day during the weeks leading up to the November 2018 election to ensure members had access to valid identification for voting. The Standing Rock tribal government expects to continue to expend time on ensuring access to valid identification for its members leading up to subsequent elections.

44. Because of the residential address requirement, Standing Rock devoted significant financial and staff resources to a field organizing campaign aimed at ensuring that members were able to obtain ID and vote in the 2018 election. The State of North Dakota has not provided Standing Rock with any resources, financial or otherwise, to assist members in obtaining IDs with residential street addresses, which the State is now requiring for Standing Rock members to vote.

45. From October 15 to November 6, 2018 the Ft. Yates enrollment office issued 807 new IDs to its tribal members. Normally, the Fort. Yates office issues about 47 IDs a month. Prior

9

to Election Day 2018, long lines, particularly during lunch breaks, formed nearly every day to obtain tribal IDs.  In the lead up to Election Day 2018, Standing Rock distributed free tribal IDs to members who previously had tribal IDs with only P.O. box addresses, members who had no IDs whatsoever, and members who did not have their *current* address on their tribal ID.

46.     Many members who receive tribal IDs do not know their residential street address and have always relied upon their P.O. box. These members needed assistance to determine their residential street address.

47.     Additionally, many people living on the reservation are not eligible for a tribal ID because they are not members of the tribe. This includes descendants of Standing Rock members, members of other tribes, and spouses of Standing Rock members.

48.     Addresses obtained by members from the 911 coordinator are not always correct. As such, members may have to try more than once to obtain the correct address.

49.     There is a severe housing shortage on the reservation, and many members live in poverty, and may not consistently live in one house. Members may rotate households depending on where their relatives and friends are. As a result, members of Standing Rock may be transient or change residences on a frequent basis. Because of the residential address requirement, members will need to update their tribal IDs each time they relocate.

50.     Many of the individuals who obtained a new ID listing their physical address will not still be living at the same address before the next election.

51.     As a result, Standing Rock has spent and expects to continue to expend substantial resources to ensure its members have the necessary identification to vote in future elections.

52.     The DOT does not operate a DLS on the Standing Rock Reservation. The nearest DLS is located in Bismarck, North Dakota. The mean travel distance for voting age Native

Americans from the Standing Rock Reservation to the DLS in Bismarck is 65.8 miles, and the mean travel time is approximately 112.4 minutes.

### Dion Jackson and Kara Longie

53.     Plaintiff Dion Jackson is a 34-year-old enrolled member of the Spirit Lake Tribe. He resides on the Spirit Lake Reservation and is a citizen of the United States. He lives with his girlfriend Plaintiff Kara Longie and their two children in Tokio, North Dakota. Mr. Jackson is the primary caregiver for his two children.

54.     Mr. Jackson has lived in in his current residence for the past two years. Since moving to this residence, Mr. Jackson had always understood his address to be 8225 34th St. NE, Tokio, N.D. 58379. Ms. Longie, his girlfriend, whose mother previously lived in the home before she passed away, informed him of this address when he moved in.

55.     Mr. Jackson has a North Dakota non-driver's ID that was issued to him on March 28, 2017. The address listed on his North Dakota identification card is 8225 34th St. NE, Tokio, N.D. 58379. He is able to receive packages through UPS and FedEx by using this address. He relies on his P.O. Box for all other mail.

56.     Mr. Jackson has not previously voted but attempted to vote for the first time in 2018. He submitted an application for an absentee ballot on October 14, 2018. The absentee ballot application included his North Dakota non-driver's ID number and the 8225 34th St. NE address that is on his state ID.

57.     On October 22, 2018, he received a letter at his P.O. box from the Benson County Auditor/Treasurer. The letter states that the Auditor received his absentee ballot application and that it was rejected because the address on the application "does not match the address in the ND

DOT database or is an invalid address." The letter was accompanied by his original absentee ballot application.

58.     While 8225 34th St. NE, Tokio, N.D. 58379 appears on Mr. Jackson's state issued ID, it nevertheless is not an address that appears using the Secretary of State's "My Voting Information" online tool.[1]

59.     Prior to the initiation of this action, upon entering Mr. Jackson's ID number and birthdate into the "My Voting Information" online tool, the tool indicated: "Record Not Found."

60.     There is no street sign on Mr. Jackson's street nor is there a number on his house.

61.     On the North Dakota GIS Hub Explorer, an official tool previously cited by Defendant Jaeger as an authoritative source for 911 addresses, Mr. Jackson's street is marked as "Unknown2."



---

[1] *My Voting Information*, N.D. Sec'y of State,
https://vip.sos.nd.gov/WhereToVote.aspx?tab=AddressandVotingTimes (last visited Oct. 30, 2018).

62.     Google Maps shows 8225 34th St. NE as an address nearby Mr. Jackson's home. In the figure below, the blue dot represents Mr. Jackson's home. The red flag indicates where Google Maps places his known address. The street with the red flag is labeled 82nd Ave. Mr. Jackson's street has no road sign.





63.     Mr. Jackson's right to vote an absentee ballot was denied on the basis of a supposedly "invalid" address despite his use of an address that is on his North Dakota state-issued ID, is the only address the residents of that home have ever known, and is used by FedEx and UPS to deliver packages.

64.     Plaintiff Kara Longie is a 35-year-old enrolled member of the Spirit Lake Tribe. She is a resident of the Spirit Lake Reservation and a citizen of the United States. She lives with her boyfriend Plaintiff Dion Jackson and their two children. She works as a slot tech at the Spirit Lake Casino.

65.     Ms. Longie's mother lived at the residence before she passed away. Ms. Longie has used this residence as her permanent residential address dating back to at least 2012 and has lived there permanently and continuously since 2013 after her mother passed away.

66.     The only address Ms. Longie has ever known for her home is 8225 34th St. NE, Tokio, N.D. 58379. She believes that she located that address in the telephone book in or around 2012.

67.     Ms. Longie has a North Dakota non-driver's identification that lists 8225 34th St. NE, Tokio, N.D. 58379 as her address. It was issued on May 3, 2012.

68.     Ms. Longie's First Community Credit Union uses this address as well.

69.     Ms. Longie recently had Dish Network satellite service set up her at residence at this address. UPS delivered the satellite to her home using this address.

70.     However, as discussed above, this address does not appear when using the "My Voting Information" online tool.

71.     Upon entering Ms. Longie's ID number and birthdate into the "My Voting Information" online tool, the tool indicates that her address is 8225 34th St NE, Warwick, ND 58381:



72.     When the Warwick address is searched for on the North Dakota GIS Hub Explorer, it identifies an address not particularly close to Ms. Longie's actual residence (the red dot in the figure below):



73.    The Warwick address does not appear in Google Maps:



74.    When Ms. Longie learned that Plaintiff Jackson's absentee ballot application was rejected she feared that she would not be permitted to vote because their shared address was considered "invalid."

75.    The day after this action was filed, the Benson County Auditor's office called Plaintiff Dion Jackson to inform him and Plaintiff Longie that their "valid" address "for voting purposes" is 8226 35th St. NE #208, Tokio, ND 58379. Neither Plaintiff Jackson nor Plaintiff Longie were familiar with this address. Nor do they have photo identification listing that address. The Benson County Auditor issued them letters to serve as their "supplemental documentation" of their residential address.

76.    North Dakota's GIS Hub Explorer does not recognize 8226 35th St. NE #208, Tokio, ND 58379 as a valid address. Per the GIS tool, there is no "8226" on 35th St. NE in Tokio, as shown below.

16



77.     Upon an order from this court, Plaintiff Longie and Plaintiff Jackson voted on November 6, 2018.

78.     If Plaintiffs Jackson or Longie lose this "supplemental documentation," they will once again find themselves without the proper paperwork to vote since their North Dakota IDs contain "invalid" addresses.

79.     Moreover, it is not clear that this "supplemental documentation" will allow Plaintiffs Jackson or Longie to vote by absentee ballot given that the address on their North Dakota ID is "invalid."

80.     Plaintiffs Jackson and Longie should not be required to furnish paperwork stating an address with which they are unfamiliar and do not use in their daily lives in order to participate in our democratic system. Plaintiffs should not be required to have documentary proof of an address "for voting purposes" that does not otherwise serve as a functional address for their home.

81.     Finally, as residents of the Spirit Lake Reservation they face the very real prospect of facing precisely the same problems in obtaining necessary paperwork to vote should they relocate to a new residence on the Reservation.

### Leslie and Clark Peltier

82.     Plaintiffs Leslie Peltier and Clark Peltier ("Peltiers") are married and reside together. They are both enrolled members of the Turtle Mountain Band of Chippewa Indians and citizens of the United States. They live on reservation Trust Land north of the Reservation boundary.

83.     Plaintiff Leslie Peltier is a member of the faculty at Turtle Mountain Community College.

84.     Plaintiff Clark Peltier is the foreman of the maintenance department at the Turtle Mountain Housing Authority.

85.     The Peltiers have lived in their current residence for the past twelve years. Their home is rural and is located about 11 miles northwest of Belcourt, North Dakota. The roads around their home are primarily gravel roads. There is not a street sign on the road where they live, nor are there are street signs nearby.

