UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Spirit Lake Tribe, on its own behalf and on behalf of its members, Dion Jackson, Kara Longie, Kim Twinn, Terry Yellow Fat, Leslie Peltier, and Clark Peltier, | ) ) ) ) ) ) | **Case No. 1:18-cv-00222** |
| Plaintiffs, | ) ) | **MEMORANDUM IN SUPPORT** |
| vs. | ) ) ) | **OF DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| Alvin Jaeger, in his official capacity as the Secretary of State, | ) ) ) | |
| Defendant. | ) ) | |

...........................................................................................................................................

## I.    INTRODUCTION.

Defendant Alvin Jaeger submits this memorandum in support of Defendant's Motion to Dismiss Second Amended Complaint, filed herewith.  Defendant requests the Court dismiss the Second Amended Complaint for Declaratory and Injunctive Relief ("Second Amended Complaint") (Doc. 51) in its entirety.  With respect to the two tribes named as plaintiffs, Spirit Lake Tribe ("Spirit Lake") and Standing Rock Sioux Tribe ("Standing Rock"), the tribes lack standing to bring claims on their own behalf and on behalf of their members as *parens patriae*.  The tribes have no standing to recoup resources they voluntarily expended as sovereign powers.  The Defendant did not force, and indeed had no power to force, the tribes to expend their own resources on normal constituent services.  Further, the tribes have no standing to assert these claims on behalf of tribal members.  In addition, all of the Plaintiffs, Spirit Lake, Standing Rock, as well as the Individual Plaintiffs Dion Jackson ("Jackson"), Kara Longie ("Longie"), Kim Twinn ("Twinn"), Terry Yellow Fat ("Yellow Fat"), and Leslie and Clark Peltier (the "Peltiers")[1], have failed to state a claim upon which relief can be granted.  The tribes are not "persons"

_____

[1] Jackson, Longie, Twinn, Yellow Fat, and the Peltiers are hereafter referred to collectively as the "Individual Plaintiffs".

or "citizens" under the Constitution or Voting Rights Act, and the Individual Plaintiffs assert merely hypothetical claims relating to future elections.  Lastly, Defendant is immune from all of the claims pursuant to the Eleventh Amendment to the United States Constitution.

## II.     PROCEDURAL HISTORY.

Spirit Lake and the Individual Plaintiffs commenced this action against Defendant Alvin Jaeger, in his official capacity as the North Dakota Secretary of State ("Secretary"), by filing a Complaint For Declaratory And Injunctive Relief ("Complaint") on October 30, 2018, seven days before the November 6, 2018 general election.  Doc. 1; Fed. R. Civ. P. 3.  Plaintiffs alleged the Secretary's implementation of N.D. Cent. Code §§ 16.1-01-04.1(2)(b) and 3(b) violated their rights under the First and Fourteenth Amendments to the United States Constitution, with relief sought pursuant to 42 U.S.C. § 1983.  *See* Doc. 1.  North Dakota residents desiring to vote are required by N.D. Cent. Code §§ 16.1-01-04.1(1), (2)(b) and 3(b) to provide a valid form of identification to proper election officials, with the identification including a current residential street address among other information, or if the identification has missing or outdated information, the voter can provide supplemental documentation.  *Id.*  The valid form of identification can include a driver's license or nondriver's identification card issued by the North Dakota Department of Transportation, or an official form of identification issued by a tribal government to a tribal member residing in the state.  N.D. Cent. Code § 16.1-01-04.1(3)(a)(1)-(2).  The supplemental documentation can include a current utility bill, current bank statement, check issued by a federal, state, or local government, paycheck, or a document issued by a federal, state, or local government.  N.D. Cent. Code §§ 16.1-01-04.1(3)(b)(1)-(5).  *It is important to note, based on these statutes, individual members of tribes in North Dakota have an additional identification option for voting purposes, which is not available to members of any other group.  Native American tribal members have an option to present a tribal ID to election officials, which no other group member in North Dakota can do.*  In the Complaint, Spirit Lake asserted claims on its own behalf and on behalf of its tribal

2

members as *parens patriae*, while the Individual Plaintiffs brought claims only on their own behalf.  Doc. 1, ¶¶ 16, 28-83.

On October 31, 2018, Plaintiffs filed an Emergency Motion For Temporary Restraining Order, asking the court to enjoin the proof of residential street address requirement and to allow voters to identify their residence on a precinct map instead. Doc. 8, 9.  The Court denied the motion on November 1, 2018 in light of the decision of the Eighth Circuit Court of Appeals in the similar case *Brakebill v. Jaeger*, 905 F.3d 553 (8th Cir. 2018) and to preserve the status quo in advance of the fast approaching election. Doc. 33.

On November 2, 2018, the Secretary and Plaintiffs entered into a stipulation that resolved any actual or perceived irregularities regarding the Individual Plaintiffs' addresses and the addresses maintained in the Central Voter File and poll books.  Doc. 34.  This Court entered an order adopting the stipulation.  Doc. 35.  None of the six Individual Plaintiffs were impeded from voting in the November 6, 2018 election.  Doc. 51, ¶¶ 77, 94, 104, 118.

On January 7, 2019, the Secretary filed Defendant's Motion to Dismiss on grounds that the Court lacks subject matter jurisdiction over Plaintiffs' claims, Spirit Lake lacked standing, and the Complaint failed to state a claim upon which relief could be granted. Doc. 38, 39.

In accordance with a stipulation between the parties (Doc. 40) adopted by the Court (Doc. 41), rather than respond to the Defendants' Motion to Dismiss, Plaintiffs amended their Complaint by filing their First Amended Complaint for Declaratory and Injunctive Relief ("First Amended Complaint") on February 28, 2019 (Doc. 43).

Standing Rock was added as an additional plaintiff in the First Amended Complaint.  Doc. 43.  Similar to Spirit Lake, Standing Rock asserted claims on its own behalf and on behalf of its tribal members as *parens patriae*.  *Id.* at ¶ 37.  In reaction to the arguments made in Defendant's Motion to Dismiss (Doc. 38, 39), numerous other

changes were made in the First Amended Complaint compared to the initial Complaint, including the removal of any reference to 42 U.S.C. § 1983 and removal of the allegation that Spirit Lake's claims on its own behalf are based on alleged loss of political and advocacy power.  *See* Doc. 43.  Additionally, the First Amended Complaint added to the causes of action, to include: Count I: alleged undue burden on the right to vote in violation of the Fourteenth Amendment; Count II: alleged undue burden on the right to vote in violation of the First Amendment; Count III: alleged arbitrary disenfranchisement in violation of the Fourteenth Amendment; Count V[2]: alleged intentional discrimination in voting on account of race in violation of Section 2 of the Voting Rights Act; Count VI: alleged discriminatory effect in voting on account of race in violation of Section 2 of the Voting Rights Act; and Count VII: alleged violations of the Fourteenth and Fifteenth Amendments.  Doc. 43, ¶¶ 248-283.

Additionally, in the First Amended Complaint, Plaintiffs attempted to incorporate by reference numerous allegations from the case *Brakebill v. Jaeger*, No. 1:16-cv-00008. On March 21, 2019, the Secretary filed a Motion to Strike and Extend Time to Respond to Pleading, seeking an order striking references to *Brakebill v. Jaeger* pursuant to Fed. R. Civ. P. 10(c) and due to prejudice to the Secretary by inclusion of the incorporated allegations.  Doc. 44, 45.  The Court granted the Secretary's motion to strike on June 17, 2019, striking references to other cases and granting Plaintiffs leave to file a second amended complaint.  Doc. 50.

Plaintiffs filed the Second Amended Complaint on June 20, 2019, having removed specific allegations incorporating by reference the pleadings in *Brakebill v. Jaeger*.  Doc. 51.  In the Second Amended Complaint, the Individual Plaintiffs each allege certain irregularities exist with respect to their address and their voting address maintained by the State, and these irregularities allegedly violate their constitutional rights and the

---

[2] The First Amended Complaint (Doc. 43) and the Second Amended Complaint for Declaratory and Injunctive Relief (Doc. 51) are missing a Count IV.

Voting Rights Act.  One of the Individual Plaintiffs alleges his rights were violated because his absentee ballot was rejected by the Benson County Auditor before the November 6, 2018 election (Doc. 51, ¶ 57), one individual claims her residential street address is not listed on any of her forms of identification and she does not have other documentation to establish it (*id.* at ¶¶ 100, 101), another individual claims the residential street address provided  by a 911 coordinator is not his actual address (*id.* at ¶¶ 108-111), and the other Individual Plaintiffs allege their rights were violated because the Secretary's online search tool did not list their exact or correct address.  *Id.* at ¶¶ 58, 71, 90.

The Individual Plaintiffs compare address information obtained through searches on the "North Dakota GIS Hub Explorer" (*id.* at ¶¶ 61, 72, 112), and the Secretary of State website's "My Voting Information" online search tool (*id.* at ¶¶ 58, 71, 90), with searches of addresses from Google Maps[3] (*id.* at ¶¶ 62, 73).  The Individual Plaintiffs claim the Secretary has previously indicated that North Dakota GIS Hub Explorer is an authoritative source for "911 addresses" and the failure of this tool to identify addresses indicates flaws in the system.  *Id.* at ¶¶ 61, 63, 178.

