**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

SPIRIT LAKE TRIBE, on its own behalf and
on behalf of its members,
STANDING ROCK SIOUX TRIBE, on its
own behalf and on behalf of its members,
DION JACKSON,
KARA LONGIE,
KIM TWINN,
TERRY YELLOW FAT,
LESLIE PELTIER,
CLARK PELTIER,

                Plaintiffs,

       v.

ALVIN JAEGER, in his official capacity as
Secretary of State,

                Defendant.

**PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
SECOND AMENDED COMPLAINT**

Civil No. 1:18-cv-00222

## INTRODUCTION

On July 17, 2019, Defendant Jaeger ("the Secretary") filed a motion to dismiss all claims in this case. Dkt. 54. First, the Secretary argues that the case must be dismissed because two of the eight Plaintiffs lack standing. Second, the Secretary argues that the case must be dismissed because all Plaintiffs have failed to state a claim. For the reasons outlined below, the Court should deny the Secretary's motion.

## BACKGROUND

The right to vote is fundamental. It is no less fundamental for Native American voters living on or near reservations than for voters living in cities.  While Native Americans may make up a relatively small percentage of North Dakota's population, they have a right to vote on a level playing field with all other voters. Plaintiffs in this lawsuit—two federally recognized Tribes and

six individual Native American voters—are fighting to protect that right. North Dakota's requirement that voters present one of three forms of identification, which must list the voter's residential address, imposes a unique and undue burden on Native voters living on or near reservations in the state. While statewide relief to protect Native voters may be too broad, tailored relief for these voters is necessary. *Cf. Brakebill v. Jaeger,* No. 18-1725, 2019 WL 3432470, (8th Cir. July 31, 2019). Plaintiffs' detailed complaint easily satisfies the plausibility requirements to survive a motion to dismiss.

*First*, North Dakota requires Native voters to obtain and present identification listing their current residential street address, as it is assigned by the county in which they reside, according to a limited range of addresses available in that county. Dkt. 51 ("2d Am. Compl.") at ¶¶ 123, 125, 127. Many Native voters do not have such an address assigned to their residences, and even where an address is assigned, many Native voters do not know the address and require assistance to determine what it is. *Id.* ¶¶ 17, 27, 30, 46, 172, 175, 179, 181. Furthermore, addresses known and used by Native voters living on or near reservations may not match the address assigned by the county; and addresses assigned by the county are often wrong themselves, and do not correspond to the available address ranges. *Id.* ¶¶ 31, 33, 38, 48, 89, 108, 133, 135, 140, 141-43, 153, 167-172, 176, 183-84, 193. Thus, even those individuals who are able to overcome the burdens imposed by the law and avail themselves of the "self-help" methods touted by the Secretary, may later be denied the right to vote despite having valid ID listing their residential street address. *See, e.g.*, ¶¶ 57, 63, 89, 133. To compound matters, the requirement that voters present documentation containing their current residential address imposes a particular burden on Native voters living on or near reservations because they are more likely to move frequently and to experience

homelessness than the general population in North Dakota. *Id.* ¶¶ 18, 28, 34, 35, 39, 49-50, 252-254.

*Second*, as this Court has recognized, obtaining a valid form of identification, and even obtaining supplementary documentation, imposes a unique and substantial burden on Native voters living on or near reservations. *Brakebill v. Jaeger,* No. 1:16-cv-00008-DLH (D.N.D.), Dkt. Nos. 50 ("1st PI Order"), 99 ("2nd PI Order"). Native voters face higher levels of poverty, homelessness, and housing instability. 2d Am. Compl. ¶¶ 18, 28, 39, 49, 213, 246-255. They disproportionately lack the means to pay for valid identification, and access to the underlying documentation necessary to obtain free identification. *Id.* ¶¶ 198-201, 214-221. Even where free identification is available, Native voters, who disproportionately lack access to transportation, must travel substantial distances to access drivers' license offices with limited service hours in order to obtain free identification. *Id.* ¶¶ 52, 197, 212-213. These burdens are particularly severe for individuals, like Plaintiff Twinn, who are not able to obtain tribal identification because they are not enrolled members of a North Dakota tribe, and who are unable to obtain state-issued ID because they lack the documentation required to do so. *Id.* ¶¶ 29, 47, 100-102, 105, 202.

*Third*, the Secretary's failure to provide uniform standards or uniform guidance related to the voter ID and residential address requirements has caused confusion. *Id.* ¶ 148. This has led to the implementation of differing standards, policies, and procedures for determining whether a residential address provided by a voter is sufficient to establish the voter's qualifications for voting, both within and across counties containing Native reservations. *Id.* ¶¶ 149-154.

*Fourth*, the disproportionate burdens of complying with North Dakota's voter ID and residential address laws are linked to and compounded by a history of discrimination against Native Americans in North Dakota—including a history of discrimination in voting—and the

3

persistent effects of that discrimination. *Id*. ¶¶ 234-255. This history includes denial of the right to vote to Native Americans unless they abandoned their tribal relations; use of literacy tests; denial of the right to vote to Native Americans who were deemed "uncivilized"; the use of at-large elections to dilute the voter of Native voters; removal of polling places from Native reservations; a history of forced assimilation and relocation; discrimination in education; and discriminatory land allotment policies and lending discrimination. *Id.* ¶¶ 237-244.

*Fifth*, the legislature was repeatedly warned that the implementation of these voter ID and residential address requirements would lead to the disenfranchisement of Native voters. The Legislature enacted these requirements anyway; indeed, it did so for the purpose of discriminating against Native Americans. *Id.* ¶¶ 145-146.

Plaintiffs have sufficiently pleaded facts showing they are injured by the Secretary's implementation of the voter ID and residential address requirements, and supported their claim for relief. As the Eighth Circuit recently acknowledged, this Court has authority to enter a narrowly tailored injunction to relieve Plaintiffs and their members of the unjustified burden imposed on them by North Dakota's voter ID law. *Brakebill*, No. 18-1725, 2019 WL 3432470 at *7 (maj. op.) (stating that the opportunity for narrowly tailored relief "remains available going forward"); *id.* at *17 (Kelly, J. dissenting) (noting that "[t]oday's opinion does not prevent the district court from fashioning a narrower form of relief"). The Secretary's motion should therefore be denied.