86.     On or about the 2012 election, the Peltiers went to vote at their polling place in Belcourt, North Dakota. A representative from Rolette County was present at the polling location and asked them to describe where they lived. Based upon the information the Peltiers described, the representative wrote down their assigned address: 10296 40th Ave. NE. The representative did not write down a city or zip code.

87.     The Peltiers have always understood themselves to live in the city of Belcourt with a zip code of 58316. The representative at the polling place did not inform them otherwise.

88.     In 2013, after receiving their 911 address, the Peltiers obtained new North Dakota driver licenses. Those driver licenses list the following address: 10296 40th Ave NE, Belcourt, ND 58316.

89.     At a subsequent election, the Peltiers again presented themselves at their polling place in Belcourt. However, this time, the poll worker informed them that, based on their address, they should vote in St. John. St. John is not located on the Reservation. As a result of this change, on Election Day, they now have to travel to St. John to vote in state and local races and to Belcourt to vote in tribal elections.

90.     When the information from the Peltiers' driver license address is entered into the Secretary of State's "My Voting Information" online tool, it does not identify 10296 40th Ave. NE, Belcourt, ND 58316. The only address it can find with the house number 10296 in the zip code 58316 is on BIA Road 7. The Peltiers do not live on BIA Road 7.

91.     When the Peltiers' driver license numbers and birth dates are entered into the online tool, their address is listed as follows: 10296 40th Ave. NE, St. John, ND 58369.

92.     The Peltiers do not have any identification or supplemental documentation that lists their address as in St. John or a zip code of 58369. Their tribal IDs do not include a residential street address.

93.     Given the difference between the address on the Peltiers' driver licenses and the "valid" address according to North Dakota's Central Voter File, the Peltiers feared they would not be able to vote when they filed this action in October 2018.

94.     Upon order of this court, the Peltiers were permitted to vote on Election Day 2018.

95.     The Peltiers plan to vote in subsequent elections. They fear that they will not be permitted to do so because the residential address on their IDs does not match the assigned 911 address for their home in the State's files.

96.     Finally, the Peltiers face the very real prospect of encountering precisely the same problems in obtaining necessary paperwork to vote should they relocate to a new residence.

### Kim Twinn

97.     Plaintiff Kim Twinn is a 46-year-old resident of Fort Yates on the Standing Rock Reservation and a citizen of the United States.

98.     Ms. Twinn was born in Fort Yates Hospital and has lived in Fort Yates, North Dakota her entire life. Although Ms. Twinn was born on the Standing Rock Reservation, she is not an enrolled member of the Standing Rock Sioux Tribe. She is an enrolled member of the Northern Cheyenne Tribe.

99.     Ms. Twinn lives at 8746 Highway 24, Fort Yates, North Dakota 58538, with her aunt Phyllis Young. She has lived there for about one year. She serves as the caretaker for her uncle Eugene Young.

100.    Ms. Twinn has only two forms of identification: her Fort Yates birth certificate and her enrollment certificate from the Northern Cheyenne Tribe. Both indicate her birth date and name but not her residential street address.

101.    Ms. Twinn does not own a home nor is her name listed on any bank statements or utility bills that are delivered to her residence. She is not employed and therefore does not receive a paycheck.

102.    Because she is not a member of the Standing Rock Sioux Tribe she cannot receive a tribal ID from the Tribe's enrollment office.

103.     After the filing of the original complaint, the Sioux County Sheriff went unannounced to both Ms. Twinn's home and an office where she was volunteering to help other Standing Rock tribal members vote to serve her with a document reflecting her 911 address.

104.     Upon order of this court, Ms. Twinn was permitted to vote on Election Day 2018.

105.     Ms. Twinn has not identified any way to obtain an identification or supplemental documentation of her residential address that would allow her to vote in subsequent elections.

### *Terry Yellow Fat*

106.     Plaintiff Terry Yellow Fat is a 69-year-old enrolled member of the Standing Rock Sioux Tribe. He lives in Fort Yates, North Dakota.

107.     A few years ago, a sign was put up near his house that said "Buffalo Avenue." He does not know who put that sign up or what it signifies but he assumed he must live on Buffalo Avenue.

108.     Sometime after that sign went up, Mr. Yellow Fat went to the courthouse to speak to the sheriff, who is also the 911 coordinator, to receive his 911 address. He was given the following address: 1343 92nd Street.

109.     There is no sign on his street that says 92nd Street. He had never heard of this address before.

110.     Even so, he and his family attempted to use that address for packages. But the packages did not arrive.

111.     Eventually, the UPS delivery person found Mr. Yellow Fat and his family. He told Mr. Yellow Fat that he had struggled to find him because 1343 92nd Street is an address that belongs to a liquor store further down the street.

21

112. When the "1343 92nd Street" address is searched for on the North Dakota GIS Hub Explorer, the search result appears on a street labeled 93rd Street. Mr. Yellow Fat actually lives further to the west of that result at the corner of what is labeled 93rd Street and Buffalo Avenue. Further to the west, the same street is labeled 92nd Street. Mr. Yellow Fat's actual residence is represented by the red circle in the figure below.



113. Mr. Yellow Fat uses his P.O. box to receive mail. His utility bills for his home are delivered to his P.O. box and do not include a residential address.

114. Mr. Yellow Fat's current tribal ID includes only his P.O. box.

115. Mr. Yellow Fat does not have any identification or supplemental declaration with the 1343 92nd Street address.

116. Even if Mr. Yellow Fat asked to have the enrollment office issue him a new tribal ID with the "911 address" he was given, it would not represent the "fixed permanent dwelling" where he actually lives.

117. After the filing of the original complaint, the Sioux County Sheriff went to Mr. Yellow Fat's home unannounced and served him with a document reflecting his 911 address "for

purposes of voting in the <u>November 6, 2018 North Dakota statewide election.</u>" *See* Doc. 34-3 (emphasis in original).

118.    Upon order of this court, Mr. Yellow Fat was permitted to vote on Election Day 2018.

119.    Mr. Yellow Fat is a qualified elector who wishes to vote in subsequent elections.

120.    The documentation provided to Plaintiff Yellow Fat is limited on its face to the November 6, 2018 election, and does not provide him with sufficient documentation of his residential address for voting in subsequent elections.

121.    Finally, as a resident of the Standing Rock Reservation he faces the very real prospect of encountering precisely the same problems in obtaining necessary paperwork to vote should he relocate to a new residence on the Reservation.

### *Defendant*

122.    Defendant Alvin Jaeger is the North Dakota Secretary of State and is sued in his official capacity. The North Dakota Secretary of State is the State's supervisor of elections. The Office of the North Dakota Secretary of State is responsible for coordinating the implementation of N.D. Cent. Code § 16.1-01-04.1. The Secretary of State is further responsible for providing "uniform training materials" to elections officials and for ensuring "uniform voting opportunities throughout the state." N.D. Cent. Code §§ 16.1.1-01-01(1), (2)(a), & (3).

### FACTS

*Eligible Native American voters have been and will continue be denied the right to vote due to the State's deeply flawed system of assigning and verifying voters' residential addresses.*

123.    North Dakota law requires voters to provide one of three qualifying forms of identification in order to vote. N.D. Cent. Code § § 16.1-01-04.1. In addition, a qualifying ID must list the voter's residential street address in order for the voter to cast a regular ballot. *Id.* The statute

does not define "residential street address" other than to state that the address must be for the fixed permanent dwelling, establishment, or abode at which the voter resides. N.D. Cent. Code § 16.1-01-04.2.

124.    The state's proffered justification for requiring voters to provide a residential street address is twofold: to prevent voter fraud and to verify the voter's qualifications to vote, including that he or she is voting in the correct precinct. *Brakebill v. Jaeger*, No. 18-1725, Slip. Op. at 8-9 (8th Cir. Sept. 24, 2018); 2018 Election Officials Manual at 8. The state represents that it is unable to ensure that a voter will receive the correct ballot without first determining the voter's residential street address. *Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 104 at 6.

125.    Defendant Jaeger's implementation of the residential address requirement of N.D. Cent. Code § 16.1-01-04.1 has not only required a residential address on a qualifying ID but also required that the residential address match a "valid" address according to the State.