Even though all of the Individual Plaintiffs were permitted to vote in the last election on November 6, 2018, they allegedly fear they might not be allowed to vote in future elections.  *Id.* at ¶¶ 77-80, 94-96, 104, 105, 118-121.  All of the Plaintiffs allege a myriad of additional issues that do not relate to the Plaintiffs in this case, but rather other Native American tribes in North Dakota or other individuals.  Doc. 51, ¶¶ 156-173, 176, 182, 187, 189, 197-200, 225, 226.  Plaintiffs, however, do not allege that any of the supposed issues as to other Native American tribes or individuals have resulted in section 16.1-01-04.1 being unconstitutional or a violation of the Voting Rights Act as applied to those sovereign entities or individuals—who are not parties to this lawsuit—or that individuals

---

[3] It is unclear what significance Plaintiffs' Google Maps searches have as this online search tool is not used as a basis for identifying residential street addresses or for verifying such addresses for purposes of voting.

were denied the right to vote.

The Second Amended Complaint in this case seeks prospective injunctive and declaratory relief for the Plaintiffs, and ostensibly other Native American voters, in certain North Dakota counties where Indian reservations are present.  Doc. 51 at Requested Relief, pp. 62-63.  Specifically, Plaintiffs are seeking a declaratory judgment that N.D. Cent. Code §§ 16.1-01-04.1(2)(b) and 3(b) violate the First, Fourteenth, and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act as applied to a class of voters in Benson, Dunn, Eddy, McLean, Mercer, Mountrail, Nelson, Ramsey, Richland, Rolette, Sargent, and Sioux Counties who fall under the following categories:

> (1) [V]oters with IDs with residential addresses that the State considers "invalid"; (2) voters with no access to an accurate residential address to place on a qualifying ID; (3) voters with no access to documentation of their residential address; (4) voters whose addresses are unassigned; and (5) voters unable to determine their address and obtain a qualifying ID.

*Id.*  Plaintiffs seek an injunction barring the Secretary from enforcing N.D. Cent. Code §§ 16.1-01-04.1(2)(b) and 3(b) as to the above class of voters.  *Id.* at 63.  In the alternative, Plaintiffs seek an injunction barring the Secretary from enforcing N.D. Cent. Code §§ 16.1-01-04.1(2)(b) and 3(b) and in lieu of those statutes, voters would be allowed to identify their residences on a precinct map to verify their eligibility to vote.  *Id.*  Defendants seek the same relief with respect to N.D. Cent. Code §§ 16.1-01-04.1(1) as to voters in the above-listed counties who cannot reasonably obtain qualifying identification, or in the alternative allowing such voters to affirm their identity by signing an affidavit.  *Id.*  Plaintiffs also seek appointment of Federal observers by the Director of the Office of Personnel Management in accordance with Section 3 and 8 of the Voting Rights Act, and an order pursuant to Section 3(c) of the Voting Rights Act, retaining jurisdiction for such period of time as may be appropriate, and requiring preclearance of voting changes by the State of North Dakota.  *Id.* at 63-64.

For the reasons discussed below, the Secretary submits this motion and

memorandum in lieu of an answer to the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b). The Secretary requests that Plaintiffs' complaint be in all things dismissed. Spirit Lake Tribe and Standing Rock lack standing to bring claims on their own behalf and on behalf of their members as *parens patriae*. In addition, all of the Plaintiffs have failed to state a claim upon which relief can be granted. Lastly, Defendant is immune from all of the claims pursuant to the Eleventh Amendment to the United States Constitution.

## III.   FACTS AND BACKGROUND.

### A.   The Secretary of State.

The North Dakota Secretary of State is the supervisor of elections in North Dakota. N.D. Cent. Code § 16.1-01-01. In this capacity, the Secretary hires personnel to administer N.D. Cent. Code Title 16.1, and supervises the conduct of elections. N.D. Cent. Code § 16.1-01-01. The Secretary and his staff have very broad requirements under state law. It requires the Secretary to:

a.   Develop and implement uniform training programs for all election officials in the state.

b.   Prepare information for voters on voting procedures.

c.   Publish and distribute an election calendar, a manual on election procedures, and a map of all legislative districts.

d.   Convene a state election conference of county auditors at the beginning of each election year and whenever deemed necessary by the secretary of state to discuss uniform implementation of state election policies.

\*\*\*

f.    Investigate or cause to be investigated the nonperformance of duties or violations of election laws by election officers.

g.   Require such reports from county auditors on election matters as deemed necessary.[4]

---

[4] County auditors administer elections in each county, and they are responsible to the Secretary of State for the proper administration within the auditor's county of state laws, rules, and regulations concerning election procedures. N.D. Cent. Code § 16.1-01-01(4) and (5)a.- j.

\*\*\*

j.   Establish standards for voting precincts and polling places, numbering precincts, precinct maps, maintaining and updating pollbooks, and forms and supplies, including but not limited to, ballots, pollbooks, and reports.

\*\*\*

*Id.*

### B.   The Plaintiffs.

The Plaintiffs include two tribes: Spirit Lake and Standing Rock, and six individuals: Jackson, Longie, Twinn, Yellow Fat; and Leslie and Clark Peltier.

#### 1.   Spirit Lake.

Spirit Lake is a federally recognized tribe with an enrollment of 7,547 members. Doc. 51, ¶ 16; *see also Spirit Lake Tribe v. North Dakota,* 262 F.3d 732 (8th Cir. 2001). Approximately 3,659 of Spirit Lake's members live on the Spirit Lake Reservation, with approximately 108 members living near the reservation.  *Id.*  Approximately 2,146 of the reservation's residents are eighteen years old or older, along with 66 of the members who live near the reservation.  *Id.*  Spirit Lake alleges that it is asserting claims based on its own alleged injuries and on behalf of its members as *parens patriae.  Id.*

Spirit Lake alleges that parts of the reservation do not have road signs, houses do not have numbers, houses may not have street addresses, mail service is limited, and many members live in poverty.  *Id.* at ¶¶ 17, 18.

Spirit Lake alleges that it has expended and will continue to expend resources to ensure that its members have acceptable forms of identification for voting.  *Id.* at ¶¶ 19, 24, 35, 36.  In that regard, it alleges it has extended its enrollment office hours to issue new tribal IDs, waived the cost of IDs, assisted members with determining their proper street address, and expended resources on public outreach to inform members about North Dakota law.  *Id.* at ¶¶ 19-24.  Spirit Lake further alleges that the State of North Dakota has not provided Spirit Lake with any resources, financial or otherwise, to assist

members in complying with North Dakota law.  *Id.* at ¶ 25.

Spirit Lake alleges that its enrollment office issued more than the usual number of tribal IDs in the weeks leading up to the November 6, 2018 election and that there were long lines to obtain IDs.  *Id.* at ¶ 26.  Spirit Lake alleges many members did not know their residential street address, usually relying on a P.O. box, sometimes due to homelessness or moving around, and needed assistance to determine their residential street address. *Id.* at ¶¶ 27, 28, 34.

Spirit Lake alleges that some members do not know their physical address when they arrive to obtain an ID and staff at the enrollment office assist the members in determining their addresses by the members' descriptions or by calling the Benson County 911 coordinator.  *Id.* at ¶ 30.  Spirit Lake claims it can sometimes take multiple attempts to reach the 911 coordinator, and the addresses obtained from the 911 coordinator are allegedly not always correct.  *Id.* at ¶¶ 30, 31.

Spirit Lake claims that prior to the November 6, 2018 election, it identified some tribal IDs that did not have a residential street address assigned, although there is no allegation that those individuals live on the reservation or whether they even live in North Dakota.  *Id.* at ¶ 32.  Spirit Lake further alleges that prior to the November 6, 2018 election, it identified a group of Spirit Lake's members who had an incorrect street address assigned.  *Id.* at ¶ 33.

### 2.    Standing Rock Sioux Tribe.

Standing Rock is a federally recognized tribe with an enrollment of approximately 15,975 members.  Doc. 51, ¶ 37; *see also Standing Rock Sioux Indian Tribe v. Dorgan*, 505 F.2d 1135 (8th Cir. 1974).  8,367 of Standing Rock's members live on the Standing Rock Reservation, located across both North Dakota and South Dakota.  *Id.*  About 5,868 of the residents living on the reservation are eighteen years old or older.  *Id.*  Standing Rock alleges that it is asserting claims based on its own alleged injuries and on behalf of its members as *parens patriae*.  *Id.*

Standing Rock alleges that it has expended and will continue to expend resources to ensure that its members have acceptable forms of identification for voting. *Id.* at ¶¶ 40, 43, 50, 51. In that regard, it alleges it has waived the cost of IDs to members under 60 years of age, organized a field campaign to provide IDs, expended resources on public outreach to inform members about North Dakota law, and spent time to ensure members had access to valid identification. *Id.* at ¶¶ 40-44. Standing Rock further alleges that the State of North Dakota has not provided Standing Rock with any resources, financial or otherwise, to assist members in complying with North Dakota law. *Id.* at ¶ 44.

Standing Rock alleges that its enrollment office issued more than the usual number of tribal IDs in the weeks leading up to the November 6, 2018 election and that there were long lines to obtain IDs. *Id.* at ¶ 45. Standing Rock alleges many members did not know their residential street address, usually relying on a P.O. box, sometimes due to poverty or transience, and needed assistance to determine their residential street address. *Id.* at ¶¶ 39, 46, 49.