## LEGAL STANDARDS

### I.      Standing

Standing exists where a plaintiff has suffered "an injury in fact, meaning 'an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical.'" *Frost v. Sioux City*, 920 F.3d 1158, 1161 (8th Cir. 2019) (quoting

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "That injury has to be fairly trace[able] to the challenged action of the defendant." *Id.* (internal quotation marks omitted) (alteration in original). And, finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted). "[A]t the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Spokeo v. Robbins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks omitted). On "a motion to dismiss for lack of standing," the court must "accept[] as true all factual allegations in the complaint and draw[] all reasonable inferences in favor of the nonmoving party." *Wieland v. U.S. Dep't of Health & Human Servs.*, 793 F.3d 949, 953 (8th Cir. 2015).

## II.    Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hafley v. Lohman*, 90 F. 3d 264, 266 (8th Cir. 1996). In ruling on a motion to dismiss, courts must "accept all of the factual allegations set out in the complaint as true and construe the complaint in a light most favorable to the plaintiff." *Dyer v. Northwest Airlines Corp.,* 334 F. Supp. 2d 1196, 1198 (D. N.D. 2004); *see also Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004). Under the Federal Rules, a complaint "does not require detailed factual allegations" to survive a motion under Rule 12(b)(6), but it must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I.      Plaintiffs Have Standing to Sue.

Plaintiffs have standing to sue. The Secretary concedes that the Individual Plaintiffs have standing to pursue their claims, dkt. 54 at 18 & n.7, and challenges only the Spirit Lake Tribe's and the Standing Rock Sioux Tribe's standing to sue, *id.* at 17-29. Indeed, the Secretary's concession regarding the Individual Plaintiffs is compelled by circuit precedent. *See Brakebill*, No. 18-1725, 2019 WL 3432470, at * 3 ("Even where a person has a residential street address, the burden of obtaining a qualifying identification or supplemental document is sufficient to constitute an injury that gives a citizen standing to sue."). Because the Individual Plaintiffs have standing to sue, the Court need not address the Secretary's standing arguments regarding the Tribes. "'[W]here one plaintiff establishes standing to sue, the standing of other plaintiffs is immaterial' to jurisdiction." *Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir. 2006) (quoting *Nat'l Wildlife Fed'n v. Agric. Stabilization & Conservation Serv.*, 955 F.2d 1199, 1203 (8th Cir. 1992)). Should the Court address the Tribes' standing, however, the Secretary's contentions are without merit.

### A.      Spirit Lake and Standing Rock Have Standing.

Spirit Lake and Standing Rock have standing to raise their legal claims. Article III standing is not limited to individual plaintiffs, but is available to any plaintiff that can establish those elements that constitute the "irreducible constitutional minimum" necessary to invoke the court's jurisdiction: an injury in fact, traceable to the defendant, and redressable by the court. *Lujan*, 504 U.S. at 560. As the Supreme Court has recognized, a plaintiff has standing to sue when it is forced to divert resources in response to a defendant's unlawful conduct. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also* 13A Fed. Prac. & Proc. Juris. § 3531.9.5 (3d ed.). Courts have recognized that tribes have standing to bring claims for injuries akin to those suffered

by organizations. *See, e.g.*, *S. Fork Band v. U.S. Dep't of Interior*, 643 F. Supp. 2d 1192, 1200 (D. Nev. 2009) ("The court finds that provided Plaintiff tribes . . . can satisfy both the constitutional and prudential limits on standing, their standing can be viewed as analogous to organizational standing."), *aff'd in part, rev'd in part on other grounds*, 588 F.3d 718 (9th Cir. 2009). Certainly, nothing about Tribes' sovereign status *lessens* their right to sue when they suffer injuries from diversion of resources. *Cf. Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 611-12 (1982) (Brennan, J., concurring) (noting that "[a]t the *very* least, the prerogative of a State to bring suits in federal court should be commensurate with the ability of private organizations") (citing *Havens Realty*, 455 U.S. at 378-79) (emphasis in original). Thus, tribes, like any other entity, are able to sue on the basis of diversion of resources. *Cf. Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) (recognizing the organizational standing of a political party where a voter ID law "compel[led] the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote").

This rule is regularly applied to confer standing on plaintiffs who are forced to divert resources to respond to state laws burdening the right to vote. *See, e.g.*, *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 623-24 (6th Cir. 2016) (holding that organization had standing, based on diversion of resources, to challenge newly enacted election law); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039-41 (9th Cir. 2015) (holding that organizations had standing to challenge violation of National Voter Registration Act because it expended resources registering voters because of law); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014) (holding that "organizations can establish standing to challenge election laws by showing that they will have to divert personnel and time to educating potential voters on compliance with the laws

and assisting voters who might" otherwise be prevented from voting.); *Scott v. Schedler*, 771 F.3d 831, 836-39 (5th Cir. 2014) (holding that NAACP had standing, despite not expending additional funds, because staff diverted time to conducting voter registration drives in response to law); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350–51 (11th Cir. 2009) ("Because it will divert resources from its regular activities to educate voters about the requirement of a photo identification and assist voters in obtaining free identification cards, the NAACP established an injury sufficient to confer standing to challenge the statute."); *Fla. Conference of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008).

Here, to ensure their tribal members could vote, the Spirit Lake Tribe and Standing Rock Sioux Tribe expended substantial resources in response to the Secretary's enforcement of North Dakota's voter ID and residential address requirements. Indeed, the Secretary concedes that the Tribes "provided important constituent services . . . to ensure that citizens receive the documentation they need to vote." Dkt. 54 at 20. Spirit Lake was required to expand its hours of operation to issue new tribal IDs, and therefore pay overtime for building security and the enrollment director. 2d Am. Compl. ¶ 19. Spirit Lake lost revenue it otherwise would have obtained from printing tribal IDs because the Tribe waived that fee to allow its members to obtain the ID they needed to vote. *Id.* ¶ 20. In total, the Spirit Lake Tribe lost over $7,000 in income and paid almost $4,000 in expenses to print IDs in the lead up to the November 2018 election. *Id.* The Tribe printed nearly thirty times the ordinary rate of tribal IDs in advance of the November 2018 election. *Id.* ¶ 26. Spirit Lake's enrollment director was diverted from her primary job responsibilities in order to respond to the residential address requirement, *id.* at ¶¶ 21, 23-24, and Spirit Lake expects the same to happen in future elections, *id.* ¶ 24. The same is true for the Standing Rock Sioux Tribe, which—having waived their fee because of the Secretary's

enforcement of the residential address requirements—lost nearly $2,500 in income and incurred almost $500 in costs just to print IDs for members in advance of the 2018 election. *Id.* ¶ 40. Standing Rock's enrollment office issued 807 new IDs in the three-week period prior to the November 2018 election; the normal amount is about 47 IDs per month. *Id.* ¶ 45. The Tribe's staff diverted its time to educating its members and ensuring they had access to the IDs required to vote. *Id.* ¶ 43. Together, these harms plainly suffice to confer standing upon the Spirit Lake Tribe and the Standing Rock Tribe to challenge the Secretary's unlawful enforcement of the voter ID and residential address requirements.