126.    When a voter arrives at a polling place or requests an absentee ballot, the 2018 Election Manual directs officials to verify the precinct in which the voter is qualified to vote, according to their residential address, to ensure that the voter receives the correct ballot. 2018 Election Officials Manual at 8. If election officials determine that the address the voter has provided on their ID is in a different precinct, the voter should be directed to the correct polling place. *Id.*

127.    The state verifies a voter's precinct by checking the house number and street name provided against a range of addresses assigned to the County through the Burkle Addressing System. Street names and house numbers within that range are assigned to fixed permanent dwellings by county 911 coordinators, sometimes with the assistance of the County GIS professional. The range of "valid" addresses for each county and precinct are available to County

24

Auditors through the Central Voter File. Doc. 39 at 15. County Auditors are instructed to verify addresses through this system. *Id.* Moreover, on September 26, 2018, the Secretary of State's office notified county auditors that they should use a non-public Department of Transportation Driver's License Address Verification webpage "to verify addresses" of voters and stated that it could be shared with pollworkers for that purpose as well.  If the residential street address provided by the voter matches a house number and street name that is within the precinct, election officials will provide the voter with a regular ballot. If the residential street address provided by the voter matches a house number and street name that is within a different precinct, then the voter will be directed to the polling place for that precinct. 2018 Election Officials Manual at 8.

128.    A voter who provides a residential street address that does not correspond with a street name and house number in the Burkle mapping system is determined to have an "invalid" or "incorrect" address.

129.    A voter who presents a form of identification or identification plus supplemental documentation that lists a residential street address that is "invalid" will not be considered qualified to vote in any precinct, and will neither be directed to a different precinct or be issued a regular ballot. *See* Election Officials Manual at 9; Sec'y Jaeger Letter, Sept. 28, 2018 (stating that if a voter presents a form of identification with "incorrect" information, their information may be updated only if they can provide one of the acceptable forms of supplemental documentation that contains the "correct" information).

130.    Although voters with "invalid" addresses on their identification and supplemental documentation may be able to vote a "set-aside" ballot, their ballot will be counted only if they obtain a new form of identification or supplemental documentation with a "valid" address, and return to the polling place or to the County Auditor's office before the County Canvassing Board

meets on the Monday following an election. N.D. Cent. Code § 16.1-01-04.1(5); Sec'y Jaeger Letter, Sept. 28, 2018.

131.    Voters whose identification lists an "invalid" address only have three days after the election to obtain and submit their new form of identification or supplemental documentation to the County Auditor, since auditors' offices are closed over the weekend. *See* Sec'y Jaeger Letter, Sept. 28, 2018. The Deputy Secretary of State Jim Silrum acknowledged that "[a]s for the set-aside ballots . . . many individuals who cast them will not likely come into [county auditors' offices] later to verify their qualifications." *Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 90-7.

132.    Indeed, 492 set-aside ballots were cast in Cass County in the November 2018 election. Only 13 were verified and counted – 2.6% of the set-aside ballots cast.

133.    Many Native American voters have forms of identification that list a residential street address that may be "invalid," and thus may be denied the right to vote. Plaintiff Jackson used the residential street address listed on his DOT-issued ID on his absentee ballot application form. His application for a ballot was denied in 2018 for having an "invalid" address, and he faces a substantial risk that he will be denied an absentee ballot in subsequent elections because the address on his ID is "invalid."

134.    Plaintiff Longie has the same address on her North Dakota non-driver's ID as Mr. Jackson. She voted in 2018, but faces a substantial risk that she will be denied an absentee ballot in subsequent elections because the address on her ID is "invalid."

135.    Spirit Lake is aware of another enrolled member of the Tribe who had their absentee ballot application for the 2018 election rejected in the same manner as Mr. Jackson. On October 14, 2018 the member turned in an absentee ballot application with the 911 address issued to her

26

by the County and listed on her DOT-issued driver's license. Upon information and belief, the 911 coordinator issued her this address. In a letter dated October 22, she received a letter rejecting her absentee ballot application because "[t]he address written on your application does not match the address in the ND DOT database *or is an invalid address*." (emphasis added).

136.    Moreover, North Dakota's absentee ballot application, last updated in 2015, does not inform voters of their right to attach supplemental documentation establishing their current residential street address.

137.    Voters like Mr. Jackson and Ms. Longie—who have an otherwise valid form of identification that lists a residential address they have always understood to correspond to the physical location of their permanent dwelling—have no notice that they may be disenfranchised. An address assigned to a fixed permanent dwelling through the 911 system is not communicated to the resident of that dwelling unless the resident affirmatively requests the address. *See* Sec'y Jaeger Letter, Sept. 28, 2018 ("After the [911] address is assigned, the office assigning it will provide a letter *upon request*.") (emphasis added). Because many Native American voters rely on P.O. boxes, they have not requested or do not know their 911 addresses.

138.    Voters like Mr. Jackson and Ms. Longie, who believed their IDs listed the correct residential address for their home, have no reason to suspect that their ID may be insufficient for voting because the county has, unbeknownst to them, assigned them a different address in the 911 system. Indeed, if Mr. Jackson had not applied to vote absentee, Ms. Longie would have no reason to suspect that the residential address on her North Dakota non-driver's ID may be "invalid" for voting purposes.

139.    Once the state extends the right to vote absentee, it must do so equally to all eligible voters.

27

140.    Some 911 addresses assigned to individuals do not correspond with the actual physical location of their fixed permanent dwelling. For example, Mr. Yellow Fat was originally issued a 911 address by the Sheriff in Sioux County that corresponds with the physical location of a liquor street down the street from his home. Thus, an eligible voter with a "valid" 911 address, may be unable to comply with the residential address requirement because the assigned address does not correspond to a dwelling, establishment, or abode to which the voter returns when not called elsewhere. N.D. Cent. Code § 16.1-01-04.2(1).

141.    In addition, 911 addresses may be changed without residents' knowledge. New street names may be assigned to an area that previously did not use them. A subdivision that is originally assigned a single street number, with unit numbers assigned to the residences therein, may later be assigned street names; or the residences may be assigned individual street numbers rather than unit numbers. For residents who already have IDs listing their residential address, these changes will render their IDs "invalid." Even where residents are provided notice of the change, they will be forced to obtain new identification or supplemental documentation for voting even though they have not changed residences.

142.    Indeed, counties were changing residents' 911 addresses shortly before and during the balloting for the 2018 election.  For example, Richland County mailed letters to residents from March through October 2018 notifying them that "Richland County is in the process of reviewing all 9-1-1 addresses within Richland County" and assigning new addresses. In March of 2018 the county sent a large number of letters to residents of Grand Bend, ND notifying them that "it was found that there was a large amount of incorrect 9-1-1 addresses within the city of Great Bend." And Golden Valley County changed the numbers and/or road names for a subdivision on October 3, 2018, in the midst of absentee voting and a month before Election Day.

143.    There is no guarantee that an address issued by a county's 911 Coordinator will be a "valid" address. On Spirit Lake, the Enrollment Director was directed to a website by the Benson County 911 Coordinator in order to verify assigned addresses. However, when the Enrollment Director later checked addresses assigned by the 911 Coordinator to Spirit Lake members requesting new IDs, she found that approximately 5-10% of assigned addresses did not appear in the website provided.

144.    On information and belief, the implementation of procedures for verifying the residential address requirement has resulted in substantial confusion for election officials and voters, which is likely to lead to the disenfranchisement of additional qualified Native American voters.

145.    Indeed, the North Dakota Legislature has been repeatedly warned, both before and after implementation of N.D. Cent. Code § 16.1-01-04, that the ID and residential address requirements would lead to the disenfranchisement of Native Americans. The North Dakota legislature first considered a bill that would impose voter ID requirements in 2011. During deliberations, the Legislature was informed that Native Americans in particular utilized the P.O. box system; that counties on tribal reservations had largely not completed their 911 addressing; and that even where 911 addresses had been assigned, individuals in those counties largely did not know what their 911 addresses were. At that time, the 2011 Legislature rejected the bill on a bipartisan basis citing concerns over its potential disenfranchising effects.

146.    The next year, Heidi Heitkamp, the candidate of choice of the Native American community, prevailed in an incredibly close 2012 United States Senate election by 3,000 votes, or about one percentage point. Her win was attributed in local and national media to the Native American vote. The very next legislative session, without substantive debate, the North Dakota

legislature passed HB 1332, the first iteration of the bill that imposed both voter ID requirements and the residential street address requirements the Legislature had previously been informed would disenfranchise Native American voters in particular. Through subsequent iterations of the law, North Dakota has maintained both the ID and residential address requirements that are unreasonably difficult for Native Americans in North Dakota to comply with. For example, Native Americans in North Dakota disproportionately lack both qualifying identification and supplemental documentation, and are disproportionately likely to not have or be able to reasonably obtain documentation of their residential street address as currently assigned and recognized by the State. Further, obtaining a qualifying ID imposes a disproportionate burden on Native Americans as compared to non-Native Americans in North Dakota due to financial hardship, limited access to state Driver's License Sites, lack of stable housing, and lack of consistent addressing of their homes.

147. Because the systems for assigning and verifying residential addresses are deeply flawed, produce conflicting and inaccurate results, and have generated significant confusion, qualified Native American voters face a substantial risk of being denied the right to vote.