Standing Rock claims the addresses obtained from the 911 coordinator are allegedly not always correct and members may have to try more than once to obtain an address. *Id.* at ¶¶ 38, 48.

Standing Rock also alleges that the North Dakota Department of Transportation does not operate a driver's license site on the Standing Rock Reservation with the mean travel distance for voting age Native Americans from the Standing Rock Reservation to the nearest site in Bismarck being 65.8 miles. *Id.* at ¶ 52.

### 3.   Dion Jackson and Kara Longie.

Both Jackson and Longie are enrolled members of Spirit Lake, and they live on the Reservation. *Id.* at ¶¶ 53, 64. Jackson alleges that he has lived at his current address for two years, which he alleges is 8225 34th St. NE, Tokio, ND 58379. *Id.* at ¶ 54. Although this is the address listed on his non-driver's ID, he alleges his absentee ballot application for the November 6, 2018 election was rejected because "the address on the

application '[did] not match the address in the ND DOT database or is an invalid address.'"  *Id.* at ¶¶ 55-57.  Jackson alleges his residential address does not appear on the Secretary of State's "My Voting Information" online search tool, and the North Dakota GIS Hub Explorer lists his street as "Unknown2."  *Id.* at ¶¶ 58, 59, 61.  Jackson also alleges that the online search tool Google Maps does not list his address correctly.  *Id.* at ¶ 62.  Jackson alleges that the Benson County Auditor's rejection of his absentee ballot application for an invalid address constituted a denial of his right to vote.  *Id.* at ¶ 63.

Longie also alleges that her address is 8225 34th St. NE, Tokio, ND 58379, and this is the address listed on her non-driver's identification.  *Id.* at ¶¶ 66, 67.  Longie alleges that when she entered her "ID number" and birthdate into the My Voting Information online tool, her address is listed as 8225 34th St. NE, *Warwick*, ND 58381.  *Id.* at ¶ 71.  Longie alleges she feared she would not be able to vote because Jackson's absentee ballot application was rejected.  *Id.* at ¶ 74.

After the commencement of this lawsuit, the Benson County Auditor issued supplemental documentation to Jackson and Longie listing their current residential address, and they were permitted to vote in the November 6, 2018 election.  Doc. 34-1, 34-2.  While the Second Amended Complaint alleges Jackson and Longie voted in the November 6, 2018 election "upon order of this court", they in fact had everything they needed to vote without a court order or stipulation, with just their non-driver's IDs and the supplemental documentation listing the residential street address issued by a government official.  *See* N.D. Cent. Code § 16.1-01-04.1(3)(b)(5); Doc. 34-1, 34-2.

The Second Amended Complaint alleges "[i]f Plaintiffs Jackson or Longie lose this 'supplemental documentation', they will once again find themselves without the proper paperwork to vote since their North Dakota IDs contain 'invalid' addresses."  *Id.* at ¶ 78.  Further, the Second Amended Complaint alleges, "Plaintiffs Jackson and Longie should not be required to furnish paperwork stating an address with which they are unfamiliar and do not use in their daily lives in order to participate in our democratic system", and

"Plaintiffs should not be required to have documentary proof of an address 'for voting purposes' that does not otherwise serve as a functional address for their home."  *Id.* at ¶ 80.  Lastly, Jackson and Longie allege they face the prospect of similar "problems in obtaining necessary paperwork to vote" in the hypothetical event they relocate to a new residence on the Spirit Lake Reservation.  *Id.* at ¶ 81.

### 4.     Leslie and Clark Peltier.

The Peltiers are enrolled members of the Turtle Mountain Band of Chippewa Indians, and they live in a rural area outside their reservation on reservation trust land, about 11 miles northwest of Belcourt, North Dakota.  *Id.* at ¶¶ 82, 85.  The Peltiers allege their residential street address is 10296 40th Ave NE, Belcourt, ND 58316, but they allege this address is inconsistent with the address in the "My Voting Information" online search tool, which identifies them as living in neighboring St. John, North Dakota.  *Id.* at ¶¶ 87, 90, 91.  The Peltiers have previously voted in St. John.  *Id.* at ¶ 89.

Although they had voted in past elections, the Peltiers allege when they filed this action that they feared they would not be permitted to vote in the November 6, 2018 election and fear they will not be permitted to vote in future elections, "because the residential address on their IDs does not match the assigned 911 address for their home in the State's files."  *Id.* at ¶¶ 93, 95.

The Parties have verified, through a stipulation adopted by the Court, that the Peltiers' address in the State's Central Voter file is 10296 40th Ave. NE, St. John, ND, 58369, and it will be reflected in the poll books of Rolette County.  Doc. 34, ¶ 5.

 "Finally, the Peltiers [allege they] face the very real prospect of encountering precisely the same problems in obtaining necessary paperwork to vote should they relocate to a new residence."  *Id.* at ¶ 96.

### 5.     Kim Twinn.

Twinn is an enrolled member of the Northern Cheyenne Tribe and she resides in Fort Yates, North Dakota, on the Standing Rock Reservation.  *Id.* at ¶¶ 97, 98.  Twinn

alleges her residential street address is 8746 Highway 24, Fort Yates, ND 58538.  *Id.* at ¶ 99.  Twinn alleges that she serves as a caretaker for her uncle and only has two forms of identification: her Fort Yates birth certificate and her enrollment certificate from the Northern Cheyenne Tribe, both of which indicate her birth date and name but not her residential street address.  *Id.* at ¶¶ 99-100.  Twinn alleges she does not own a home, does not have any bank statements or utility bills in her name, is not employed and therefore has no paycheck, and is not a member of the Standing Rock tribe and therefore cannot receive a tribal ID.  *Id.* at ¶¶ 101, 102.

Twinn alleges that "[a]fter the filing of the original complaint, the Sioux County Sheriff went unannounced to both Ms. Twinn's home and an office where she was volunteering to help other Standing Rock tribal members vote to serve her with a document reflecting her 911 address."  *Id.* at ¶ 103.

In advance of the November 6, 2018 election, the Parties stipulated that the Secretary will instruct the Sioux County Auditor to permit Twinn to cast a ballot at her designated voting location, with her Northern Cheyenne Tribe enrollment certificate the Sioux County Courthouse (FY East), Fort Yates, ND.  Doc. 34, ¶ 3.

Despite receiving a document reflecting her 911 address from a government official, and despite self-help options available, discussed in more detail below, Twinn claims she has not identified any way to obtain an identification or supplemental documentation of her residential address that would allow her to vote in subsequent elections.  *Id.* at ¶ 105.

### 6.    Terry Yellow Fat.

Yellow Fat is an enrolled member of the Standing Rock Sioux Tribe, and resides in Fort Yates, North Dakota.  *Id.* at ¶ 106.  Yellow Fat alleges the 911 coordinator gave him a residential street address of 1343 92nd Street, even though there is no sign on his street that says 92nd Street.  *Id.* at ¶¶ 108, 109.  Yellow Fat alleges that when his address is input into the North Dakota GIS Hub Explorer online search tool, the search result

appears on a street labeled as 93rd Street.  *Id.* at ¶ 112.  Yellow Fat alleges that he does not possess any identification that lists his current residential street address.  *Id.* at ¶ 115. Yellow Fat alleges that after the filing of the original Complaint in this action, the Sioux County Sheriff served Yellow Fat with a document reflecting his 911 address for purposes of voting in the November 6, 2018 election as 1392 92nd St. Fort Yates, ND 58538.  *Id.* at ¶ 117; Doc. 34-3.  In advance of the November 6, 2018 election, the Parties entered into a stipulation adopted by the Court that the Sioux County Auditor has issued supplemental documentation to Yellow Fat that lists his current residential address as 1392 92nd St. Fort Yates, ND 58538 and that Yellow Fat will be able to cast a ballot with his supplemental documentation and his tribal ID.  Doc. 34, ¶ 4.

While the Second Amended Complaint alleges Yellow Fat was permitted to vote in the November 6, 2018 election "upon order of this court", he in fact had everything he needed to vote without a court order or stipulation with the addition of this supplemental documentation listing his residential street address issued by a government official.  *See* N.D. Cent. Code § 16.1-01-04.1(3)(b)(5); Doc. 34-1, 34-2.  Yellow Fat inaccurately claims the documentation provided to him is limited on its face to the November 6, 2018 election and does not provide him with sufficient documentation of his residential address for voting in subsequent elections.  *Id.* at ¶ 120.  "Finally, [Yellow Fat alleges he] faces the very real prospect of encountering precisely the same problems in obtaining necessary paperwork to vote should he relocate to a new residence on the Reservation."  *Id.* at ¶ 121.

## C.    The Central Voter File System.

The Second Amended Complaint attempts to explain, based on information and belief, how the state addressing system works with respect to the "GIS mapping system" and an individual's ability to vote on Election Day in conjunction with North Dakota's residential street address requirements. Doc. 51, ¶¶127-147.  Plaintiffs label the system used for assigning and verifying residential addresses as "deeply flawed, produc[ing]

conflicting and inaccurate results" which have "generated significant confusion" and results in otherwise qualified Native American voters facing a substantial risk of being denied the right to vote. Doc. 51, ¶ 147.  Plaintiffs allege that "[t]he state verifies a voter's precinct by checking the house number and street name provided against a range of addresses assigned to the County through the Burkle Addressing System. Doc. 51, ¶ 127.