The Secretary's contrary arguments are misplaced. First, the Secretary contends that only voters have standing to challenge election laws. Dkt. 54 at 19. This is incorrect; as evidenced by the cases cited above. The Secretary relies upon the Supreme Court's decision in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), but that case has no bearing here. *Gill* was a case about what types of individual voters have standing to challenge gerrymandering of districts; it said nothing about other types of standing. In *Gill*, the Court held that voters challenging a partisan gerrymander only had standing to do so with respect to the districts in which they resided. *Id.* at 1931, 1934. But the Court did not hold that individual voters were the only type of plaintiff with standing; indeed, the Court specifically noted that "different kinds of plaintiffs" might be able to pursue statewide partisan gerrymandering claims. *Id.* at 1931. *Gill* simply does not apply outside the context of individual claims challenging partisan gerrymandering.

Second, the Secretary contends that the Tribes lack standing based upon their diversion of financial and other resources because these were "voluntary actions and expenditures," dkt. 54 at 20, and the Secretary had no power to force the Tribes to take those steps. This misses the point. A plaintiff's standing does not rise or fall based upon whether the state *literally forces* the diversion

of resources. None of the plaintiffs in the cases cited above were *required by law* to divert their resources to combat the wrongs attributable to the challenged laws; rather, diversion of resources was necessary for plaintiffs to continue fulfilling their missions in light of the challenged laws. The same is true here—because the Secretary's enforcement of the voter ID and residential address requirements was likely to disenfranchise tribal members, it was necessary for the Spirit Lake Tribe and Standing Rock Sioux Tribe to take steps to ensure that their members were able to exercise the fundamental right to vote. Nor does the fact that tribes are sovereign shield the Secretary from responsibility for inflicting those injuries. While the Secretary has no means to force the Tribes to assist their tribal members, absent North Dakota's voter ID and residential address laws, the Tribes would not have incurred, and would not continue to incur, substantial cost to ensure their members can vote. Because the injury would not exist if not for the law, the injury is traceable to the Secretary.

Finally, the Secretary's alarm that if such injuries conferred standing then the State could be sued whenever the Tribes offered assistance to their members is a red herring. Tribes will only have standing if they are assisting their members to mitigate the negative effects of the State's unlawful conduct. If the Tribes' efforts do not relate to a violation of the law by the Secretary or other state officials, there will be no standing to sue. The Secretary's worry that the Tribes might sue again if the state acts unlawfully again is not a legitimate reason to conclude the Tribes lack standing.

In sum, the North Dakota legislature enacted voter ID and residential address requirements that are discriminatory and have caused many of the Tribes' members to face imminent disenfranchisement. The Tribes devoted significant resources to prevent this outcome—diverting those resources from their other administrative duties and get-out-the-vote efforts. Absent a change

in the law, the Tribes will have to dedicate resources every election to ensure that their members have the identification and proof of residential address required to vote. If the law is enjoined, the Tribes would use those resources elsewhere, as they did prior to its enactment. The Tribes have suffered concrete injury traceable to the Secretary and have standing to challenge the North Dakota voter ID law.

### B.    Spirit Lake and Standing Rock Have Standing To Sue on Behalf of Their Members as *Parens Patriae.*

The Spirit Lake Tribe and Standing Rock Sioux Tribe have standing to sue as *parens patriae*.[1] The doctrine of *parens patriae* recognizes the right of a sovereign to sue "to prevent or repair harm to its 'quasisovereign' interests." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 258 (1972). The Supreme Court has explained that a sovereign's quasi-sovereign interests "fall into two general categories . . . [(1)] the health and well-being—both physical and economic—of its residents in general . . . [and (2)] not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp*, 458 U.S. at 607. The Court further explained that a sovereign has standing to sue as *parens patriae* if a "sufficiently substantial segment of its population" is injured by the challenged conduct:

> The Court has not attempted to draw any definitive limits on the proportion of the population of the [sovereign] that must be adversely affected by the challenged behavior. Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the [sovereign] has alleged injury to a sufficiently substantial segment of its population.

*Id.* This represents an evolution of *parens patriae* doctrine. "Once quite limited, the concept of *parens patriae* has been expanded to include actions in which a [sovereign] seeks to redress quasi-

---

[1] The Court need not reach this issue since the individual Plaintiffs have standing and the Tribes have standing based on their own injuries. However, the Tribes have an obligation to protect their members and their right to sue on their behalf.

sovereign interests . . . even where the injury is to a fairly narrow class of persons." *United States v. Hooker Chemicals & Plastics Corp.*, 749 F.2d 968, 984 (2d Cir. 1984).

Native American tribes have the same *parens patriae* standing as States. The Supreme Court has held that *parens patriae* standing is not limited to states. *See Alfred L. Snapp*, 458 U.S. at 607-08 n.15 ("Although we have spoken throughout of a "State's" standing as *parens patriae* . . . Puerto Rico is similarly situated to a State in this respect: It has a claim to represent its quasi-sovereign interests in federal court at least as strong as that of any State."). The Eighth Circuit has never questioned the ability of tribes to sue as *parens patriae*. *See e.g.*, *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 610 (8th Cir. 2018) (leaving the lower court's finding of tribal *parens patriae* standing intact and reversing on abstention grounds); *Delorme v. United States*, 354 F.3d 810, 816 (8th Cir. 2004) (holding that a hereditary chief lacked standing because he didn't clarify "whether he claims standing as the representative of a tribal government . . . as the tribal government seeking parens patriae standing . . . or as an individual"); *Standing Rock Sioux Indian Tribe v. Dorgan*, 505 F.2d 1135, 1137 (8th Cir. 1974). And other circuits have allowed tribes to sue as *parens patriae*. *See, e.g.*, *Confederated Tribes of the Chehalis Reservation v. Thurston Cty. Bd. of Equalization*, 724 F.3d 1153 (9th Cir. 2013); *Cheyenne and Arapaho Tribes v. First Bank & Trust Co.*, 560 Fed. Appx. 699, 703-04 (10th Cir. 2014) (assuming, but not deciding, *parens patriae* standing for tribes).