### Defendant's Failure to Promulgate or Enforce Uniform Standards for Determining Voter Qualifications Arbitrarily Disenfranchises Otherwise Eligible Voters

148. On information and belief, the Defendant has failed to provide uniform direction or enforce uniform standards for ensuring that individuals with documentation of their current residential address will have that documentation accepted to vote notwithstanding whether that address matches the state's haphazard "official" addressing system.

149. On information and belief, election officials in counties including Reservation land developed disparate policies, procedures, and standards for determining whether the residential address provided by a particular voter was sufficient to establish the voter's qualifications for

voting on an ad hoc basis. As a result, policies, procedures, and standards for determining a voter's qualifications based on their residential address differ from county to county and within counties.

150.    Election officials determine a voter's qualifications by reviewing the ID provided by the voter, and any supplemental documentation. The Elections Manual issued by the Secretary of State does not specify any policies, procedures, or standards that elections officials must use in determining whether an acceptable form of identification listing a voter's current residential street address sufficiently verifies that voter's qualifications.

151.    In several counties containing Native American reservations, elections officials have announced different policies for determining a voter's qualifications based on the residential address provided by the voter. Before the 2018 elections, County Auditors in Eddy, Mercer, McLean, and Sioux County stated that a voter who presented an acceptable form of identification listing an address that was not found within the state's system would be entitled to vote a regular ballot. In contrast, the County Auditor in Rolette County stated that a voter who presented an address that appeared to be "invalid" according to the state's system would be offered a set-aside ballot.

152.    Furthermore, election officials at the Sioux County Auditor's office required some voters to take additional steps to establish their qualifications for voting even after presenting a valid tribal ID listing his or her current residential address.

153.    At least one voter was initially denied the right to vote an in-person absentee ballot at the Sioux County Auditor's office in 2018, despite presenting a newly issued tribal ID with her current residential address on it. An election official at the Auditor's office refused to provide her with an in-person absentee ballot unless she updated her address on the DOT website. The voter attempted to update her address on the DOT website for approximately forty minutes. When she

was unsuccessful, the elections official continued to refuse her an in-person absentee ballot. The individual was only allowed to vote after a second official intervened and, upon information and belief, manually updated the voter's address in the Central Voter File.

154.     At least one voter in Sioux County was denied the right to vote an in-person absentee ballot after presenting a tribal ID listing his name, birth date, and residential address in the dorms at Sitting Bill College. An elections official at the Auditor's office turned the voter away, stating that he would not be allowed to vote unless he could provide supplementary documentary proof of his residence. The voter was forced to leave the auditor's office and obtain a letter on tribal letterhead affirming his residence before he was allowed to return and cast his ballot.

### Defendant's Failure to Provide a Coherent, Singular, and Consistent Residential Addressing System to Native Americans Will Disenfranchise Many Eligible Voters.

155.     The North Dakota counties that are home to the State's Native American reservations have a 911 addressing system characterized by disarray, errors, confusion, and missing or conflicting addresses.

156.     Take Rolette County, home to the most populous of North Dakota's Native American Tribes, the Turtle Mountain Band of the Chippewa Indians. Here is how the 911 coordinator for Rolette County has characterized his county's preparedness for the newly effective law in the media: "County emergency coordinator Mike Stewart said Monday [October 1, 2018] that residential street addresses have been assigned in '99 percent' of the county—including on the reservation—in the past several years."[2] Moreover, Mr. Stewart explained that "[h]e agreed

---

[2]  James MacPherson, *ND Officials Tell Tribes of Election Requirements*, Rapid City Journal, https://rapidcityjournal.com/news/state-and-regional/nd-of_cials-tell-tribes-of-electionrequirements/ article_d62a5623-cf66-5211-b5f3-4dc2210ac550.html.

with state elections officials that obtaining a residential street address is a no-cost and quick process that may take no more than a few hours."[3]

157.    The facts show a different story. One recent example is of Ace Charette and his fiancée Adriana Riggs, who moved to Belcourt, in Rolette County, in the fall of 2017 from Arizona when Mr. Charette started a new job as Director of Research, Assessment, and Accreditation at Turtle Mountain Community College. They needed North Dakota driver licenses but hit a roadblock because their rental home had no street address.

158.    So, they called the Rolette County government to obtain their address but were told they could get a 911 address only by appearing in person in Rolla, a city about ten miles away.

159.    On a weekday, Ms. Riggs drove to Rolla Courts, where the office was located, but when she arrived she was told the necessary employee was gone and no one could assist her.

160.    About a week later, in October 2017, she and Mr. Charette tried again, but once again were told the necessary employee was gone and no one could assist them.

161.    Finally, Ms. Riggs called ahead on November 14, 2017 and was told "Kurt" was in the office. When she arrived (for the third time in approximately one month), she found Kurt with two computer screens, each displaying a different mapping program. Kurt toggled between the two mapping programs looking for her address, based upon her neighbors' house numbers.

162.    Kurt explained to Ms. Riggs that the County's two mapping programs were often in conflict with one another, and most homes in Rolette County had two different addresses depending upon which computer program was selected. He told Ms. Riggs he hoped to start using just one of the programs.

---

[3] *Id.*

163.    Kurt settled on an address—321 Sunset Street NE. Ms. Riggs saw that the other computer program showed a different address for her home, with the numbers transposed.

164.    Kurt handwrote the address on a slip of paper with his first name, phone number, and longitudinal coordinates, as shown below:



165.    Ms. Riggs and Mr. Charette received no official government determination from their trip to the government office, nor did the County later send them any such documentation by mail or otherwise. It took over a month for Ms. Riggs and Mr. Charette to obtain their residential street address, which they now display on a piece of paper taped to their window because the County has not provided a house number or a road sign.

166.    Vast areas of Rolette County have no road signs and no house numbers. Although the County may have maps with road names and house numbers in its office, no one outside those offices would have reason to be aware of such maps.

167.    Kurt's admission of the conflicting and confused Rolette County 911 addressing system matches the experience of the former Belcourt Fire Chief Marcus Laverdure, Sr. Mr. Laverdure has lived on the Turtle Mountain Reservation for most of his life. From 2012 to 2015, he served as Belcourt Fire Chief, and for three prior years as a volunteer at the department.

168.    As Fire Chief, Mr. Laverdure experienced issues with the inaccuracy of Rolette County's 911 system. For example, in one emergency call, 911 dispatch in Rolla directed him to the wrong address following an automatic emergency call from a home's smoke alarm system. The 911 system led the fire department about one mile from the actual alarm; Mr. Laverdure's team had to work in concentric circles knocking on doors until they found the correct home.

169.    Based on Mr. Laverdure's experiences as Fire Chief encountering homes with incorrect addresses, he decided to contact the 911 coordinator in Rolla to determine whether the address he had always known to be his own was correct. He called the coordinator (with whom he was personally familiar) and proceeded to describe the location of his home: "a mile north of the dump ground on BIA road number 23." That was the most specific he could be, given his rural location.

170.    The address the coordinator assigned him was different from the one he had always understood to be his.

171.    Mr. Laverdure never received any proactive notice from the County of his 911 address. And the County did nothing to verify that Mr. Laverdure lived at the address he reported. Had his experience as Fire Chief not alerted him to Rolette County's inaccurate address system, he would have had no reason to inquire as to whether his existing address matched what the County assigned him.

172.    As Rolette County's 911 coordinator Mr. Stewart has acknowledged to the media, "[i]t's very possible some homes have been overlooked." *Id.*   And even those who have been assigned addresses may have multiple addresses assigned, or may possess IDs with addresses that no longer correspond to the 911 address system.

173.    In short, Rolette County residents have little reason to believe their addresses are "valid," reflect where they live and where they should vote, and will not lead them to being disenfranchised under Secretary Jaegar's publicly stated standard for ballot rejection: "information on the ID is incorrect, not current, [or] missing."[4]

174.    Rolette County is not unique; similar issues plague the Spirit Lake Nation, which is primarily located within Benson and Eddy counties, but is also included within parts of Ramsey, Wells, and Nelson counties.

175.    On parts of the Spirit Lake Reservation, homes do not have addresses assigned, or if they do, the residents are unaware of the addresses. The counties have not provided signage for roads or house numbers in many parts of the Reservation. Mail service does not exist on parts of the Reservation, and throughout the Reservation residents rely upon P.O. boxes to conduct affairs.

176.    In some instances, the State has identified a single home as having two different physical addresses. Vice Chairman of the Spirit Lake Tribe Douglas Yankton was issued a state ID with an address of 7041 37th St. NE, Oberon, ND 58357. He has lived at that home for eighteen years, always with that address. Yet when his girlfriend Sara Hesse called the 911 coordinator to obtain her address (at the same home) in 2015, she was provided the following: 7041 37th St. NE, Fort Totten, ND 58335.

177.    Furthermore, the Secretary of State's online search tool for identifying the correct polling place using house number and zip code recognizes neither address.