The State of North Dakota utilizes the Centralized Voter File ("CVF"), which is a collection of databases linked together by a centralized statewide system. N.D. Cent. Code § 16.1-02-01.  State law requires that the CVF contain various information, including the complete residential address of the individual.  N.D. Cent. Code § 16.1-02-12.

The CVF is established in cooperation with the North Dakota Department of Transportation ("DOT") and county auditors.  N.D. Cent. Code § 16.1-02-03.  A portion of the databases are maintained by the State while other portions are maintained by the 53 county auditors, who are required to have access to the CVF to update and make changes to the information contained in the CVF (among other things), and they are the chief custodians of the CVF records in each county. N.D. Cent. Code § 16.1-02-01. The CVF is created from the records maintained by the DOT and the county auditor's precinct pollbooks used and created in the respective county from elections. N.D. Cent. Code § 16.1-02-03(1)-(2).  An existing or potentially new voter's information is continually updated and changed in the CVF through the DOT records, when a relevant update or change is made to the records maintained by the DOT.  N.D. Cent. Code § 16.1-02-09. The DOT is required to provide, among other information, the complete residential address including both the previous and current residential addresses, if changed. *Id.* Such updates or changes most commonly occur when an individual submits information to obtain a license or a non-driver's ID.

If an individual's information has not been previously populated into the CVF through DOT records or the county auditor's pollbooks following an election, the law requires a county auditor to enter "the name and required information of each individual

15

who voted at the last election who is not already contained in the [CVF]." N.D. Cent. Code § 16.1-02-05(1). Therefore, an individual can have their information populated into the CVF through their existing information with the DOT or county auditor, by updating their information in-person or through the DOT website[5] with the DOT, or with the county auditor prior to an election, or by voting on election day with the requisite information and thereafter being entered onto the CVF by the county auditor.

The State does not rely upon the GIS Hub Explorer for the administration of elections, or to make an authoritative determination as to verify a voter's precinct as Plaintiffs allege.[6] Because the county auditor is the chief custodian of the CVF records in their respective counties pursuant to section 16.1-02-01, the counties maintain a portion of the database within the CVF specific to that county, which contains the possible address ranges in that county. The address ranges in that county are available to the county auditor who may consult the 9-1-1 system for rural addressing. Under N.D. Cent. Code § 57-40.6-10(1)(a), "[t]he governing body of the local governmental unit . . . shall designate a governing committee that shall: Designate an emergency services communication system coordinator [9-1-1 coordinator]." The governing committee also shall "[p]rovide for a written plan for rural addressing . . . ." N.D. Cent. Code § 57-40.6-10(d). The 9-1-1 coordinator must provide to the county auditor information to verify and correct names and addresses used for official purposes. N.D. Cent. Code § 57-40.6-07(2). Since the 9-1-1 coordinator is tasked with ensuring that address and mapping data are updated in the mapping system, which must follow the plan set forth for rural addressing, the 9-1-1 coordinator possesses the ability to assign addresses for individuals residing in rural areas who may not otherwise know their address, and the 9-

---

[5] Driver's License Address/Email Change System, https://apps.nd.gov/dot/dlts/dlos/addressWelcome.htm, (last visited July 11, 2019).
[6] Plaintiffs do not identify what is meant by the "GIS mapping system" in their Second Amended Complaint. The Secretary believes this refers to the GIS Hub Explorer referred to earlier in Plaintiffs' complaint and addresses it as one in the same.

1-1 coordinator communicates that information to the county auditor pursuant to State law.

It follows that if an individual is unaware of their residential street address, the person may contact the 9-1-1 coordinator in the county where that individual resides to determine the correct address.  Once the 9-1-1 coordinator updates an address, the information is shared with the county auditor or at the county auditor's request.  An individual may also get a license or non-drivers ID with the DOT that reflects a residential address.  Updates may be made by contacting the DOT, as previously explained. Updates to a residential address for purposes of voting may also be made by contacting the county auditor.  Contacting the DOT to update information or obtain an ID, contacting the county auditor, or a 9-1-1 coordinator in the respective county where an individual lives to determine an address an individual is otherwise unaware of, are all considered self-help methods for individuals to determine an accurate residential street address for purposes of voting in the elections.  These self-help methods were available prior to, and during, the November 6, 2018, election and continue to be available thereafter.

## IV.    ARGUMENT.

### A.    Spirit Lake and Standing Rock Lack Standing.

Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy.  "The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood.  The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal citation omitted). "To demonstrate Article III standing, a plaintiff 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Heglund v. Aitkin Cty.*, 871 F.3d 572, 577 (8th Cir. 2017) (quoting *Spokeo*, 136 S. Ct. at 1547).  The injury-in-fact element requires an injury both particularized and concrete, and actual or imminent rather than

conjectural or hypothetical. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1). Under the second element, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560-61 (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976)).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547 (internal quotation marks and citation omitted). Standing is determined as of the time a suit is commenced. *Park v. Forest Serv. of United States*, 205 F.3d 1034, 1038 (8th Cir. 2000).

Spirit Lake and Standing Rock have asserted claims both on their own behalf and on behalf of the individual members of their tribes under the doctrine of *parens patriae*. Doc. 51, ¶¶, 16, 37. However, the tribes lack standing for all of their claims in this case and their claims should therefore be dismissed. The issue of standing is raised with respect to the two tribes named as Plaintiffs: Spirit Lake and Standing Rock. While individual members of these tribes may have standing to pursue claims[7], the tribes themselves do not.

> **1.    The tribes have no standing to pursue the claims on their own behalf as they have not suffered an injury in fact and any alleged injury is not fairly traceable to the Secretary.**

Initially, it should be noted that Spirit Lake and Standing Rock's claims made on

---

[7] Regardless of standing, the Individual Plaintiffs' claims should be dismissed on other grounds, namely for failure to state a claim, as discussed more thoroughly below.

their own behalf do not appear to be based upon the right to vote[8], and indeed, the claims on their own behalf cannot be based on the right to vote as there would be no standing for such claims.  The Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.'"  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).  Accordingly, the "individual and personal injury of the kind required for Article III standing" requires plaintiffs who challenge an election law to show "a burden on those plaintiffs' own votes," that is, an "injury that they have suffered as individual voters."  *Id.* at 1931.  Voters must "demonstrate a burden on their individual votes" *id.* at 1934, because the "Court is not responsible for vindicating generalized partisan preferences" and has a "constitutionally prescribed role . . . to vindicate [only] the individual rights of the people appearing before it."  *Id.* at 1933.  Moreover, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Id.* at 1934 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)).

In *Gill*, the Supreme Court held that voters who lived outside of districts where gerrymandering allegedly caused Democratic votes to be diluted had no standing to challenge Wisconsin's legislative redistricting plan because the "disadvantage to the voter as an individual . . . results from the boundaries of the particular district in which he resides.  And a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." *Id.* at 1930 (internal citations and quotation marks omitted).

Rather than being grounded in the right to vote, the claims brought by Spirit Lake and Standing Rock on their own behalf relate to resources they have allegedly expended and expect to expend to ensure that tribal members have acceptable forms of identification for voting.  Doc. 51, ¶¶ 19, 24, 35, 36, 40, 43, 50, 51.  Specifically, Spirit

---

[8] Despite the ambiguous first sentence of the Introduction to the Second Amended Complaint, which states, "Plaintiffs bring this action to vindicate their right and the right of their members to vote under the First, Fourteenth, and Fifteenth Amendments to the United States Constitution and the Voting Rights Act."

Lake alleges it has extended its enrollment office hours to issue new tribal IDs, waived the cost of IDs, assisted members with determining their proper street address, and expended resources on public outreach to inform members about North Dakota law.  *Id.* at ¶¶ 19-24.  Spirit Lake claims it lost over $7,000 in income and paid almost $4,000 in expenses to print IDs.  *Id.* at ¶ 20.  Similarly, Standing Rock alleges it has waived the cost of IDs to members under 60 years of age, organized a field campaign to provide IDs, expended resources on public outreach to inform members about North Dakota law, and spent time to ensure members had access to valid identification.  *Id.* at ¶¶ 40-44. Standing Rock claims it lost nearly $2,500 in income and incurred almost $500 in costs to print IDs.  *Id.* at ¶ 40.

However, all of these claims are the result of voluntary actions and expenditures undertaken by Spirit Lake and Standing Rock in their capacities as sovereign tribes on behalf of their members.  These actions and expenditures were not mandated by the North Dakota Legislative Assembly through the passage of N.D. Cent. Code §§ 16.1-01-04.1(1), (2)(b) or 3(b), nor were they forced upon the tribes by the actions of the Secretary. The Secretary is not empowered to force the tribes to undertake the actions and expenditures they complain of, nor is he empowered to stop the tribes from doing so. While Spirit Lake and Standing Rock voluntarily provided important constituent services as sovereigns, and have acted as liaisons between their tribal members and state officials to ensure that citizens receive the documentation they need to vote, this cannot be considered an injury to the sovereign tribes, nor is it fairly traceable to the alleged actions of the Secretary.