Spirit Lake and Standing Rock properly invoke their *parens patriae* standing in this case. The Secretary's implementation of N.D. Cent. Code § 16.1-01-04.1 injures their quasi-sovereign interests by denying the benefits of the federal system to their populations by imposing barriers to voting that disproportionately affect tribal members. *See, e.g.*, 2d Am. Compl. ¶ 133 ("Many Native American voters have forms of identification that list a residential address that may be

'invalid,' and thus may be denied the right to vote."); ¶ 146 ("Native Americans in North Dakota disproportionately lack both qualifying identification and supplemental documentation, and are disproportionately likely to not have or reasonably be able to obtain documentation of their residential street address as currently assigned and recognized by the State."); ¶ 201 ("The acceptable 'supplemental' documentation are categories of documents that must generally be mailed to be of any use. But to be delivered by mail to Plaintiffs, they must show the precise address—a P.O. box—the State has deemed inadequate to prove residency."); ¶ 212 ("The DL sites closest to North Dakota Indian reservations have limited hours and require eligible voters to drive [ ] substantial distances in order to obtain qualifying ID."); ¶ 278 ("Defendant has failed to promulgate or enforce uniform standards for determining voter qualifications based on their residential address, resulting in arbitrary and disparate treatment of eligible voters by election officials in counties including Reservation land.").

As plaintiffs' allegations—which must be accepted as true at this stage—demonstrate, the voter ID law, combined with the Secretary's haphazard procedures regarding compliance with its residential address requirement, have erected barriers to voting that disproportionately affect Native Americans. When the Tribes' members' efforts to vote are frustrated, their political power is diminished and their ability to advocate for their needs is diluted. Moreover, plaintiffs allege that the voter ID law was enacted with the purpose of discrimination against Native Americans. 2d Am. Compl. ¶¶ 282-84, 290-91. When a law makes it more difficult for members of minority groups to vote, members of those groups are discriminatorily denied "the benefits that are to flow from participation in the federal system." *Alfred L. Snapp*, 458 U.S. at 608. The Spirit Lake Tribe and Standing Rock Sioux Tribe "have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its

general population." *Id.* at 607-08. That interest sustains the Tribes' standing to sue as *parens patriae*.

The Secretary's arguments to the contrary are without merit. The Secretary contends that the Spirit Lake Tribe and Standing Rock Sioux Tribe lack *parens patriae* standing because they are suing on behalf of "only some but not all members of the [T]ribe[s]." Dkt. 54 at 25. The Secretary notes that not all members live on or near reservations, not all members live in North Dakota, not all members are over 18 and eligible to vote, and not all members lack the requisite IDs or supplemental documentation. *Id.* at 25-28. True enough. But the Secretary posits far too crabbed a view of the law and the facts.

The Supreme Court made clear in *Alfred L. Snapp* that there is no requirement that *all* members of the relevant population be directly harmed in order for there to be *parens patriae* standing. Rather, the tribes must allege an injury to a "sufficiently substantial segment of its population." *Alfred L. Snapp*, 458 U.S. at 607. In that case, the Supreme Court held that Puerto Rico had *parens patriae* standing notwithstanding the fact that a relatively small number of individuals were directly harmed by the alleged violation of federal law—"some 787 out of a total population of close to 3 million." *Id.* at 599. The Court explained that a "narrow" focus on the number of directly affected individuals was inappropriate, because Puerto Rico has an "interest in securing residents from the harmful effects of discrimination." *Id.* at 609. The Court explained that the "sting" of discrimination is felt beyond those it most directly affects, and that sovereigns have the right to vindicate violations of federal law:

> This Court has had too much experience with the political, social, and moral damage of discrimination not to recognize that a State has a substantial interest in assuring its residents that it will act to protect them from these evils. This interest is peculiarly strong in the case of Puerto Rico simply because of the unfortunate fact that invidious discrimination frequently occurs along ethnic lines. . . .

> Regardless of the possibly limited effect of the alleged financial loss at issue here . . . [d]eliberate efforts to stigmatize the labor force as inferior carry a universal sting.

*Id.* at 609 (quotation marks omitted) (bracket in original).

In this case, a substantially larger proportion of tribal members are directly affected than was sufficient in *Alfred L. Snapp*. And the harms flowing from discrimination against Native Americans in voting are arguably greater—and more widespread—than the employment discrimination at stake in that case. The right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). As such, "any racial discrimination in voting is too much," *Shelby Cty. v. Holder*, 570 U.S. 529, 557 (2013). The Supreme Court has recognized that *all* people are affected by the selection of representatives, even if they are not themselves voters. "As the Framers of the Constitution and the Fourteenth Amendment comprehended, representatives serve all residents, not just those eligible or registered to vote. Nonvoters have an important stake in many policy debates . . . and in receiving constituent services, such as help navigating public-benefits bureaucracies." *Evenwel v. Abbott*, 136 S. Ct. 1120, 1132 (2016) (internal citations omitted). In this case, the state is alleged to have intentionally discriminated against Native Americans in voting and, regardless of intent, imposed an electoral system with discriminatory results. *See* 2d Am. Compl. ¶¶ 282-91. This discrimination directly impairs the right to vote of thousands of tribal members, and indirectly affects the rest of the Tribes' members.

Ignoring *Alfred L .Snapp,* the Secretary relies on lower court cases (which themselves fail to discuss or cite *Alfred L. Snapp*) to contend that "all" members must be directly affected for *parens patriae* standing to lie. *See* Dkt. 54 at 24-28. In any event, the Secretary's reliance on these cases is misplaced because they are not comparable to this case. First, the Secretary's cited cases involved narrow claims on behalf of particular individuals. For example, in *United States v. Santee*

*Sioux Tribe of Neb.*, a tribe was asserting *parens patriae* standing on behalf of the signatories to fifteen financial accounts that were garnisheed by the federal government. 254 F.3d 728 (8th 2001). The court noted that "the doctrine cannot be used to confer standing on the Tribe to assert the rights of a dozen or so members of the Tribe." *Id.* at 734. The other cases cited by the Secretary involve claims on behalf of a single set of grandparents and a "small group of tribe members." Dkt. 54 at 25 (citing cases). In this case, the proportion of directly affected members is vastly larger—larger than what the Supreme Court found sufficient in *Alfred L. Snapp*.