178.    The problems with 911 addresses on Spirit Lake are not isolated. The North Dakota GIS Hub Explorer, an official tool previously cited by Secretary Jaeger as an authoritative record

---

[4] Memo from N.D. Sec'y of State to Tribal Leaders, Sept. 28, 2018.

of 911 addresses, reveals that many homes in Spirit Lake are on roads labeled "Unknown" or on roads the County has assigned more than one road name. Below are just a few examples, of many:



179.    Moreover, many Spirit Lake tribal members are unaware of their residential street address, even if they have one.

180.    Prior to the November 6, 2018 election, Robin Smith, the enrollment director for Spirit Lake, issued 665 tribal IDs in just over two weeks, which is nearly two years' worth of IDs at the normal rate.

181.    Ms. Smith reported that approximately one third of the IDs she issued during this period involved changing the listed address from a P.O. Box to a physical address. Approximately half of the people obtaining IDs during this time did not otherwise have a valid form of

identification. While Ms. Smith was able to assist many members in determining their physical addresses without contacting the 911 administrator, at least 30-40 percent of the individuals to whom she issued IDs during this period were unable to determine their physical address without requesting it from or having it assigned by the 911 coordinator.

182. Ms. Smith has encountered significant confusion because of the complicated 911 addressing system as it applies to the Reservation. For example, a member living in the Tokio area could have one of four different cities for their residential street address: Sheyenne, Warwick, Tokio, or St. Michael. All would have different zip codes.

183. One member had to come to Ms. Smith's office three different times before the office could accurately identify the member's residential address. He was initially told his 911 address was on Crow Hill Road in Fort Totten. But Ms. Smith determined that was wrong because many residents in the same area have Oberon addresses, not Fort Totten addresses. They ultimately determined his address was in Oberon.

184. Inconsistent addressing raised an alarm for Ms. Smith. The Benson County 911 Coordinator had given her a link to a state website where she could check physical addresses to ensure they were registered as official addresses. Ms. Smith went through all of the IDs she had issued with addresses provided by the 911 coordinator and checked them against the website. She discovered that approximately 5-10% of the issued IDs had addresses that did not appear on the website.

185. As of two weeks prior to the election, Spirit Lake had identified 262 people who had only P.O. boxes on their IDs and no residential street address. Ms. Smith estimates that 40 percent of those have come in for an updated tribal ID, leaving well over 100 people who still have tribal IDs with no residential street address.

186.    The 911 addressing is similarly confused and contradictory in the Fort Berthold Reservation. Fort Berthold extends into Mountrail, McLean, Mercer, Dunn, and McKenzie counties.

187.    The GIS Hub Explorer shows that a significant number of roads in Fort Berthold, on which sit a significant number of homes, are either labeled "Unknown," have no label, or have multiple names for a single road. Below are a few illustrative examples, of many:







188.    McKenzie County's records reflect confusion and errors in addressing. The image below was produced in response to an open records request to McKenzie County and reflects both improperly assigned house numbers and an ongoing need to alter home addresses:



189.    The Enrollment Director for the Mandan, Hidatsa and Arikara Nation, Sevant Taft,

likewise explained that the system for assigning 911 addresses on the reservation is complicated

leading to errors and confusion. For example, the town of White Shield is split by farmland and

the south side of White Shield is considered part of Garrison whereas the north side is part of

Roseglen. Additionally, the zip code for New Town extends into Four Bears, which is four miles

away, separated by the Missouri River, and is part of a different county. People living outside of

Four Bears have a different zip code than those within the town limits. The Twin Buttes community

is likewise split up; there, some people use the zip code for Halliday, which is 10-15 miles away

and off the Reservation. Yet, members who live in Dodge, Zap, and Golden Valley are considered

to live in Twin Buttes and not Halliday.

190.   Confusion in the government's addressing system abounds in Standing Rock in Sioux County as well. The 911 coordinator has previously assigned home addresses at a liquor store, preexisting road signs contradict 911 addresses, there are few house number or road signs, and people are unaware of their addresses, as most people have always used a P.O. box. Indeed, the 2016 Emergency Services Communication Report in North Dakota to the legislature identifies road signs as a priority for Sioux County.[5] The same report shows that as of 2016, 4 counties in North Dakota lacked a plan to address residential street addresses.[6] Here this confusion and disarray jeopardizes the most fundamental right in our country—the right to vote.

191.   If the address situation were not confusing and chaotic enough, Defendant Jaeger made the situation worse in the lead up to the 2018 election by refusing to provide public comment on whether poll workers will accept addresses printed on newly issued IDs, while simultaneously issuing statements that residential street addresses on IDs must not be "incorrect"—a warning that creates a particular chill for Native American voters, in light of the chaos and uncertainty caused by the rapid response to the newly effective law. Nor has Defendant Jaeger provided any clarity on the situation in the months since the November 6 election.

192.   Additionally, adding to the confusion, in the weeks leading up to the election the Sioux County Auditor was unable to provide the Standing Rock Sioux Tribe requested legal descriptions of the Sioux County precincts because "someone threw [her] file out." The Standing Rock Sioux Tribe needed the maps to ensure that the Burkle addressing system devised by the Tribe to assign addresses to members without addresses could be used to accurately assign members to the appropriate precinct. Defendant Jaeger provided no assistance and dismissed pleas

---

[5] Emergency Servs. Commcn's Coordinating Cmte., Emergency Services Communication in North Dakota at 16; https://www.legis.nd.gov/files/committees/64-2014%20appendices/17_5152_03000appendixc.pdf.
[6] *Id.* at 26.

from the Tribe for accurate maps, instead stating it was up to the County Auditor to provide the maps. Eventually, shortly before the election, the County Auditor provided Standing Rock Sioux Tribe a hand-drawn map which lacked legal descriptions.[7]

193.    Even more alarmingly, a Spirit Lake tribal member was issued an ID through her tribal government with an address issued by the County 911 Coordinator. Yet, she was denied an absentee ballot in 2018 because the State's system considered the address invalid. There is therefore no guarantee that even following the system proposed by Mr. Jaeger that Native Americans will not continue to be denied access to the ballot box.

194.    Fair elections demand clear and uniform rules. The circumstances surrounding 911 addresses for North Dakota's Native Americans make that impossible for the counties containing reservations.

### The Application of the "Current Residential Address" Requirement Imposes a Uniquely Severe Burden for Native Americans in North Dakota.

195.    The Court found substantial and compelling evidence of the severe burdens imposed upon Native Americans by the residential address requirement in the *Brakebill* litigation. Those effects are unchanged.  *See Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. Nos. 50 ("1st PI Order"), 99 ("2nd PI Order").

196.    The burden only became more severe, however, in the weeks leading up to the election in 2018.

197.    The DMV offers services in Rolette County one day a month for a total of three (3) hours.[8]  Thus, for voters in Rolette County, the primary source of state IDs is unavailable all but

---

[7] Amy Dairymple, '*Someone threw my file out': County officials on Standing Rock Reservation lose legal description of voting precincts*, Bismarck Tribune, https://www.grandforksherald.com/news/government-and-politics/4523990-someone-threw-my-file-out-county-officials-standing-rock,

[8] This was particularly problematic in 2018. The Supreme Court declined to reinstate the statewide stay on the residential address requirement on October 9, 2018. The last time the site was available at the county seat of Rolla

three hours each month, unless residents are able to make the 200 mile roundtrip drive to Minot, or a 160 mile roundtrip drive to Devil's Lake. Not only does this require a substantial amount of time, it also requires access to reliable transportation.

198.    The sole bank on the Turtle Mountain Reservation, Turtle Mountain State Bank, has over 2,500 accounts, the vast majority of which show only the mailing address—P.O. boxes—on the bank statements, because otherwise there would be no way for the customers to receive the statements in the mail, given the lack of residential mail delivery.

199.     Utility statements in Turtle Mountain generally list P.O. boxes as well, for the same reason.

200.    These categories of "supplemental" documentation of residential street addresses are systematically unavailable to many Native Americans—and not just in Turtle Mountain, but in all of North Dakota's reservations.

201.    The acceptable "supplemental" documentation are categories of documents that must generally be mailed to be of any use. But to be delivered in the mail to Plaintiffs, they must show the precise address—a P.O. box—the State has deemed inadequate to prove residency.

202.    The burden is particularly severe for those Native Americans who are either not enrolled in a Tribe, or who are enrolled in Tribes from outside the State. There are many such people, like Ms. Twinn, but because their circumstances preclude their access to documentation to prove their residential address, they cannot obtain state-issued IDs (if such services are even accessible), and they also cannot obtain tribal identification from a North Dakota tribe.

---

was October 3, 2018—six days before the Supreme Court's decision. The next time the site was available is November 7, 2018—one day after the November 2018 election.

203.    Moreover, for those unaware of or lacking a residential address, the requirement that they obtain those addresses from their county's 911 coordinator may mean that in order to vote, they must first interact with law enforcement. In Sioux County, the only 911 coordinator is the Sheriff. The same is true in Mountrail County. And for Spirit Lake, the 911 coordinator is located at the Law Enforcement Center, which is surrounded by Corrections buildings, the Sheriff, and other law enforcement.