"Today, in the United States, we have three types of sovereign entities--the Federal government, the States, and the Indian tribes."  The Honorable Sandra Day O'Connor, *Lessons from the Third Sovereign: Indian Tribal Courts*, 33 Tulsa L.J. 1 (1997). The United States Supreme Court first acknowledged the continued sovereignty of Indian tribes in "the well known and often quoted opinion of Chief Justice Marshall in" *Worcester*

*v. Georgia*, 31 U.S. 515 (1832).   *Iron Crow v. Ogallala Sioux Tribe of Pine Ridge Reservation, S.D.*, 129 F. Supp. 15, 19–20 (D.S.D. 1955), *aff'd sub nom. Iron Crow v. Oglala Sioux Tribe of Pine Ridge Reservation, S.D.*, 231 F.2d 89 (8th Cir. 1956).   "There Chief Justice Marshall stated inter alia, 'The Indian nations had always been considered as distinct, independent, political communities…' '…and the settled doctrine of the law of nations is that a weaker power does not surrender its independence, its right to self-government, by associating with a stronger and taking its protection.'"   *Iron Crow*, 129 F. Supp. at 19–20 (citing *Worcester*, 31 U.S. 515).   "Following [*Worcester*] the courts have consistently held that Indian tribes have inherent powers of self-government which are recognized by the Constitution, although such powers may be limited, regulated or entirely terminated by Congress at will."   *Iron Crow*, 129 F. Supp. at 20.   Under the Indian Commerce Clause, Congress has plenary authority over Indians and Indian Tribes. *Means v. Wilson*, 522 F.2d 833, 839 (8th Cir. 1975) (citing W*orcester*, 31 U.S. at 559). Federally recognized tribes are "quasi-sovereign nations with the inherent powers of sovereignty, except to the extent that those powers have been taken away from them by the exercise by Congress of its paramount power in the area or by treaty."   *United States v. Walking Crow*, 560 F.2d 386, 388–89 (8th Cir. 1977).

States do not have such recognized superior power over sovereign tribes with reservations within their borders, however, the United States Supreme Court long ago abandoned the position that states have absolutely no force within reservation boundaries.   *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 141–43 (1980) (citing *Worcester*, 31 U.S. 515; *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 481–483 (1976); *New York ex rel. Ray v. Martin*, 326 U.S. 496 (1946); *Utah & Northern R. Co. v. Fisher*, 116 U.S. 28 (1885)).   On the complicated issue of the boundary between the state's regulatory power over matters occurring within a reservation in a state and tribal self-government, "[g]eneralizations… have become… treacherous."   *White Mountain Apache Tribe*, 448 U.S. at 141 (citing *Mescalero Apache Tribe v. Jones*, 411 U.S. 145,

148 (1973)).  Fortunately, analysis of that complicated issue is not necessary in the present case.  The statutes at issue in this lawsuit, and the Secretary's implementation of those statutes, do not regulate the tribes or matters occurring on reservations.  *They simply recognize tribal IDs as valid identification for election purposes, an additional form of identification not available for any citizen in North Dakota other than members of tribes.*

Both Spirit Lake and Standing Rock complain that the State of North Dakota has not provided them with any resources, financial or otherwise, to assist members in complying with North Dakota law.  Doc. 51, ¶¶ 25, 44.  However, N.D. Cent. Code § 16.1-01-04.1, and the implementation of the statute by the Secretary, do not require any action or expenditure of funds by any tribe.  Section 16.1-01-04.1(3)(a)(2) simply recognizes as a valid form of identification for voting "[a]n official form of identification issued by a tribal government to a tribal member residing in this state."  *The law simply gives members of a tribe in North Dakota one additional option for identification for voting purposes not available to any other group in the state.*  The law and the Secretary's implementation of the law do not require any tribe to issue IDs, nor do they require tribal IDs to contain any particular information.  If a valid form of identification, such as a tribal ID, does not contain all of the information needed for voting, or the information is outdated, the information can be provided to election officials by a voter through supplemental documentation under N.D. Cent. Code § 16.1-01-04.1(3)(b)(1)-(5), which can include: (1) a current utility bill, (2) a current bank statement; (3) a check issued by a federal, state, or local government; (4) a paycheck; or (5) a document issued by a federal, state, or local government.

The actions Spirit Lake and Standing Rock complain of were undertaken by the tribes as sovereign powers.  The State of North Dakota and the Secretary did not require the tribes to issue IDs, start public outreach campaigns, assist in the determining of residential street addresses, or other actions, and they arguably would have been powerless to stop the actions had they wanted to.  The Court may take judicial notice of the fact that sovereign governments often act as liaisons for their constituents when

22

dealing with other sovereign or quasi-sovereign powers.  As examples: nations dealing with customs, immigration, and foreign travel of their citizens; or state boards of law examiners providing documents to other states with which reciprocity for bar admission exists.  Governments often work with other governments when their constituencies and issues overlap.  Sovereign governments do not, however, have standing to sue each other in federal court to recoup the costs incurred in those typical interactions voluntarily undertaken on behalf of constituents.  If such expenditures could constitute an Article III injury, the State could be subject to liability any time a tribe decides to assist members in interactions with the State, even when the individual member could have dealt with the State on his or her own.  This would essentially shift the burden of a tribal expenditure on to the State to pay for programs and actions decided on by the tribal leaders, but not by the North Dakota Legislative Assembly.

Spirit Lake and Standing Rock have no standing to assert claims on their own behalf because they were not injured in fact and any alleged injury is not fairly attributable to the Secretary.  For the reasons discussed below, the Spirit Lake and Standing Rock also have no standing to assert claims on behalf of their members.

> **2.    The tribes do not have standing to sue on behalf of their members under the doctrine of parens patriae.**

In addition to asserting claims on their own behalf, Spirit Lake and Standing Rock also assert claims on behalf of the individual members of their tribes under the doctrine of *parens patriae*.  Doc. 51, ¶¶, 16, 37.  "*Parens patriae* is a doctrine whereby a sovereign, usually a state or federal government, may in appropriate circumstances sue as 'parent of the country' to vindicate interests of their citizens."  *Navajo Nation v. Superior Court of State of Wash. for Yakima Cty.*, 47 F. Supp. 2d 1233, 1240 (E.D. Wash. 1999), *aff'd sub nom. Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*, 331 F.3d 1041 (9th Cir. 2003).  "The Eighth Circuit has considered, but not yet recognized the doctrine of *parens patriae* in the context of tribes suing on behalf of tribal members."

*Rosebud Sioux Tribe v. United States*, No. 3:16-CV-03038-RAL, 2017 WL 1214418, at
*4 (D.S.D. Mar. 31, 2017) (citing *United States v. Santee Sioux Tribe of Neb.*, 254 F.3d
728, 734 (8th Cir. 2001); *Delorme v. United States*, 354 F.3d 810, 816 (8th Cir. 2004)).

Standing for purposes of Article III can be established if there is a showing that
*parens patriae* standing requirements are satisfied: "the requirements of Article III will be
satisfied if the Tribe demonstrates that it has *parens patriae* standing to bring claims . . .
." *Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1178 (N.D. Okla.
2009). *See Massachusetts v. EPA,* 549 U.S. 497, 498 (2007) (distinguishing requirement
for a state to have standing to sue from the *Lujan* test); *Glanton ex rel. ALCOA
Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1126 (9th Cir. 2006) (noting
that governmental entities have standing under Article III if they can demonstrate *parens
patriae* standing); *Massachusetts v. Bull HN Info. Sys., Inc.*, 16 F. Supp. 2d 90, 103 (D.
Mass. 1998) ("Because the Commonwealth has parens patriae standing to pursue this
action, Article III no longer poses an obstacle.").

Standing under *parens patriae* has two requirements that are not met in this case:
1) the claims of the sovereign must be made on behalf of all of its citizens, not merely a
select group of citizens; and 2) the sovereign must assert its own quasi-sovereign
interest, not only the interests of private parties. *Santee Sioux Tribe of Nebraska*, 254
F.3d at 734; *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607
(1982). While failure to meet either one of these requirements is fatal to *parens patriae*
standing, Spirit Lake and Standing Rock fail to meet both requirements in this case. *See
id.*