Second, those cases did not involve allegations of discrimination against an entire classification of people, as was the case in *Alfred L. Snapp* and as is the case here. Those courts thus either had no occasion to consider—or were not presented with arguments regarding—the broader indirect harms that flowed from the challenged conduct. But, as the Supreme Court has expressly held, those effects must be considered in cases involving discriminatory treatment. *Alfred L. Snapp*, 458 U.S. at 607. And discrimination in the context of voting—a fundamental right that forms the foundation of all other rights—has perhaps the most widespread indirect effects on the relevant population at large. *See Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.").

Third, even on their own terms, those cases do not stand for the proposition that "all" members must be *directly* harmed. Rather, they make the point that the action must be "on behalf of the interest of all of its citizens." *Santee Sioux Tribe*, 254 F.3d at 734. This must be understood in light of the Supreme Court's holding that *parens patriae* standing lies when the number of directly and indirectly affected individuals represents a "sufficiently substantial segment" of the population. *Alfred L. Snapp*, 458 U.S. at 607. When that standard is met, then a sovereign *is* raising

a claim "on behalf of the interest of all its citizens," *Santee Sioux Tribe*, 254 F.3d at 734, because it serves the interests of all its citizens for the sovereign to act on behalf of such a large segment of the population. That is especially so in the context of voting; even if a particular tribal member's ability to vote is not directly affected by the law, her ability to effectively associate with other like-minded tribal members, and thereby elect mutual candidates of choice, is lessened when such a substantial portion of the tribal members are directly affected by the law. In any event, to the extent the Secretary contends that these lower court decisions require that literally all members be directly harmed in order for *parens patriae* standing, then the Secretary asks this Court to interpret those decisions as being in direct contradiction of binding Supreme Court precedent. The Spirit Lake Tribe and Standing Rock Sioux Tribe have alleged facts that more than sufficiently satisfy the population requirements outlined by the Supreme Court in *Alfred L. Snapp*.

The Secretary also contends that the Spirit Lake Tribe and the Standing Rock Sioux Tribe have not properly alleged a quasi-sovereign interest, but this too is wrong. The Secretary cites a single paragraph regarding the diminution of the Tribes' collective political power that was included in the first amended complaint but inadvertently omitted from the second amended complaint, *see* dkt. 54 at 28-29, to contend that the Tribes no longer allege a quasi-sovereign interest and thus cannot proceed under *parens patriae* standing.[2] The Secretary's argument is wrong. The second amended complaint is replete with allegations that demonstrate the Tribes' quasi-sovereign interest in its members' rightful place in the federal system that is harmed by the Secretary's enforcement of the voter ID and residential address law. *See, e.g.*, 2d Am. Compl. ¶¶ 133, 146, 201, 212, 218, 282-84, 290-91. Plaintiffs are not obligated to plead legal theories or

---

[2] In so doing, the Secretary concedes that diminution of the Tribes' collective political power is a quasi-sovereign interest sufficient to assert a quasi-sovereign interest, a position he previously contested. *See* Dkt. 39, at 20.

hyper-technical recitations of the phrase "quasi-sovereign" in order to plead facts demonstrating a quasi-sovereign interest. "'[I]t is unnecessary to set out a legal theory for the plaintiff's claim for relief' in a pleading." *In re SuperValu, Inc.*, 870 F.3d 763, 772 (8th Cir. 2017) (quoting *Johnson v. City of Shelby, Miss.*, 574 U.S. 10) (2014) (per curium)). And the Court should draw fair inferences from the allegations in a plaintiff's complaint. *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) ("[T]he plaintiff is entitled to all reasonable inferences that may be drawn from the allegations of the complaint."); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[O]n a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (internal quotation marks omitted). Plaintiffs have alleged sufficient facts to assert the Tribes' quasi-sovereign interests supporting their invocation of *parens patriae* standing.

## II.     Plaintiffs have alleged sufficient facts to state a claim under Rule 12(b)(6).

### A.     The Spirit Lake Tribe and Standing Rock Sioux Tribe Have Stated a Claim for Relief.

The Spirit Lake Tribe and Standing Rock Sioux Tribe have stated a claim for relief. The Secretary raises two arguments in support of his contention that the Tribes fail to state a claim. First, the Secretary contends that Spirit Lake and Standing Rock are not "persons" or "citizens of the United States" and therefore are not entitled to bring the constitutional or Voting Rights Act claims asserted in this lawsuit. Dkt. 54 at 30. This argument misses the mark. The Tribes are not alleging that they suffer a burden on their own right to vote but rather that they have a cognizable interest in protecting their tribal members' right to vote. When discussing the right of a State to bring suit in its own interest, the concurrence in *Alfred L. Snapp* observed, "I can discern no basis either in the Constitution or in policy for denying a State the opportunity to vindicate the federal rights of its citizens." *Alfred L. Snapp*, 458 U.S. at 611 (Brennan, J., concurring). Similarly, here,

the Tribes' interests are in the protection of the federal rights of their citizens who are unquestionably people and citizens of the United States. And in the many cases cited above where an organization brought suit in the voting right context, the organization's interest was sufficiently proximate to the individual voter to bring claims under the Constitution and the Voting Rights Act. *See, e.g.*, *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009); *see supra* at 7-8. There is no reason a Tribe should be treated as less than an organization for purposes of vindicating the rights of its members. See *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (Tribes "are a good deal more than 'private, voluntary organizations.'").

Indeed, this Court has previously recognized the Spirit Lake Tribe's interest in bringing suit on its own behalf to protect its citizens from violations of the Fourteenth and Fifteenth Amendments as well as Section 2 of the Voting Rights Act. *See Spirit Lake Tribe v. Benson Cty.*, No. 2:10-CV-095, 2010 WL 4226614, at *1 (D.N.D. Oct. 21, 2010); *cf. Navajo Nation v. San Juan Cty.*, 929 F.3d 1270 (10th Cir. 2019) (Navajo Nation pursuing claims under the Fourteenth Amendment and Section 2 of the Voting Rights Act). The Spirit Lake Tribe and the Standing Rock Sioux Tribe can also assert constitutional and Voting Rights Act claims in order to protect their interest in the fundamental rights of their citizens to vote.