204.    For many people, particularly minorities and those suffering disparities in socioeconomic status, encounters with law enforcement are intimidating and to be avoided. Many states prohibit the presence of law enforcement at the polls. Requiring Native American voters to first come into contact with law enforcement, like in Sioux County, as a precondition to exercising their right to vote causes a severe burden, with a serious chilling effect on the franchise.

205.    And for those who do attempt to nonetheless interact with law enforcement to learn of their 911 address, the bureaucratic tape can be difficult to navigate, with multiple pre-recorded telephone messages and options, none of which reference 911 coordinators or obtaining an address.

206.    Rolette County's paper application for a 911 address is an illustrative example.  It asks residents to provide their home's longitude and latitude; Township, Range, and Section; Block Number and Lot Number; and, paradoxically, "[r]oad name providing property address." How one could know the latter, with no postage road name signage, is unclear.

207.    Standing on its own, the residential address requirement poses a particular and acutely severe burden for Native American voters. The severity of that burden has been magnified by the failure of the State and counties to fulfill their roles in providing a basic governmental service—correctly and uniformly assigning residential addresses for Native American voters.

Nevertheless, the State has chosen to make residential addresses the paramount determination for the eligibility to vote.

208.    The State may not condition the right to vote upon a Native American voter's access to a category of information only the government can provide and which the government has made difficult or functionally impossible to obtain. Even if the elector can successfully navigate this system, there is no guarantee the address that is issued will be correct or will be accepted.

***North Dakota's requirement that eligible voters provide one of three acceptable forms of identification imposes a severe and disproportionate burden on Native American voters living on or near reservations.***

209.    Native Americans in North Dakota are more likely than non-Native Americans to lack qualifying ID and obtaining a qualifying ID in North Dakota is more difficult for Native Americans.

210.    The list of qualifying IDs for voting is extremely limited. Voters must obtain either a state-issued driver's license or ID card or be eligible to obtain a tribal ID from a North Dakota tribe.

211.    Native Americans living on reservations who are not eligible to obtain tribal IDs, such as Plaintiff Kim Twinn, must obtain a North Dakota Driver's License or non-driver ID in order to vote.

212.    Travel to a driver's license site to obtain a qualifying North Dakota ID imposes a severe burden on Native American voters. Only 19 DL sites exist across the state, and there is not a single DL site on an Indian reservation in the state. The DL sites closest to North Dakota Indian reservations have limited hours and require eligible voters to drive driving substantial distances in order to obtain qualifying ID.

213.    Native Americans in North Dakota experience higher rates of homelessness, poverty, and unemployment than non-Native Americans. Many Native Americans who live on reservations disproportionately lack access to reliable transportation as compared to non-Native populations.

214.    The costs of obtaining documentation, including the cost to obtain a tribal ID, impose a unique burden on Native American voters. High rates of poverty and unemployment, and the lack of access to transportation among Native Americans in North Dakota prevent and will continue to prevent many Native Americans from travelling to a DLS and obtaining the requisite ID.

215.    Both Standing Rock and Spirit Lake were forced to waive fees for tribal IDs in the weeks leading up to the 2018 election to ensure that tribal members could obtain the identification necessary to vote. Had the tribes not waived the cost of obtaining ID, hundreds of Native Americans living on reservations would not have been able to obtain qualifying ID and would therefore have been denied the right to vote.

216.    Finally, obtaining the underlying documentation necessary to obtain identification imposes a unique burden on Native Americans' living on reservations, many of whom lack these underlying documents. Ms. Twinn, for example, does not have any of the documents listed on the DOT website as required to provide satisfactory proof of residence in order to obtain a non-driver ID.

217.    For many eligible Native American voters living on reservations, the documents required to provide proof of residence are likely to list the voter's P.O. Box rather than their residential address, because the acceptable documents required are of the sort that would typically be mailed to an individual. Per the list on the DOT's website, a letter from the 911 coordinator is

not an acceptable document for proving a residential address. *See* N.D. Dep't of Transportation, Proof          of          Identification          is          Required          at          3, *https://www.dot.nd.gov/divisions/driverslicense/docs/proof-of-identification-documents.pdf*   (last visited Feb. 26, 2019).

218.    In addition to proof of residence, applicants for a state-issued ID must also provide proof of identity. The only acceptable documents for proof of identity that are available to eligible Native American voters are an unexpired U.S. passport or a U.S. birth certificate, for which an applicant must provide a state certified or government issued document. *See id.* at 1. Obtaining these documents requires a substantial investment of time and money, and in many cases will also require the applicant to provide some form of ID.

219.    For example, an individual must have an ID to obtain a certified copy of their North Dakota birth certificate, which they must obtain in order to prove their identity for the purpose of obtaining a state-issued ID.. Further, the costs of obtaining this underlying documentation is likely prohibitive for eligible Native American voters living on reservations in North Dakota.

220.    The minimum fee to obtain a U.S. passport is $145 for first time-applicants and $110 for renewals. The cost to obtain a North Dakota birth certificate is $7, and it may be greater if the voter was born in a different state. In comparison, Spirit Lake and Standing Rock waived fees of $11 and $5 respectively to ensure that the cost of obtaining an ID would not prevent any of their members from being able to vote in the 2018 elections.

221.    These factors combine to severely limit the access for Native Americans living on reservations have to DL sites and therefore to qualifying identification for voting.

***North Dakota's interest in enforcing the identification and residential address
verification requirements against Native American voters living on or near reservations is low.***

222.    The state asserts that the residential address requirement advances the important
interests of ensuring that qualified electors vote in the correct precinct or receive the correct ballot,
and preventing non-resident voters from voting in North Dakota simply by setting up a P.O. box
in the state. *See Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 104 at 9.

223.    Enforcing the residential address requirement against Native American voters who
reside on or near reservations does not advance the interest of preventing non-resident voters from
voting in North Dakota.

224.    The state has rejected alternative methods of determining which ballot to provide a
voter, or which precinct the voter is entitled to vote in because those methods are self-
authenticating. *See, e.g.*, *Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 81 at 6-10.

225.    On information and belief, obtaining a 911 address is a self-authenticating process.
When Mr. Lavendure obtained his 911 address, the 911 coordinator asked him to describe where
he lived based upon the BIA road numbers and landmarks. The 911 coordinator did not do anything
to verify that the address was actually where Mr. Lavendure lived. Similarly, when Ms. Riggs
obtained her 911 address, the 911 coordinator simply asked her what her neighbor's street numbers
were.

226.    North Dakota law provides that the DOT director *may* require "proof of residence"
to obtain a state ID card or driver's license. N.D. Cent. Code § 39-06-03.1(3). The DOT website
currently provides a list of acceptable documents for proof of residence and states that "proof of
residence will be requested every time an address is changed."[9] As of December 2017, however,

---

[9] https://www.dot.nd.gov/divisions/driverslicense/docs/proof-of-address-documents.pdf

it was possible to obtain a North Dakota driver license without providing any documentary proof of residence. Ms. Riggs' contemporaneous text message to her fiancé confirms this:

> The guy said all the formal paperwork is needed for only CDLs. Well geez guess they give ppl license with nothing. All he asked was what state I'm coming from and that's it. Lol.
>
> Dec 6, 12:33 PM · SMS

> Nice! At least that part was easy

227. Further, on information and belief, anyone with an existing North Dakota driver license or non-driver ID card can simply update their address online without having to provide any proof that they reside at the new address, a system that is therefore entirely self-authenticating.

228. Moreover, voters living near the state's borders frequently have addresses that suggest they reside in another state (e.g., Montana) when the post office for their zip code is located across the border. Upon information and belief, county auditors accept those IDs as valid so long as they are issued by North Dakota, but not if issued by the State reflected by the USPS assigned mailing address.

229. Requiring a voter to provide a form of identification listing a residential street address that corresponds with a street name and house number in the 911 address system does not advance the interest in ensuring that voters vote in the correct precinct or receive the correct ballot substantially more than any other self-authenticating method of determining a voter's precinct.

230. Additionally, the State's purported interest in having voters vote in the correct precinct is belied by the Sioux County Auditor's reliance on imprecise hand drawn precinct maps lacking legal descriptions. Defendant Jaeger further admitted that the State had no interest in or system for checking that precincts in Counties were accurately or precisely drawn.

231.    Furthermore, there is no evidence that Native Americans living on or near reservations in North Dakota have engaged in substantial or widespread voter fraud.

232.    As discussed *infra* however, there is a substantial likelihood that requiring Native American voters living on or near reservations to provide one of the three acceptable forms of identification for voting will result in the disenfranchisement of substantial numbers of otherwise eligible voters.