### i. The tribes are not representing all tribal members in this action.

Spirit Lake and Standing Rock fail to establish *parens patriae* standing because
they are not representing the interests of all of their members, rather only a select group.
In *Santee Sioux Tribe*, the Eighth Circuit Court of Appeals rejected a tribe's argument

that it had standing to sue on behalf of its tribal members under the doctrine of *parens patriae* because the "doctrine is reserved for actions which are asserted on behalf of *all* of the sovereign's citizens."   254 F.3d at 734 (citing *United States v. Hooker Chemicals & Plastics Corp.,* 749 F.2d 968, 984–85 (2d Cir.1984)) (emphasis in original).  The Eighth Circuit stated, "The *parens patriae* doctrine cannot be used to confer standing on the Tribe to assert the rights of a dozen or so members of the Tribe."   *Id.* (citing *Navajo Nation,* 47 F. Supp. 2d at 1240 (Tribe lacked standing under the doctrine of *parens patriae* to assert rights of biological grandparents in action challenging adoption of grandchild because claims were personal to grandparents and not those of tribe as a whole, stating "[t]he governmental entity must raise claims which affect *all its members*, not just a select few.") (emphasis added); *Kickapoo Traditional Tribe of Texas v. Chacon,* 46 F. Supp. 2d 644, 652 (W.D. Tex.1999) (Tribe did not have standing to assert a first amendment violation because the rights sought to be asserted were primarily those of a small group of tribe members and not those of the tribe as a whole)).   Other federal courts that have considered the issue have likewise held that tribes have no standing under the doctrine of *parens patriae* if the claims are brought on behalf of only some but not all members of the tribe.   *See Kickapoo Tribe of Oklahoma v. Lujan*, 728 F. Supp. 791, 795 (D.D.C. 1990) (Sovereign tribe could not sue under the doctrine of *parens patriae* because it was not acting on behalf of all of its members although all of its members may be affected in some way by reorganization); *Assiniboine & Sioux Tribes v. Montana*, 568 F. Supp. 269, 277 (D. Mont. 1983) (Tribe did not have standing to sue under *parens patriae* doctrine because it was not acting on behalf of the collective interests of all its citizens: "Here, the proposed claim is on behalf only of those Indians seeking refunds because they have been improperly subjected to these taxes, and those Indians who might, but for this lawsuit, continue to be wrongfully subjected to them."); Alabama & Coushatta Tribes of Texas v. Trustees of Big Sandy Indep. Sch. Dist., 817 F. Supp. 1319, 1327 (E.D. Tex. 1993) (In a case challenging a hair length restriction in a school dress code, the court

stated, "[w]hile the application of the hair restriction may in some way affect members of the Tribe other than the Native American students at Big Sandy and their families, the Tribe is not representing the interests of all its members in this case, as the doctrine of *parens patriae* requires.").

Spirit Lake alleges in the Second Amended Complaint that it has 7,547 enrolled members, approximately 3,659 of which live on the Spirit Lake Reservation and 108 additional members living within twenty miles of the Reservation.  Doc. 51, ¶ 16.  Of those members living on the Spirit Lake Reservation, approximately 2,146 of them are eighteen years or older, along with 66 of the members who live near the Reservation (total of 2,212).  *Id.*  The Second Amended Complaint goes on to allege issues with the residential street address requirement set forth in section 16.1-01-(2)(b) and (3)(b), for some—but not all—of its members living on the Reservation.  Of those determined to satisfy the age requirement to vote (2,212), Spirit Lake's enrollment office issued 665 new tribal IDs to tribal members from October 22 to November 6, 2018.  *Id.* at ¶ 26.  The Second Amended Complaint generally alleges that "many" of those members who received tribal IDs were unaware of their residential street address and needed assistance to determine their residential street address. *Id.* at ¶ 27.  Prior to November 6, 2018, Spirit Lake additionally identified 262 members "whose tribal IDs did not list [] residential street addresses" and identified an error in the street address for at least 15 members.  *Id.* at ¶¶ 32, 33.  The Second Amended Complaint does not provide any indication whether the 262 members identified as not possessing tribal IDs with residential street addresses or the 15 with an error in street address had another form of identification or supplemental documentation that fits within the requirements of section 16.1-01-04.1(2)(b) and (3)(b).

Standing Rock alleges in the Second Amended Complaint that it has 15,975 enrolled members, 8,367 of which live on the Standing Rock Reservation, located across both North Dakota and South Dakota.  *Id.* at ¶ 37.  Plaintiffs do not specify in the Second Amended Complaint the total number of tribal members living on the North Dakota side

of the Standing Rock Reservation.  Approximately 5,868 of the residents living on the Reservation are eighteen years old or older.  *Id.*  Standing Rock alleges from October 15 through November 6, 2018, it issued 807 total IDs.  *Id.* at ¶¶ 40, 45.  The Second Amended Complaint generally alleges that "many" of those members who received tribal IDs were unaware of their residential street address and needed assistance to determine their residential street address. *Id.* at ¶ 46.

With respect to both Spirit Lake and Standing Rock, they make no allegations on behalf of the many thousands of tribal members not living on or near one of their respective reservations, or on behalf of the members living on the South Dakota side of the Standing Rock Reservation.

As to the tribal members living in North Dakota on one of the reservations, the tribes do not allege that every member has issues with the residential street address requirement; only that "many" of the 665 Spirit Lake members and "many" of the 807 Standing Rock members who received IDs leading up to the November 6, 2018 election were unaware of their residential street address and needed assistance to determine their residential street address.  Doc. 51, ¶¶ 26, 27, 40, 45, 46.  It is not clear how many of the additionally identified 262 Spirit Lake members whose tribal IDs did not list a residential street address or the 15 members with an error as to street address on the tribal ID had other forms of identification, supplemental documentation, or a State issued ID with a residential street address.  *See id.* at ¶¶ 32, 33.  However, even given the most generous factual assumptions in favor of the Plaintiffs, it is clear the tribes are only seeking to pursue claims in this case on behalf of a small percentage of Spirit Lake's 7,547 enrolled members and Standing Rock's 15,975 enrolled members.  Plaintiffs' own allegations clearly indicate Spirit Lake and Standing Rock are not acting on behalf of all of their members in this lawsuit.

The numbers provided by the Plaintiffs in this case foreclose on Spirit Lake and Standing Rock's *parens patriae* standing argument because even if the residential street

address may in some way affect all of their members living on or off the reservation, the tribes do not represent the interests of all their members and do not meet the requirements for *parens patriae* standing. *Kickapoo Tribe of Oklahoma v. Lujan*, 728 F. Supp. at 795.

Spirit Lake and Standing Rock have no standing under the doctrine of *parens patriae* since they are not acting on behalf of all of their members, or even a substantial number of their members, in this lawsuit.  No further analysis is needed for the Court to find lack of standing under the doctrine of *parens* patriae, as the Eighth Circuit Court of Appeals did in *Santee Sioux Tribe*.  254 F.3d at 734.  However, even if the Court does not find lack of standing under the doctrine of *parens patriae* for that reason, there is nevertheless lack of standing for another reason: the tribes are not asserting a quasi-sovereign interest, as required in order to have *parens patriae* standing.

### ii.      The tribes are not asserting a quasi-sovereign interest.

*Parens patriae* standing requires that a quasi-sovereign interest is asserted.  *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607.  The interest asserted must be "apart from the interests of particular private parties . . . [the party] must be more than a nominal party." *Id*.  Quasi-sovereign interests "are not sovereign interests, proprietary interests, or private interests pursued by the State [or Tribe] as a nominal party." *Id*. at 602. "First, a State [or Tribe] has a quasi-sovereign interest in the health and well-being-both physical and economic-of its residents in general.  Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id*. at 607. Spirit Lake fails to assert a quasi-sovereign interest as required under *Alfred L. Snapp & Son, Inc.* and, therefore, it fails the requirements for *parens patriae* standing.

In the original Complaint in this action, Spirit Lake alleged:

> The Spirit Lake Tribe has a strong and demonstrated interest in ensuring its members are able to exercise their right to vote on Election Day.  If Spirit Lake Tribe members are unable to vote, the collective political power of the Spirit Lake Tribe is reduced.  Spirit Lake Tribe advocates on behalf of all its members to local, state, and federal representatives.  If some of its

28

> members are unable to vote, the Spirit Lake Tribe's overall ability to
> advocate effectively for crucial resources for the Spirit Lake Tribe and the
> Reservation will be diminished.

Doc. 1, ¶ 17. However, the foregoing paragraph was deleted and not included in the First Amended Complaint or Second Amended Complaint, and similar allegations are not made with respect to Standing Rock. Rather, in the Second Amended Complaint, the allegations as to Spirit Lake and Standing Rock relate only to expenditures of the tribe's own resources, claims as sovereigns, not quasi-sovereign interests in the health and well-being of residents in general or denial of the tribes' its rightful status within the federal system. The resources expended by Spirit Lake for the election do not constitute a quasi-sovereign interest. The financial resources of Spirit Lake are functionally distinct from the resources of individual members. The Second Amended Complaint is devoid of any allegations establishing a quasi-sovereign interest.

Based on the foregoing, Spirit Lake and Standing Rock do not satisfy the requirements for *parens patriae* standing, and should be dismissed from this case.

**B.** **All of the Plaintiffs' claims against the Secretary should be dismissed with prejudice because their allegations fail to state a claim.**

"To state a claim under the Federal Rules of Civil Procedure [with respect to Rule 12(b)(6) of the Federal Rules of Civil Procedure], a complaint must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (citing Fed. R. Civ. P. 8(a)(2)). A complaint must also contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Zink*, 783 F.3d at 1098 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A pleading need not include 'detailed factual allegations,' but it is not sufficient to tender 'naked assertion[s]' that are 'devoid of further factual enhancement.'" *Zink*, 783 F.3d 1098 (citations omitted) (alterations in original). And, a "complaint must do more than allege 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id.*

Spirit Lake and Standing Rock have failed to state a claim because, as Indian tribes, they are not "persons" or "citizens of the United States", and thus are not granted rights under the constitutional provisions or portion of the Voting Rights Act relied upon in the Second Amended Complaint.  Further, the tribes cannot recoup from the Secretary resources that they voluntarily expended as sovereigns to provide services to their members.