Second, the Secretary contends that the Tribes cannot state claims to recover the money they expended responding to the Secretary's enforcement of the Voter ID and residential street address requirements. But the Tribes do not seek recovery of those funds through this lawsuit; they only seek prospective relief that will relieve them of the need to continue expending these resources. The resources diverted and expended by the Tribe—and that will continue to be diverted and expended—are injuries suffered by the Tribes sufficient to confer standing so that the Tribes can challenge the Voter ID and residential street address requirements under the Constitution and

Voting Rights Act in their own right. Accordingly, the Tribes are seeking prospective injunctive relief from N.D. Cent. Code § 16.1-01-04.1 and its discriminatory and burdensome effects both on themselves and on the tribal members the tribes have an interest in protecting. 2d Am. Compl. at 62-64. The Tribes have not brought a claim to recoup past expenditures.

**B.     The Individual Plaintiffs Have Stated a Claim for Relief.**

The Individual Plaintiffs have stated a claim for legal relief. To begin, the Secretary styles his motion to dismiss the Individual Plaintiffs as a motion to dismiss for failure to state a claim. Dkt. 54 at 29. However, upon closer inspection, most of the Secretary's arguments are mootness claims—he contends that the injuries Plaintiffs faced prior to the 2018 election have passed and their future injury is too attenuated to support standing. *See, e.g.*, dkt. 54 at 36 ("Longie's fear should not be construed as an injury for purposes of standing. An injury must be more than mere conjecture or hypothetical in the future."). For example, the Secretary argues that Dion Jackson and Kara Longie's alleged injuries are "hypothetical" based on "a potential occurrence in the future." *Id.* at 35. In so doing, the Secretary relies heavily on the supplemental documentation they received *after* the filing of this lawsuit. *Id.* at 34.[3] His argument with respect to Plaintiffs Peltiers and Yellow Fat are nearly identical. *Id.* at 36-37, 38-39.

_____

[3] To the extent that the Secretary argues that Plaintiffs' claims are moot because of actions the Secretary took prior to the 2018 election to allow the Individual Plaintiffs to vote—*e.g.* by calling local county officials and asking them to hand deliver supplemental documentation to the Individual Plaintiffs and agreeing to a stipulated court order enabling them to vote—that is precisely the type of temporary voluntary acts by a defendant that cannot moot a plaintiff's claims. *See e.g.*, *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006) ("It is well-settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. . . .The defendant faces a heavy burden of showing that 'the challenged conduct cannot reasonably be expected to start up again.") (internal quotation marks omitted). There is no reason believe that the Secretary would have taken these actions absent litigation nor any reason to believe that the Secretary will provide such personalized assistance to overcome the barriers of North Dakota's law to the Individual Plaintiffs or any other Native American voters outside the context of this litigation.

The Secretary's arguments ignore the plain application of the "capable of repetition yet evading review" standard in this case. This exception applies if "(1) the challenged conduct is of too short a duration to be litigated fully prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Nat'l Right to Life Pol. Action Comm. v. Connor*, 323 F.3d 684, 691 (8th Cir. 2003) (internal quotation marks and citations omitted).

The Eighth Circuit has recognized that "[e]lection issues are 'among those most frequently saved from mootness by this exception.'" *Id.* (quoting *Van Bergen v. Minnesota*, 59 F.3d 1541, 1547 (8th Cir. 1995); *see also Lunde v. Schultz*, 221 F. Supp. 3d 1095, 1100 (S.D. Iowa 2014) ("Given the abbreviated and often unmovable timelines associated with election disputes and the prolonged nature of litigation, challenges to state election laws are likely the type of dispute that is too short to be fully litigated prior to its cessation or expiration."). Indeed, the Supreme Court and Eighth Circuit have routinely decided election law cases under this exception. *See, e.g., Norman v. Reed,* 502 U.S. 279, 288 (1992); *Storer v. Brown*, 415 U.S. 724, 737 n. 8 (1974); *Moore v. Ogilvie,* 394 U.S. 814, 816 (1969); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1547 n. 4 (8th Cir. 1996).

In this case, it is obvious that the "challenged conduct [was] of too short a duration to be litigated fully prior to its cessation or expiration." *Nat'l Right to Life,* 323 F.3d at 691. These Plaintiffs brought an *as-applied* challenge to North Dakota's voter ID and residential street address requirements for voting. The Secretary did not begin enforcement of the requirements at the heart of this dispute until the Eighth Circuit stayed this Court's injunction in another case on September 24, 2018, *Brakebill v. Jaeger*, 905 F.3d 553 (8th Cir. 2018), and the Supreme Court denied the plaintiffs' application to vacate the stay on October 9, 2018, *Brakebill v. Jaeger,* 139 S. Ct. 10

(2018). And Plaintiffs in this action first discovered the Secretary's intention to match addresses on voters' documentation to a central voter file of "correct" addresses when Plaintiff Jackson received his absentee ballot rejection letter on October 22, 2018, stating the address on his North Dakota ID was "invalid." Plaintiffs filed suit eight days later on October 30, 2018. This Court denied Plaintiffs' motion for a temporary restraining order because the November 6, 2018, election was "imminent" and courts are reticent to change the status quo "when elections are fast approaching." Dkt. 33 at 2. Plaintiffs did not delay in their filing of this suit and the time prior to the election was too short to provide preliminary or permanent relief. *See generally Nat'l Right to Life*, 323 F.3d 684; *id* at 692 (noting that "courts are reluctant to hastily decide the[ ] outcomes [of election cases], and thus, as a practical matter, we doubt that even expedited procedures would have "resolved" this case in time for NRLC to have effectively participated in the 2000 election.").

Likewise, "there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* at 691. This inquiry is far less stringent than the ordinary standing inquiry. The "question is 'whether the controversy [is] *capable* of repetition and not . . . whether the claimant ha[s] demonstrated that a recurrence of the dispute was more probable than not.'" *Missourians for Fiscal Accountability v. Klahr,* 830 F.3d 789, 795 (8th Cir. 2016) (quoting *Honig v. Doe,* 484 U.S. 305, 318 n. 6 (1988) (emphasis in original)). The Eighth Circuit has made clear that Plaintiffs invoking this exception need not provide that the exact same facts will arise again so long as similar facts are likely to give rise to similar challenges. *See Nat'l Right to Life,* 323 F.3d at 692 ("We are reluctant to draw such a narrow scope of probability. . . . Viewed together, these and other scenarios make it reasonably likely, in our view, that NRLC will again find itself in conflict with the [challenged law]. This satisfies the 'capable of repetition' prong of the mootness exception."); *see also FEC v. Wisconsin Right to Life*, 551 U.S. 449, 463 (2007)

("Requiring repetition of every 'legally relevant' characteristic of an as-applied challenge—down to the last detail—would effectively overrule this statement by making this exception unavailable for virtually all as-applied challenges. History repeats itself, but not at the level of specificity demanded by the FEC.").