233.    Thus, even assuming that "'[t]he application of the statute to the vast majority of [North Dakota] voters is amply justified by the valid interest in protecting the integrity and reliability of the electoral process,'" it is not justified as applied to Native American voters living on or near reservations who "can show [the statute] imposes a special burden on them." *See Brakebill v. Jaeger*, No. 1:16-cv-00008-DLH (D.N.D.), Dkt. 104 at 7 (quoting *Crawford v. Marion Cty Elec. Bd.*, 553 U.S. 181, 204 (2008) and relying *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) for the proposition that as-applied challenges such as this are compatible with *Crawford* because "the high hurdles for some persons eligible to vote entitle those particular persons to relief").

### *The Disproportionate Burdens of Defendant Jaeger's Implementation of the Identification and Proof of Residential Address Requirements on Native Americans Are Linked to Historical and Social Conditions of Discrimination Against Native Americans in North Dakota*

234.    North Dakota has a long history of discrimination against Native Americans generally, and of denying Native Americans the right to vote in particular.

235.    This Court has recognized the history of discrimination in North Dakota against Native Americans with regard to voting. *See Spirit Lake Tribe v. Benson Cty., N.D.*, No. 2:10- cv-095, 2010 WL 4226614, at *3 (D.N.D. 2010); Consent Judgment and Decree, *United States v.*

*Benson Cty.*, Civ. A. No. A2-00-3 0 (D.N.D. Mar. 10, 2000); *State ex rel. Tompton v. Denoyer*, 72 N.W. 1014, 1019 (N.D. 1897)

236.    North Dakota has a long history of discrimination against Native Americans generally, and of denying Native Americans the right to vote in particular. Indeed, courts have repeatedly recognized the history of discrimination against Native American voters in North Dakota. *See Spirit Lake Tribe v. Benson Cty., N.D.*, No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. 2010); Consent Judgment and Decree, *United States v. Benson Cty.*, Civ. A. No. A1-00-30 (D.N.D. Mar. 10, 2000); *State ex rel. Tompton v. Denoyer*, 72 N.W. 1014, 1019 (N.D. 1897).

237.    Until 1897, North Dakota did not allow Native Americans to vote "unless they had entirely abandoned their tribal relations, and were in no manner subject to the authority of any Indian chief or Indian agent." *Denoyer*, 72 N.W. at 1019. In 1898, North Dakota amended its Constitution to allow only "[c]ivilized persons of Indian descent" who "severed their tribal relations two years next preceding" an election to vote. N.D. Const., art. V § 121 (1898). This insidious classification applied only to Native Americans and was not removed until 1922. The 1898 Constitution also established a literacy test as a qualification for voting, a practice commonly used to disenfranchise minority voters and prohibited by the Voting Rights Act of 1965. And in 1920, the North Dakota Supreme Court held that Native Americans were not able to vote under the "civilized persons" provision unless the local BIA Superintendent and other witnesses testified that the prospective voter "live[d] just the same as white people." *Swift v. Leach*, 178 N.W. 437, 438-40 (N.D. 1920). The state in that case argued that the Native American plaintiffs could not qualify as "civilized" because they were dependent on the federal government.

238.    Nor is discrimination against Native American voters in North Dakota a relic of the distant past. In 2000, the Justice Department filed an action against Benson County, North Dakota

to enforce Section 2 of the Voting Rights Act because the at-large elections system in Benson County discriminated against Native American voters and denied them the opportunity to participate meaningfully in the political process. *See* Consent Judgment at preamble, *Benson Cty.*, Civ. A. No. A1-00-30. The parties entered into a consent decree, and Benson County agreed to adopt a five-district election system, with two majority Native American districts. *Id.*¶ 6.

239.    In 2010, the Spirit Lake Tribe again sued Benson County to prevent the removal of a polling place on the reservation, some 100 years after the Tribe first sued to establish the reservation polling place..  After this Court found that the removal of the Spirit Lake polling pace likely violated Section 2 of the VRA, the polling place was reestablished on the reservation. *Spirit Lake Tribe*, 2010 WL 4226614, at *3.

240.    Native Americans in North Dakota face discrimination in other arenas as well, which hinders their ability to participate effectively in the political process. Throughout the nineteenth and early twentieth centuries, forced assimilation policies lead to the suppression and destruction of traditional tribal religions and culture, including through violent means. Indian trust funds were misappropriated to pay Christian denominations to proselytize to Native Americans.

241.    Native Americans in North Dakota were not exempt from these discriminatory policies. Christian and government boarding schools were established in North Dakota to indoctrinate Native Americans into Christianity and "civilization." This practice was not only unsuccessful, but incredibly harmful, leading to significant disparities in education and literacy between Native Americans and non-Native Americans in North Dakota. Native children attending public schools also faced significant discrimination, including being subjected to humiliating stereotypes and language discrimination. Native students often reported feeling powerless, experiencing depression, and generally feeling alienated form their own cultures. Dropout rates

among Native children attending public schools were higher than those for non-native children, while reading levels were lower. At the same time, Native people were generally prevented from serving on school boards.

242.    The effects of discrimination in the educational setting are still felt by Native Americans in North Dakota today. Native American residents over the age of twenty-five are twice as likely to lack a high school diploma as compared to the state as a whole, and over twice as likely as white residents. Native Americans are more likely to face harsh disciplinary measures, receiving out of school suspensions at over four times the rate as white students. Twice as many Native American students are retained in kindergarten an extra year as compared to white students.

243.    Native Americans in North Dakota have also suffered from discriminatory land allotment policies, losing millions of acres of land across the Midwest, as well as lending discrimination, including the systematic denial of farm loans to Native American farmers living on reservations. *See Keepseagle v. Vilsack*, 118 F. Supp. 3d. 98 (D.D.C. 2015), *appeal denied* 2015 WL 9310099 (D.C. Cir. 2015).

244.    The State of North Dakota has also engaged in discrimination against Native Americans, including through forced assimilation and relocation policies embraced by the North Dakota Indian Affairs Commission.

245.    The disproportionate burdens imposed on Native Americans of the proof of residential address requirement are the result not only of the lack of adequate addressing on Reservations, but also the persistent effects of this long history of discrimination against the Native American community. .

246.    As a result of this discrimination, Native Americans in North Dakota face higher rates of poverty and unemployment, which in turn make obtaining the elusive documentation for voting even more burdensome.

247.    According to the 2013-2017 American Community Survey Estimates, North Dakota as a whole has an unemployment rate of 2.7% and a not in labor force rate of 29.4%.

248.    According to the same survey, the unemployment rate for the white population is 2.2% while the unemployment rate for the Native American population is 12.4%. The "not in labor force" rate for the white population is 29.2% while the "not in labor force" rate for the Native American population is 43.7%.

249.    Native Americans in North Dakota disproportionately live in poverty.

250.    According to the 2013-2017 American Community Survey Estimates, North Dakota as a whole has a family poverty rate of 11%.

251.    According to the same survey, the family poverty rate for the white population is 8.5% while the family poverty rate for the Native American population is 37.56%.

252.    Native Americans in North Dakota also experience higher levels of homelessness and transience.   In 2017, Native Americans comprised nearly 30 percent of North Dakota's homeless population while only comprising approximately 5 percent of the overall population.

253.    Moreover, homeless does not necessarily mean without a roof over their head, and many homeless are not captured by point-in-time surveys. For example, according to the Turtle Mountain Housing Authority 2008 Preliminary Ten-Year Strategic Plan to End Homelessness, "[t]he homeless at Turtle Mountain are described as 'precariously housed' – that is, people who are imminent risk of becoming literally homeless at any time. Often, they are temporarily doubled up."

254.    Upon information and belief, Native Americans in North Dakota are disproportionately "precariously housed" and therefore their residential addresses change more often as they move among friends and family who are able to provide them with short-term housing.

255.    These and other socioeconomic factors related to the history of discrimination against Native Americans in North Dakota compound the disproportionate burdens this proof of residential address requirement impose on Native Americans.

## CAUSES OF ACTION

**Count I:    Undue Burden on the Right to Vote in Violation of the Fourteenth Amendment to the United States Constitution**

256.    Plaintiffs repeat and reallege paragraphs 1-247 above.

257.    "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure" and the right to an effective vote is protected by the Equal Protection Clause of the Fourteenth Amendment. *See Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

258.    When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

259.    The Eighth Circuit gave Defendant Jaeger the opportunity to implement N.D. Cent. Code § 16.1-01-(2)(b), (3)(b) in a manner that would not disenfranchise eligible North Dakotan voters. He has failed to do so for many citizens living on North Dakota reservations.

260.    Defendant Jaeger's implementation of N.D. Cent. Code § 16.1-01-04.1(2)(b), (3)(b) threatens to deny hundreds if not thousands of North Dakota voters the opportunity to cast a ballot.

261.    Upon information and belief, these failures in implementation have disproportionately impacted Native American eligible voters.

262.    This mismanaged system imposes a severe burden on the right to vote; and indeed may result in the outright denial of the right to vote in many circumstances.

263.    This burden is particularly acute for absentee voting, which the state does not offer in a uniform and nondiscriminatory manner.

264.    The State has no legitimate interest in enforcing a law requiring accurate residential street addresses on IDs where the addressing system itself has failed.