With respect to the Individual Plaintiffs, since they were permitted to vote in the November 6, 2018 election, the claims in the Second Amended Complaint are only anticipatory of future potential problems in future elections.  Without resorting to pure speculation, all of the Individual Plaintiffs are equipped to vote in future elections without incident.

        **1.**       **Spirit Lake and Standing Rock.**

            **i.**      **Spirit Lake and Standing Rock are not "persons" or "citizens of the United States".**

Spirit Lake and Standing Rock are not "persons" or "citizens of the United States" entitled to bring the constitutional or Voting Rights Act claims asserted in this lawsuit.  In the Second Amended Complaint, all of the Plaintiffs' claims are based on alleged violations of the First, Fourteenth, and Fifteenth Amendments to the United States Constitution, and Section 2 of the Voting Rights Act.  Doc. 51, ¶¶ 256-91.  The First and Fourteenth Amendments only give protection to "persons", while the Fifteenth Amendment and Section 2 of the Voting Rights Act only give protection to "citizens of United States".  As federally recognized tribes, Spirit Lake and Standing Rock are not "persons" or "citizens of United States" and thus have no rights to assert the claims in this case.

The right to vote is recognized as a fundamental right under the First Amendment. *Libertarian Party of N.D. v. Jaeger*, 659 F.3d 687, 694 (8th Cir. 2011).  However, protection from infringement of this right by a state, as opposed to infringement by the

federal government, comes from the Due Process Clause of the Fourteenth Amendment, not from the First Amendment itself. *Id.*; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336, n.1 (1995) (explaining that the term "liberty" in the Due Process Clause of the Fourteenth Amendment makes the First Amendment applicable to the States.)

In addition to the Due Process Clause, Plaintiffs' allegations in this case also implicate the Equal Protection Clause of the Fourteenth Amendment. Doc. 51, ¶¶ 256-73, 277-81, 290, 291. The Fourteenth Amendment states in relevant part, "nor shall any State deprive any <u>person</u> of life, liberty, or property, without due process of law; nor deny to any <u>person</u> within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (emphasis added). As often stated by the United States Supreme Court, "In common usage, the term 'person' does not include the sovereign, [and] statutes employing the phrase are ordinarily construed to exclude it." *See Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979) (citations omitted). This presumption is not a "hard and fast rule of exclusion, but it may be disregarded only upon some affirmative showing of statutory intent to the contrary." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780-81 (2000) (internal citation omitted).

Tribes have been described as "unique aggregations possessing attributes of sovereignty over both their members and their territory" and "'a separate people' possessing 'the power of regulating their internal and social relations…'" *United States v. Antelope*, 430 U.S. 641, 645 (1977) (rejecting an equal protection claim rooted in the Fifth Amendment based on the unique status of Indians) (citations omitted). Additionally, the Court in *Inyo County, Cal. v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony* decided whether a tribe qualifies as a "person within the jurisdiction" of the United States under 42 U.S.C. § 1983. *See generally Inyo County*, 538 U.S. 701

(2003).  In *Inyo*, the Court held that a *tribe* is not a "person" qualified to sue under § 1983.  *Id.* at 712.  In coming to this decision, the Court recognized that a single tribal member is a "person" that could bring such a claim but a tribe bringing a claim asserting its "sovereign" status cannot.  *Id*.  The Court reasoned that in cases where a tribe brings a claim and the claim is based upon its status as a political entity it is not a "person."  Instead, when a tribe's claim invokes its unique status it falls under the general rule that a sovereign is not a person.  *Id.* at 711-13.[9]  Spirit Lake and Standing Rock are not "persons" and thus have no applicable rights under the First or Fourteenth Amendment by which to assert claims in this case.

The Fifteenth Amendment and Section 2 of the Voting Rights Act grant protections for a narrower category of individuals, being limited to "citizens of the United States".  The Fifteenth Amendment states in relevant part, "The right of <u>citizens of the United States</u> to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  U.S. Const. amend. XV, § 1 (emphasis added).  Similarly, Section 2 of the Voting Rights Act prohibits states and political subdivisions from imposing or applying qualifications or prerequisites to voting, or standards, practices, or procedures which result in "a denial or abridgement of the right of any <u>citizen of the United States</u> to vote on account of race or color, or in contravention of the guarantees set forth in" certain other portions of the Voting Rights Act.  52 U.S.C.A. § 10301(a) (emphasis added).  Tribes such as Spirit Lake and Standing Rock are not "citizens of the United States" and thus have no rights under the Fifteenth Amendment or under Section 2 of the Voting Rights Act by which to bring their claims.

Under the Fourteenth Amendment, "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.  Indian tribes are neither born

---

[9] Using similar logic, the Court previously held a state is likewise not a "person" subject to suit under § 1983.  *See generally Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989).

nor naturalized in the United States.  Congress explicitly granted citizenship to individual Indians in 8 U.S.C.A. § 1401(b), which states that "a person born in the United States to a member of an Indian… tribe" "shall be [a] national[] and citizen[] of the United States at birth", but there is no such naturalization of tribes themselves.  *Id.*  Similarly, it is well established that "[a]n Indian tribe is not a citizen of any state…."  *Auto-Owners Ins. Co. v. Tribal Court of Spirit Lake Indian Reservation*, 495 F.3d 1017, 1020 (8th Cir. 2007) (citing *Standing Rock Sioux Indian Tribe v. Dorgan*, 505 F.2d 1135, 1140 (8th Cir. 1974); *Gaming World Int'l v. White Earth Band of Chippewa Indians*, 317 F.3d 840, 847 (8th Cir. 2003)).

Spirit Lake and Standing Rock are not "persons" or "citizens of the United States" entitled to bring suit under the First, Fourteenth, or Fifteenth Amendments, or Section 2 of the Voting Rights Act.  As such, they have failed to state a claim and their allegations in the Second Amended Complaint should be dismissed.

### ii.   Spirit Lake and Standing Rock's claims are based on their own voluntary actions.

Additionally, Spirit Lake and Standing Rock failed to state a claim because their allegations relate to resources they voluntarily expended to assist their members.  The tribes are sovereign powers with control over their own internal affairs.  The Secretary did not mandate that the tribes issue IDs, waive fees, keep enrollment offices open late, assist members to obtain residential street addresses, or any of the other actions alleged.  These are services that a sovereign power can, and typically does, provide to its constituents.  The Secretary has no control over the expenditure of resources by Spirit Lake and Standing Rock and there is no recognized cause of action for the recovery of those resources in this Court.

### 2.   Dion Jackson and Kara Longie.

The root basis for Jackson and Longie's claims that they fear they will not be able to vote in future elections is the prior rejection of Jackson's absentee ballot application by

the Benson County Auditor.   Doc. 51, ¶¶ 54-57, 63, 74.   However, the parties to this lawsuit entered into a stipulation that permitted Jackson and Longie to vote in the November 6, 2018 election.   Doc. 34, ¶ 2.   The stipulation provides that the Benson County Auditor issued a supplemental document to each of them, listing their current address.   *See* Doc. 34-1, 34-2.   The supplemental documents were issued pursuant to N.D. Cent. Code § 16.1-01-04.1(3)(b)(5).   The stipulation also provides that the law permits Jackson and Longie to cast a ballot with this supplemental document and their state-issued IDs at Benson County Precinct 4 – Warwick Fire Hall, Warwick, North Dakota.   Doc. 34, ¶ 2.   There is no dispute the supplemental documents (Doc. 34-1, 34-2), in addition to Jackson and Longie's non-drivers IDs, are sufficient to vote under the requirements of N.D. Cent. Code § 16.1-01-04.1, without any stipulation or court order and there is no reason that Jackson and Longie cannot use this same documentation in future elections.

The Second Amended Complaint alleges "[i]f Plaintiffs Jackson or Longie lose this 'supplemental documentation', they will once again find themselves without the proper paperwork to vote since their North Dakota IDs contain 'invalid' addresses."   *Id.* at ¶ 78. This claim presents a hypothetical situation and does not state an actual claim.   Jackson and Longie do not allege they have lost their supplemental documentation, but that they could.   The supplemental documentation was issued by the Benson County Auditor.   *See* Doc. 34-1, 34-2.   If Jackson and Longie lose their documentation, they can simply ask the Benson County Auditor for another copy.   Alternatively, they could ask their attorneys for a copy of the documents, which are filed with the Court in this case.   Jackson and Longie also allege they "should not be required to furnish paperwork stating an address with which they are unfamiliar and do not use in their daily lives in order to participate in our democratic system", and "Plaintiffs should not be required to have documentary proof of an address 'for voting purposes' that does not otherwise serve as a functional address for their home."   Doc. 51, ¶ 80.   However, the Second Amended Complaint does not cite

any applicable authority that citizens have a right to paperwork that states what they want it to state.  Rather, the Second Amended Complaint cites constitutional provisions and the Voting Rights Act, which guarantee a right to vote.  The supplemental documentation allowed Jackson and Longie to vote in the November 6, 2018 election and will allow them to vote in future elections.