The underlying facts alleged that led to the unconstitutional burdens on Plaintiffs' right to vote prior to the 2018 election have not meaningfully changed. The Secretary is still enforcing the challenged statute. And the Secretary has confirmed that he intends to require all voters to have a "valid" address that matches the central voter file. Dkt. 54 at 16 ("[T]he counties maintain a portion of the databases within the CVF specific to that county, which contains the possible address ranges in that county."). As alleged in the complaint, Plaintiffs are Native Americans living on Reservations or Reservation Trust Land in North Dakota. 2d Am. Compl. ¶¶ 53, 64, 82, 97, 106. As such, they are far more likely to not have a residential street address; to not have an ID or supplemental document with their residential street address; to have a residential street address on their identification that is considered "invalid"; or to not have a qualifying voter ID when it is time to vote again. *See generally* 2d Am. Compl. The burdens that Plaintiffs faced prior to the 2018 election—and which required the Secretary to take action to resolve—are likely to recur for Plaintiffs and other Native Americans across the state in every forthcoming election.[4]

---

[4] In election cases, courts have often relaxed the second prong of the test and not required proof that the same harm is likely to recur to the same parties so long as it is likely to recur. *See Lawrence v. Blackwell*, 430 F.3d 368, 372 (6th Cir. 2005) ("Even if the court could not reasonably expect that the controversy would recur with respect to Lawrence or Shilo, the fact that the controversy almost invariably will recur with respect to some future potential candidate or voter in Ohio is sufficient to meet the second prong because it is somewhat relaxed in election cases. Courts have applied the capable of repetition yet evading review exception to hear challenges to election laws even when the nature of the law made it clear that the plaintiff would not suffer the same harm in the future.") (citing *Rosario v. Rockefeller,* 410 U.S. 752, 756 n. 5 (1973) and *Dunn v. Blumstein,* 405 U.S. 330, 333 n.2 (1972))); *see also McLain v. Meier*, 637 F.2d 1159, 116 n. 5 (8th Cir. 1980)

For all these reasons, the Secretary does not—and cannot—contend that the problems raised in Plaintiffs' complaint are not *capable* of repetition. This Court should not dismiss their claims by relying on Plaintiffs' fleeting status after this Court issued a stipulated order allowing them to vote, and the Secretary rushed to enlist local officials—including law enforcement officers—to provide Plaintiffs with the necessary paperwork to vote. Instead, since the "capable of repetition yet evading review" standard applies, this Court should analyze Plaintiffs' as-applied challenge to the constitutionality of the North Dakota voter ID and residential street address requirements in light of the burdens Plaintiffs faced at the time of the filing of the lawsuit. The Supreme Court has explained:

> The 'capable of repetition, yet evading review' doctrine, in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks. The construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held.

*Storer v. Brown,* 415 U.S. 724, 737 n.8 (1974) (adjudicating the dispute based on the facts presented prior to the election). The facts alleged in Plaintiffs' complaint of the Secretary's implementation of the law in the run up to the 2018 election provide important information about the Secretary's construction of the statute and the statute's operation on Reservations and as applied to Native Americans. Thus, this Court's proper application of the capable of repetition yet evading review standard vitiates the Secretary's challenge to the Individual Plaintiffs' claims.

The Secretary also contends that the Individual Plaintiffs fail to state a claim because they have "self-help options" available to them, such as "obtaining a free, non-drivers ID with the DOT," dkt. 54 at 37, or "contact[ing] the county auditor or 9-1-1 coordinator to cure [the

---

("Regardless of McLain's candidacy in any future election, election law controversies tend not to become moot.").

inaccurately assigned addresses] and consequently update[ing] [the] information with the DOT or county auditor," *id.* at 35.; *see also id.* at 13, 17, 38. But, of course, the relative burdens of these "self-help" options are factual questions at the crux of this case. Moreover, the Secretary oddly seeks to dismiss *all* of plaintiffs' claims for failure to state a claim without addressing the legal standards and elements of *any* of their claims or explaining why their allegations do not meet those standards.

The Individual Plaintiffs have alleged facts sufficient to support all of their causes of action. In support of their undue burden on the right to vote claims (Counts I & II), they have alleged that the challenged scheme imposes a severe and discriminatory burden on their right to vote and promotes no legitimate state interest. *See, e.g.*, 2d Am. Compl. at ¶¶ 256-276. At this stage, this Court must take those allegations as true. The *Anderson-Burdick* balancing test for assessing burdens on the right to vote requires a careful balancing of the burdens of a challenged procedure against the State's asserted interests. *See Burdick v. Takushi,* 504 U.S. 428, 433 (1992). That inquiry is necessarily fact-specific. Thus, at this stage, the Secretary's self-serving factual declaration that "the inconvenience of going to the DMV, gathering required documents, and posing for a photograph, does not qualify as a substantial burden on [plaintiffs'] right to vote," dkt. 54 at 38, or that they simply have to jump through all the "self-help" hoops (*i.e.*, burdens) associated with the voter ID law in order to vote, cannot form the basis for dismissal. Plaintiffs have contended otherwise and that is a factual question that this Court will have to decide upon a full evidentiary record.

The Individual Plaintiffs' other claims are similarly fact-specific and cannot be resolved on a motion to dismiss. Under Count III, Plaintiffs have alleged arbitrary and disparate treatment of eligible voters in violation of *Bush v. Gore*. 2d Am. Compl.  at ¶¶ 277-281. The Secretary's

motion to dismiss does not address this allegation at all. Under Court V and Count VII,[5] Plaintiffs have alleged intentional discrimination (which would not require the same showing of burden as an *Anderson-Burdick* claim). *Id.* at ¶¶ 282-284, 290-291. This, too, is a highly fact-bound inquiry. *Veasey v. Abbott,* 830 F.3d 216, 230 (5th Cir. 2016) (en banc) ("Legislative motivation or intent is a paradigmatic fact question.") (internal quotation marks and citation omitted). The Secretary has not addressed this claim either. Finally, Count VI requires a careful analysis of whether the challenged scheme deprives Native Americans of an equal opportunity to participate in the electoral process in violation of Section 2 of the VRA. Section 2's totality of the circumstances analysis also requires a careful fact-bound analysis on a complete record. *See id.* at 256 n. 52 (noting the "importance of the fact-bound Section 2 analysis" in determining which voter ID requirements run afoul of Section 2 and which do not). Once again, the Secretary does not address this claim in his motion to dismiss. The Individual Plaintiffs have alleged facts sufficient to support all claims in the amended complaint and the Secretary's lackluster attempt to dismiss their claims in their entirety should be denied.