265.    Nor can the State's interest in determining the precinct of a voter by documentary proof override an eligible voter's right to cast a ballot when the State has not provided the voter any way to obtain the necessary identification.

266.    This is particularly so because Defendant's stated interest in enforcing this law to ensure voters cast a ballot in the correct precinct is weak in the affected areas given the lack of clear, consistently applied, and accurate 911 addresses on reservations. Indeed, that interest would be equally or better served in many cases by having a voter identify his or her residence on the precinct map.

267.    Defendant's stated interest in using a system other than self-authentication to ensure voters cast a ballot in the correct precinct cannot explain or justify Defendant's implementation of the 911 address assignment system for these voters. The 911 address assignment system itself depends on a voter's self-authentication of where they currently reside. And yet it is more likely to result in an inaccurate result than a voter's self-identification of their residence on a precinct map.

268.    Defendant Jaeger's implementation of this residential address requirement has failed in practice for many voters on reservations and cannot survive Fourteenth Amendment scrutiny as applied to them.

269.    Furthermore, Defendant Jaeger's implementation of N.D. Cent. Code 16.1-01.04.1(1) similarly imposes a severe burden on eligible Native American voters living on reservations.

270.    Upon information and belief, these burdens threaten to deny hundreds if not thousands of eligible Native American voters the opportunity to cast a ballot.

271.    Yet the State has not demonstrated any legitimate threat of voter fraud by Native American voters living on reservations that would justify imposing this requirement on those voters who reasonably cannot obtain one of the three acceptable forms of identification for voting.

272.    Insofar as the voter ID requirement is motivated by the state's general interest in preventing voter fraud, it is therefore overbroad as applied to Native Americans living on or near reservations in North Dakota.

273.    As such, Defendant Jaeger's implementation of this residential address requirement has imposes an undue burden as applied to eligible Native American voters living on reservations in North Dakota, in violation of the Fourteenth Amendment.

**Count II:     Undue Burden on the Right to Vote in Violation of the First Amendment to the United States Constitution**

274.    Plaintiffs repeat and reallege paragraphs 1-265 above.

275.    Voting and participating in the election process is a form of speech and expression. It is the ultimate form of political speech and association and is entitled to First Amendment protection.

276.    Defendant Jaeger's implementation of the residential address and voter ID requirements has imposed severe—sometimes insurmountable—burdens on the right to vote for many voters on reservations. These burdens violate the First Amendment.

**Count III:    Arbitrary Disenfranchisement in Violation of the Fourteenth Amendment to the United States Constitution**

277.    Plaintiffs' repeat and reallege paragraphs 1-268 above.

278.    Defendant has failed to promulgate or enforce uniform standards for determining voter qualifications based on their residential address, resulting in arbitrary and disparate treatment of eligible voters by elections officials in counties including Reservation land. Policies and procedures for determining whether a voter is qualified to vote vary not only from county to county, but within counties.  As such, an eligible voter who presents an acceptable form of ID listing his residential address may be denied the right to vote based entirely on which county the voter lives in, or on an opaque and arbitrary determination by an individual county official that the voter has not sufficiently established their qualifications for voting.

279.    Therefore, Defendant's implementation of the residential address requirement cannot withstand even rational basis review.

280.    "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one

person's vote over that of another." *Bush v Gore*, 531 U.S. 98, 104-05; *see also id.* at 106 (finding that voting procedures that "vary not only from county to county but indeed within a single county" are not "sufficient [to] guarantee[] equal treatment"); *see, e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

281.    Defendant's implementation of the residential address requirement allows for arbitrary disenfranchisement in violation of the Fourteenth Amendment.

**Count V:      Intentional Discrimination in Voting On Account of Race, Section 2 of the Voting Rights Act**

282.    Plaintiffs' repeat and reallege paragraphs 1-273 above.

283.    The North Dakota legislature enacted N.D. Cent. Code § 16.1-01-04.1 in full knowledge of and because of its disenfranchising effects on Native Americans.

284.    N.D. Cent. Code § 16.1-01-04.1 violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 because it was enacted with the purpose to deny and abridge the right to vote on account of race.

**Count VI:     Discriminatory Effect in Voting On Account of Race, Section 2 of the Voting Rights Act**

285.    Plaintiffs' repeat and reallege paragraphs 1-276 above.

286.    Defendant Jaeger's implementation of N.D. Cent. Code § 16.1-01-04.1(2)(b), (3)(b) violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, because it results in a denial of the right to vote on account of race or color.

287.    It imposes a substantial, unwarranted, and disproportionate burden on Native Americans and denies them an equal opportunity to vote by absentee or in-person in North Dakota.

288.    Defendant Jaeger's implementation of N.D. Cent. Code § 16.1-01-04.1(2)(b), (3)(b) interacts with historical, socioeconomic, and other electoral conditions in North Dakota to prevent Native Americans from having an equal opportunity to vote. *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

289.    As a result of the enactment of Defendant Jaeger's implementation of N.D. Cent. Code § 16.1-01-04.1(2)(b), (3)(b) and under the totality of the circumstances, the political process in North Dakota is not equally open to participation by Native American citizens insofar as they have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

**Count VII:    Violations of the Fourteenth and Fifteenth Amendment to the United States Constitution**

290.    Plaintiffs repeat and reallege paragraphs 1-281 above.

291.    N.D. Cent. Code § 16.1-01-04.1(2)(b), (3)(b) violates the Fourteenth and Fifteenth Amendments to the Constitution of the United States because its purpose and effect is to deny or abridge the right to vote to Plaintiffs and other minority voters on the account of race and ethnic origin.

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1.    Enter a declaratory judgment that N.D. Cent. Code § 16.1-01-04.1(2)(b), (3)(b) violates the First, Fourteenth, and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act as applied to voters residing in the counties in North Dakota that include territory within the exterior boundaries of an Indian reservation, including but not limited to, Benson, Dunn, Eddy, McLean, Mercer, Mountrail, Nelson, Ramsey, Richland, Rolette, Sargent, and Sioux counties who fall into the following categories: (1) voters with IDs with

residential addresses that the State considers "invalid"; (2) voters with no access to an accurate residential address to place on a qualifying ID; (3) voters with no access to documentation of their residential address; (4) voters whose addresses are unassigned; and (5) voters unable to determine their address and obtain a qualifying ID.

2.  Enter preliminary and permanent injunctions barring Defendant from enforcing N.D. Cent. Code § 16.1-01-04.1 (2)(b), (3)(b) as to the voters described above;

3.  In the alternative, enter preliminary and permanent injunctions barring Defendant from enforcing N.D. Cent. Code § 16.1-01-04.1(2)(b), (3)(b) as to the voters described above and, in lieu of that statute, allow voters to identify their residences on the precinct map to verify their eligibility in the precinct;

4.  Enter a declaratory judgment that N.D. Cent. Code § 16.1-01-04.1(1) violates the First, Fourteenth, and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act as applied to voters residing in the aforementioned counties who cannot reasonably obtain qualifying identification.

5.  Enter preliminary and permanent injunctions barring Defendant from enforcing N.D. Cent. Code § 16.1-01-04.1(1) as to the voters described above.

6.  In the alternative, enter preliminary and permanent injunctions barring Defendant from enforcing N.D. Cent. Code § 16.1-01-04.1(1) as to the voters described above and, in lieu of that statute, allow voters to affirm their identity by signing an affidavit.

7.  Authorize the appointment of Federal observers by the Director of the Office of Personnel Management in accordance with Section 3 and 8 of the Voting Rights Act to service such period of time as the Court shall determine is appropriate to enforce the guarantees of the

Fourteenth and Fifteenth Amendments to the U.S. Constitution as provided by 52 U.S.C. §

10302(a);

8.      Enter an order pursuant to Section 3(c) of the Voting Rights Act, 52 U.S.C. §

10301a(c), retaining jurisdiction for such period of time as may be appropriate, and requiring

preclearance of voting changes by the State of North Dakota;

9.      Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action;

and

10.     Grant such other relief the Court may deem just and proper.

Dated: June 20, 2019

Respectfully submitted,

Matthew Campbell,
NM Bar No. 138207, CO Bar No. 40808
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
Phone: (303) 447-8760
mcampbell@narf.org

Jacqueline De León
CA Bar No. 288192, DC Bar No.1023035
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
jdeleon@narf.org

Joseph M. Sellers, Bar No. 318410
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

/s/ Timothy Q. Purdon
Timothy Q. Purdon (ND#05392)
ROBINS KALPAN LLP
1207 West Divide Avenue
Suite 200
Bismarck, ND 58503
T: (701) 255-3000
F: (612) 339-4181
TPurdon@RobinsKaplan.com

Mark P. Gaber
D.C. Bar No. 988077
Danielle M. Lang
D.C. Bar No. 1500218
Molly Danahy
D.C. Bar No. 1643411
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
dlang@campaignlegal.org
mdanahy@campaignlegal.org

*Counsel for Plaintiffs*

65