Jackson and Longie also allege they face the prospect of similar "problems in obtaining necessary paperwork to vote" in the hypothetical event they relocate to a new residence on the Spirit Lake Reservation.  *Id.* at ¶ 81.  Again, Jackson and Longie have not stated a claim by simply stating a potential occurrence in the future, which may or may not actually come to pass.  Further, in the prior election, and in the event they run into an issue in future elections, self-help is available to Jackson and Longie.  This puts Jackson and Longie in a situation no different than anyone else who must rely on supplemental documentation until an ID is properly updated.  Upon learning there was an issue with his residential address, Jackson could have engaged in self-help methods such as contacting the county auditor or the 9-1-1 coordinator to cure this irregularity.  After curing the address irregularity, Jackson could have submitted another absentee ballot with the correct address.  Similarly, upon learning of the issue with the residential address, Longie could have utilized the same self-help methods and contacted the county auditor or 9-1-1 coordinator to cure this irregularity and consequently update her information with the DOT or county auditor.  With her non-driver ID and after curing the address irregularity, Longie would have been able to vote.

Jackson and Longie's alleged election irregularity is not reasonably expected to recur based upon the steps taken to address the lack of alignment between their address and the address maintained in the CVF.  Jackson and Longie both possess a non-drivers ID and supplemental documentation recognized under N.D. Cent. Code § 16.1-01-04.1(3)(b)(5).  Additionally, both Longie and Jackson could update their information on their non-drivers IDs with the DOT and would not require the supplemental

documentation.  Going forward, both Jackson and Longie are currently qualified electors who meet the state voting requirements, and are in a position to vote in future elections, if they choose to do so.

Even if Longie claims that she continues to fear not being able to vote because Jackson's absentee ballot was rejected, Longie's fear should not be construed as an injury for purposes of standing.  An injury must be more than mere conjecture or hypothetical in the future. *Gill*, 138 S.Ct. 1916.

### 3.    Leslie and Clark Peltier.

Although the Peltiers had previously voted in St. John, North Dakota (Doc. 51, ¶ 89), they alleged a fear that they would not be permitted to vote in the November 6, 2018 election because the town listed on their IDs allegedly did not match the town listed on the CVF.  *Id.* at ¶ 93.  The Parties entered into a stipulation that the Peltier's address, 10296 40th Ave. NE, St. John, ND, 58369, was currently listed in the State's CVF, and that they would be permitted to cast ballots at St. John Senior Center, St. John, North Dakota.  Doc. 34, ¶ 5.

The Peltiers allege that they fear they will not be able to vote in future elections (Doc. 51, ¶ 95), however going forward, the Peltiers possess IDs and supplemental documentation in compliance with N.D. Cent. Code § 16.1-01-04.1(3)(b)(5) and are in a position to vote in future elections, if they choose to do so, just like they have in past elections.  The Peltiers may also update the information on their IDs with the DOT and could forego the supplemental documentation to vote in future elections.  If an issue arose regarding the city designated on the Peltiers' IDs, the Peltiers could update their IDs with the DOT or contact their county auditor to update their address and fix any irregularity.

Also, an injury must be more than mere conjecture or hypothetical in the future. *Gill*, 138 S.Ct. 1916.  The Peltiers' "fear" is mere conjecture and hypothetical especially since the Peltiers had voted in St. John in prior elections when the residential address

requirement was in place.

The Peltiers also allege they "face the very real prospect of encountering precisely the same problems in obtaining necessary paperwork to vote should they relocate to a new residence."  Doc. 51, ¶ 96.  This is merely a hypothetical claim as there is no allegation that they plan to move to a new residence, or that there will be any issue obtaining a new residential street address at the particular residence they may move to. In any event, there is no reason to assume the Peltiers will move to an residence no listed on the 911 system.

### 4.   Kim Twinn.

While Twinn voted in the November 6, 2018 election, she alleges that she "has not identified any way to obtain an identification or supplemental documentation of her residential address that would allow her to vote in subsequent elections."  Doc. 51, ¶¶ 104-105.  Twinn did not allege a deficiency in the address system for voting.  The Parties entered into a stipulation that permitted Twinn to vote on Election Day by presenting her Northern Cheyenne Tribe enrollment certificate.  Doc. 34, ¶ 3.

It is the Secretary's position that Twinn could have voted without the stipulation entered into by the Secretary because Twinn had available to her the same self-help options of obtaining a free, non-drivers ID with the DOT.  These same self-help options are still available.

Even though Twinn may need to obtain a non-drivers ID at the Department of Motor Vehicles (DMV) in order to comply with the applicable voting requirements, this requirement is not an unconstitutional burden.  The United States Supreme Court held, in a challenge to Indiana's requirement for voters to present an ID, that:

> [J]ust as other States provide free voter registration cards, the photo identification cards issued by Indiana's BMV [Bureau of Motor Vehicles] are also free. For most voters who need them, the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting.

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008).  The Court's rationale applies here.  In order to vote, Twinn may have needed to obtain an ID at the DMV. Because North Dakota's non-driver ID is free, the inconvenience of going to the DMV, gathering required documents, and posing for a photograph, does not qualify as a substantial burden on Twinn's right to vote nor does it represent a significant increase over the usual burdens of voting.

If the non-driver ID does not have a residential street address, Twinn admits the Sioux County Sheriff served her with a document reflecting her 911 address, which could be used as supplemental documentation in order to vote.  Doc. 51, ¶ 103.

### 5.    Terry Yellow Fat.

Yellow Fat lists his residential street address as 1343 92nd Street.   Doc. 51, ¶ 108. When this address is allegedly input into the North Dakota GIS Hub Explorer online search tool, Yellow Fat's address is listed as 93rd St.  *Id.* at ¶ 112.  The Parties entered into a stipulation whereby the Sioux County Auditor issued supplemental documentation to Yellow Fat, listing his current residential address for voting purposes as 1392 92nd St., Fort Yates, ND 58538.  Doc. 34, ¶ 4; Doc. 34-3.  The supplemental documentation was issued pursuant to N.D. Cent. Code § 16.1-01-04.1(3)(b)(5).   Doc. 34-3.  The stipulation provides that the law permits Yellow Fat to cast a ballot with this supplemental document and his tribal ID at Sioux County Courthouse (FY West), Fort Yates, North Dakota.  Doc. 34, ¶ 4.

It is the Secretary's position that Yellow Fat could have voted in the November 6, 2018 election without the stipulation entered into by the Secretary. Yellow Fat had available to him self-help methods of contacting the county auditor or his 9-1-1 coordinator to work out any irregularity in his residential address prior to the election. If Yellow Fat had voted on Election Day with an irregularity in his residential address, he could have marked a set-aside ballot and used the self-help tools to provide supplemental

information after Election Day to have his ballot counted.

Yellow Fat claims the supplemental documentation provided to him (Doc. 34-3) is limited on its face to the November 6, 2018 election and does not provide him with sufficient documentation of his residential address for voting in subsequent elections. Doc. 51, ¶ 120.   This allegation is inaccurate.   While the second page of the documentation references the November 8, 2018 election, the letter that constitutes the first page clearly states the residential street address and is not so limited.   The supplemental documentation meets the requirements of N.D. Cent. Code § 16.1-01-04.1(3)(b)(5) for a future election.   In any event, the Sioux County Auditor issued the supplemental documentation and if Yellow Fat is concerned about future elections, he can simply request the Sioux County Auditor provide similar documentation

Yellow Fat also alleges he "faces the very real prospect of encountering precisely the same problems in obtaining necessary paperwork to vote should he relocate to a new residence on the Reservation."  Doc. 51, ¶ 121.  This is merely a hypothetical claim as there is no allegation that Yellow Fat plans to move to a new residence, or that there will be any issue obtaining a new residential street address at the particular residence he may move to.

The alleged wrongful behavior or injury is not reasonably expected to recur because Yellow Fat is currently a qualified elector who possesses an ID and supplemental documentation in accordance with N.D. Cent. Code § 16.1-01-04.1(3)(b)(5) which meets the State voting requirements, and at this time is in a position to vote in future elections without impediment.

### C.    The Secretary is immune under the Eleventh Amendment.

Since the Plaintiffs' suit is against the Secretary in his official capacity, Eleventh Amendment immunity applies.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Pennhurst State Sch. Hosp. v. Halderman*, 465 U.S. 89 (1984).  If this court determines the Plaintiffs are entitled to any relief, it may be prospective, injunctive relief

only under *Ex Parte Young*, 209 U.S. 123 (1908), that would address the alleged violations. *Will*, 491 U.S. at 71, n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, at 167, n.14).

## V.   CONCLUSION.

For the foregoing reasons, the Secretary respectfully requests that the Second Amended Complaint be in all things dismissed.

Dated this 17th day of July, 2019.

State of North Dakota
Wayne Stenehjem
Attorney General

By:   /s/  Matthew A. Sagsveen         By:   /s/  David R. Phillips
      Matthew A. Sagsveen                   David R. Phillips
      Solicitor General                     Assistant Attorney General
      State Bar ID No. 05613                State Bar ID No. 06116
      Office of Attorney General           Office of Attorney General
      500 North 9th Street                 500 North 9th Street
      Bismarck, ND 58501-4509              Bismarck, ND 58501-4509
      Telephone (701) 328-3640            Telephone (701) 328-3640
      Facsimile (701) 328-4300            Facsimile (701) 328-4300
      Email masagsve@nd.gov               Email drphillips@nd.gov

Attorneys for Defendant.