The Individual Plaintiffs' particular allegations regarding their circumstances underscore why dismissal would be inappropriate. The Secretary's suggestion that Plaintiff Twinn simply obtain an ID is particularly inapt given that she has specifically alleged that she does not possess and cannot obtain the necessary documentation to obtain a valid ID for the purposes of voting. *See* 2d Am. Compl. at ¶¶ 100-105. Moreover, while the Secretary attempts to rely on *Crawford v. Marion County Election Board* to support the categorical dismissal of Plaintiff Twinn's claims, the Supreme Court decided *Crawford* at the summary judgment phase. 553 U.S. 181, 187 (2008). The fact that the Supreme Court found that the record in that case was "not sufficient to support a

---

[5] Plaintiffs note that they inadvertently omitted the label "Count IV" and apologize for their error.

facial attack" of an Indiana statute does not resolve Plaintiff Twinn's as-applied claims here.[6] *Id.* at 189.

The Secretary's arguments regarding Plaintiff Yellow Fat are also misplaced. Mr. Yellow Fat alleged that he lacks identification or supplemental documentation with the residential address previously indicated by the county sheriff, and that this address—1343 92nd Street—does not actually represent the "fixed permanent dwelling" where he resides, as is required by North Dakota law. 2d Am. Compl. ¶¶ 115-17. After filing suit, Mr. Yellow Fat was visited, unannounced, by the county sheriff who served upon him a document reflecting this same address, indicating that it could be used for the November 2018 election. *Id.* ¶ 117. In addition to the Secretary's flawed argument that Mr. Yellow Fat fails to state a claim because he could have taken "self-help" measures, the Secretary disputes that the documentation he was provided is limited to the 2018 election, contending that the cover letter attached to the document is not limited to the 2018 election. This is not an argument that can be decided upon a motion to dismiss, and certainly not in the Secretary's favor. All reasonable inferences must be drawn in favor of the plaintiff, not the Secretary. The cover letter does not purport to suffice as proof of Mr. Yellow Fat's address for voting purposes, rather it purports to attach a document that could be so used as that proof. That attached document is expressly limited to the November 2018 election. Dkt. 34-3. And, Mr. Yellow Fat's claim cannot be dismissed based upon the Secretary's suggestion that he just ask for a new document for future elections. Dkt. 54 at 39. That is among the unlawful burdens challenged in this suit.

The Secretary argues Plaintiff Jackson and Plaintiff Longie's irregular address that led to Plaintiff Jackson's absentee ballot being rejected can also be updated through "self-help" and

---

[6] Indeed, *Crawford* makes clear that its ruling relied heavily on the lack of evidence produced by Plaintiffs at the summary judgment stage and the nature of a facial challenge. *Id.* at 200-203.

therefore "Jackson and Longie [are] in a situation no different than anyone else who must rely on supplemental documentation until an ID is properly updated." Dkt. 54 at 35. Not so. On October 14, 2018, Defendant Jackson attempted to vote for the first time by filling out an application for an absentee ballot. 2d Am. Compl. ¶ 56. The address Plaintiff Jackson provided on his absentee ballot was the only address he had for his residence and was the address that appeared on his North Dakota issued identification. *Id.* ¶¶ 54, 55. But, The Benson County Auditor rejected Plaintiff Jackson's absentee ballot request because the address Plaintiff Jackson provided "does not match the address in the ND DOT database or is an invalid address." *Id.* ¶ 57. Through no fault of his own and with no warning, it became substantially more difficult for Plaintiff Jackson to vote than other North Dakota voters. Further, Plaintiffs' Second Amended Complaint provides ample evidence this confusion and irregular addressing is substantially more likely to occur within reservation communities. *Id.* ¶¶ 27, 30, 31, 38, 58-63, 71-73, 76, 85, 90-93, 107-112. Plaintiff Longie, who lives at the same residence as Plaintiff Jackson, was also forced to obtain additional supplemental documentation due to her irregular address, despite having North Dakota-issued identification listing her residential address. These burdens are among the unlawful burdens being challenged by this lawsuit and cannot be resolved by a motion to dismiss.

Finally, Plaintiffs Leslie and Clark Peltier likewise faced additional burdens when attempting to vote due to the mismatch between what they had believed to be their address and the State's "My Voting Information" online tool. *Id.* ¶¶ 88, 90. The Peltiers were also told conflicting information about where to vote from poll workers. *Id.* ¶¶ 86-89. Whether the irregularities and confusion faced by the Peltiers constituted an undue burden on their right to vote lies at the heart of the claims brought by Plaintiffs. The proper evaluation of those claims cannot be resolved at the motion to dismiss stage.

**CONCLUSION**

For the foregoing reasons, the Secretary's motion should be denied.

Dated: August 7, 2019

Respectfully submitted,

Matthew Campbell,
NM Bar No. 138207, CO Bar No. 40808
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
Phone: (303) 447-8760
mcampbell@narf.org

Jacqueline De León
CA Bar No. 288192, DC Bar No.1023035
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
jdeleon@narf.org

Joseph M. Sellers, Bar No. 318410
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
jsellers@cohenmilstein.com

Timothy Q. Purdon (ND# 05392)
ROBINS KALPAN LLP
1207 West Divide Avenue
Suite 200
Bismarck, ND 58503
T: (701) 255-3000
F: (612) 339-4181
TPurdon@RobinsKaplan.com

/s/ Mark P. Gaber
Mark P. Gaber
D.C. Bar No. 988077
Danielle M. Lang
D.C. Bar No. 1500218
Molly Danahy
D.C. Bar No. 1643411
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
dlang@campaignlegal.org
mdanahy@campaignlegal.org

*Counsel for Plaintiffs*